# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| SOFIENE ROMDHANI, MICHELLE MALONEY and BOBBI JOE ZELLER, ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) ) | Civil Action No. 07-715 (JJF) |
| EXXON-MOBIL CORPORATION ) ) | |
| Defendant. ) ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND TO STRIKE

**MARTIN & WILSON, P.A.**

*/s/ Timothy J. Wilson*

**TIMOTHY J. WILSON, ESQ.** (DE Bar ID 4323)
**JEFFREY K. MARTIN, ESQ.** (DE Bar ID 2407)
1508 Pennsylvania Ave.
Wilmington, DE 19806
E-mail – twilson@martinandwilson.com
(302) 777-4681

Debra S. Katz, Esq.
Avi Kumin, Esq.
Katz, Marshall & Banks, LLP
1718 Connecticut Ave., N.W., Sixth Floor
Washington, DC 20009
(202) 299-1140 (telephone)
Attorneys for Plaintiffs Sofiene Romdhani,
      Michelle Maloney, and Bobbi Joe Zeller

Dated: January 14, 2008

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES................................................................iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS....................1

SUMMARY OF ARGUMENT................................................................2

STATEMENT OF FACTS....................................................................3

ARGUMENT................................................................................4

I.      PLAINTIFF CONSENTS TO THE DISMISSAL OF COUNTS VII,
        VIII AND IX......................................................................4

II.     THE QUESTIONED PORTIONS OF PLAINTIFF'S COMPLAINT ARE
        DIRECTLY RELEVANT TO PLAINTIFF'S CLAIMS AGAINST
        DEFENDANT, AND SHOULD NOT BE STRICKEN...............................4

        A.      Standard of Review....................................................5

        B.      Because the Admissibility of Agency Proceedings Cannot Be
                Determined at This Early Stage, the Court Should Not Strike
                Paragraph 40..........................................................6

        C.      Paragraphs 50, 51, 69, 70, 76, And 77 of the Complaint are Relevant
                to Religious Discrimination Alleged by Plaintiffs Against Defendant......8

        D.      Under Totality of the Circumstances Test, Paragraphs 71 and 75 of the
                Complaint are Relevant to Retaliatory Animus and Adverse
                Actions Suffered by the Plaintiffs......................................10

CONCLUSION..............................................................................12

## TABLE OF AUTHORITIES

**CASES**                                                                                           **Page**

*Burlington Northern and Santa Fe Ry. Co. v. White,*
    ___U.S.___, 126 S. Ct. 2405 (2006)............................................................11, 12

*Coleman v. Home Depot, Inc.,*
    306 F.3d 1333 (3d Cir. 2002)...............................................................6

*Despanie v. Henderson,*
    32 Fed. Appx. 390 (9th Cir. 2002)......................................................11

*Farrell v. Planters Lifesavers Co.,*
    206 F.3d 271 (3d Cir. 2000)................................................................10

*Hakanson-Black v. United Pacific Ins. Co.,*
    865 F.2d 264, 1988 WL 141206 (9th Cir. 1998)...................................6

*McClure v. Mexia Ind. Sch. Dist.,*
    750 F.2d 396 (5th Cir. 1985)..............................................................6

*Merit v. Southeastern Pa. Transit Auth.,*
    315 F. Supp. 2d 689 (E.D. Pa. 2004)..................................................10

*Olson v. Largo-Springhill Ltd. P'ship,*
    919 F. Supp. 847 (D. Md. 1995).........................................................6

*Oncale v. Sundowner Offshore Services, Inc.,*
    523 U.S. 75 (1998)............................................................................11

*Schwarzkopf Tech. Corp. v. Ingersoll Cutting Tool Co.,*
    820 F. Supp. 150 (D. Del. 1992).........................................................5

*Seidel v. Lee,*
    954 F. Supp. 810 (D. Del. 1996)......................................................5, 9

*Taylor v. Small,*
    350 F.3d 1286, 1293 (D.C. Cir. 2003)................................................11

*Toll v. American Airlines, Inc.,*
    166 Fed. Appx. 633 (3d Cir. 2006).....................................................11

*Woodson v. Scott Paper Co.,*
    109 F.3d 913, 920-921 (3d Cir. 1997)...................................................10

STATUTES

Del. Code Ann. Tit. 19, § 710.............................................................2

Del. Code Ann. Tit. 19, § 712 (c)(3).....................................................8

TREATISES

S. Baicker-McKee *et al.*, *Federal Civil Rules Handbook* (2008).................4, 5, 9

Wright & Miller, *Federal Practice and Procedure: Civil* 3d (2007) .............4, 5, 7

UNREPORTED DECISIONS

*Abbott Diabetes Care, Inc. v. Dexcom, Inc.,*
    2007 WL 2892707 (D. Del. 2007)...................................................5

*CFMT, Inc. v. YieldUp Intern. Corp.,*
    1996 WL 33140642 (D. Del. Apr. 5, 1996)........................................6, 9

*Defazio v. River City Brass Band, Inc.,*
    2007 WL 3072257 (W.D. Pa. Oct. 19, 2007)......................................6

*Federal Deposit Ins. Corp v. Parkway Exec. Office Ctr.,*
    1997 WL 535164 (E.D. Pa. Aug. 18, 1997)......................................4

*Greiff v. T.I.C. Enterprises, L.L.C.,*
    2004 WL 115553 (D. Del. Jan. 9, 2004)..........................................5

*McKesson Information Solutions, LLC v. Trizetto Group, Inc.,*
    2005 WL 914776 (D. Del. Apr. 20, 2005)........................................5

*Papacoda v. A.I. Dupont Hosp. for Children,*
    2006 WL 1789077 (E.D. Pa. June 26, 2006)....................................5

*Peltz v. Dahlgren's Mailing Service, Inc.,*
    2002 WL 1000162 (D. Del. Apr. 24, 2002)......................................5

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs Sofiene Romdhani, Michelle Maloney, and Bobbi Joe Zeller, through counsel, hereby submit the following Opposition to Defendant's Motion to Dismiss and To Strike. As discussed more thoroughly below, since Mr. Romdhani's Delaware Discrimination in Employment Act ("DDEA") claims overlap entirely with his Title VII claims, he consents to the dismissal of his DDEA claims. Plaintiff opposes, however, Defendant's request to strike portions of Plaintiffs' complaint, as the questioned portions are directly relevant to plaintiffs' disputes with defendant, and as Defendant fails to meet the high standard required for a motion to strike.

On December 20, 2007, Defendants filed this Motion as its responsive pleading to Plaintiffs' Complaint. Plaintiffs hereby file this opposition.

1

**SUMMARY OF ARGUMENT**

1.  Because his remedies under the Delaware Discrimination in Employment Act (19 Del. C. § 710 *et seq.*) ("DDEA") overlap entirely with his remedies under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*) ("Title VII"), Plaintiff Sofiene Romdhani consents to dismissal of his DDEA claims.

2.  The sections of the Complaint which defendant seeks to strike are directly relevant to the dispute between the parties. Defendant's motion to strike does not meet the high threshold for a motion to strike, and should be denied.

## STATEMENT OF FACTS

Plaintiffs' Sofiene Romdhani, Michelle Maloney, and Bobbi Joe Zeller, former employees of Defendant ExxonMobil, filed their Complaint against ExxonMobil on November 5, 2007. Plaintiffs allege in their complaint that Exxon discriminated against each of them on the basis of race and religion, and retaliated against them for engaging in protected activity. See Compl. In addition, Plaintiff Sofiene Romdhani alleges discrimination on the basis of national origin.

Plaintiff Romdhani's charges of religious and national origin discrimination, brought pursuant to Title VII and the DDEA, appear in this Complaint at Counts IV through IX. Ms. Maloney and Ms. Zeller have both filed charges of discrimination with the Delaware Department of Labor ("DDOL") and the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging, *inter alia*, religious discrimination and retaliation. See Compl. ¶¶ 61, 83. Both Ms. Maloney and Ms. Zeller have since requested right-to-sue letters from the DDOL. See Email from A. Kumin to J. Cutler, DDOL Administrator (Jan. 9, 2008), attached hereto as Exhibit A. The DDOL has indicated that it is inclined to promptly issue such right-to-sue letters to Ms. Maloney and Ms. Zeller, given the pendency of claims by them against Exxon in court. See DDOL Preliminary Findings and Recommendations (Dec. 27, 2007), attached hereto as Exhibit B.

## ARGUMENT

### I.    Plaintiff Consents to the Dismissal of Counts VII, VIII, and IX

In its Motion to Dismiss, Exxon cites cases which have held that, when a DDEA claim is brought in federal court and the plaintiff has also brought either a Title VII or ADEA claim, the DDEA claim should be dismissed. See Mem. In Supp. at 7. This is because the coverage and remedies available under both Title VII and the ADEA overlap entirely with the DDEA. Because dismissal of his DDEA claims will not afford him less protection than that available to him under Title VII, Mr. Romdhani consents to the dismissal of Counts VII, VII, and IX of the Complaint.

### II.    The Questioned Portions of Plaintiff's Complaint Are Directly Relevant to Plaintiffs' Claims Against Defendant, And Should Not Be Stricken

Defendant's Motion to Strike is contrary to established Supreme Court and Third Circuit precedent, and improperly seeks to eliminate from the Complaint allegations directly relevant to the Parties' disputes. "A motion to strike redundant, immaterial, impertinent, or scandalous matter is also viewed with disfavor as a time-waster. The court will not strike such matter unless it bears no possible relation to the parties' dispute, or could confuse the issues." S. Baicker-McKee et al., Federal Civil Rules Handbook, at 400-01 (2008) (citing cases); Wright & Miller, Federal Practice and Procedure: Civil 3d § 1382, at 436 (2007) (motions to strike under Rule 12(f) generally considered "time-wasters"); accord Federal Deposit Ins. Corp. v. Parkway Exec. Office Ctr., 1997 WL 535164, at *3 (E.D. Pa. Aug. 18, 1997) (motions to strike are "viewed with disfavor because of their potential to be used as a dilatory tactic").

Such motions to dismiss are strongly disfavored and should be denied where, as here, it cannot be said with certainty that the challenged allegations are wholly unrelated to any issues relevant to this case.

4

**A.    Standard of Review**

As Exxon freely concedes in its memorandum, motions to strike under Rule 12(f) are heavily disfavored. See, e.g., Seidel v. Lee, 954 F. Supp. 810, 812 (D.Del. 1996); Schwarzkopf Tech. Corp. v. Ingersoll Cutting Tool Co., 820 F. Supp. 150, 154 (D. Del. 1992); see generally Wright & Miller, § 1380 at 434 (collecting cases); Federal Civil Rules Handbook, at 400-01 (burden on party moving to strike is "formidable") (citing cases).  As a result, they are "rarely granted." Papacoda v. A.I. Dupont Hosp. for Children, 2006 WL 1789077, at *6 (E.D. Pa. June 26, 2006).  "When ruling on such a motion, 'the [c]ourt must construe all facts in favor of the nonmoving party" and in favor of the challenged pleading.  Abbott Diabetes Care, Inc. v. Dexcom, Inc., 2007 WL 2892707, at *2 (D. Del. 2007); McKesson Information Solutions, LLC v. Trizetto Group, Inc., 2005 WL 914776, at *1 (D. Del. Apr. 20, 2005); see generally Federal Civil Rules Handbook, at 400 (courts generally "resolve all doubts in favor of denying the motion to strike.").  Courts are instructed not to grant a motion to strike "unless it appears to a certainty that . . . [the movant] would succeed despite any state of the facts, which could be proved in support of the [challenged material]." Abbott Diabetes Care, 2007 WL 2892707, at *2 (quoting Greiff v. T.I.C. Enterprises, L.L.C., 2004 WL 115553, at *2 (D. Del. Jan. 9, 2004); McKesson Information Solutions, 2005 WL 914776, at *1.

In fact, a motion to strike should not be granted "unless the matter is clearly irrelevant to the litigation," Seidel v. Lee, 954 F. Supp. 810, 812 (D. Del. 1996), or where the "defendant cannot reasonably be expected to frame a responsive pleading or to defend against those portions of the complaint which the defendant contends constitutes a 'redundant, immaterial, impertinent, or scandalous matter.'" Peltz v. Dahlgren's Mailing Service, Inc., 2002 WL 1000162, at *1 (D. Del. Apr. 24, 2002).  Motions to strike are generally appropriate only "when they serve to

5

expedite, rather than delay." CFMT, Inc. v. YieldUp Intern. Corp., 1996 WL 33140642, at *1 (D. Del. Apr. 5, 1996).

**B.    Because the Admissibility of Agency Proceedings Cannot Be Determined at This Early Stage, the Court Should Not Strike Paragraph 40**

Exxon cites only one case from another district court, Defazio v. River City Brass Band, as its basis for striking Paragraph 40 of the Complaint, which references the DDOL's positive determination regarding Mr. Romdhani's charge of discrimination and Exxon's refusal to participate in DDOL-ordered conciliation. See Def.'s Mem. In Supp. at 11. Several circuit courts have ruled, however, that such information is not only relevant, but that it constitutes reversible error for a district court to refuse to permit the introduction of an EEOC or other investigative agency determination at trial. See, e.g., McClure v. Mexia Ind. Sch. Dist., 750 F.2d 396, 399 (5th Cir. 1985); Hakanson-Black v. United Pacific Ins. Co., 865 F.2d 264, 1988 WL 141206, at *3 (9th Cir. 1988) ("As a general rule, administrative reports and findings are relevant and admissible."); accord Olson v. Largo-Springhill Ltd. P'ship, 919 F. Supp. 847, 852 (D. Md. 1995) ("administrative findings may be considered by the court"), aff'd 1996 WL 102689, at *1 (4th Cir. Feb. 1, 1996).

The Third Circuit Court of Appeals has not adopted a blanket rule on this issue, but has instead left it up to district courts to decide, on a case-by-case basis, whether information regarding investigative agency proceedings is admissible or non-admissible. See Coleman v. Home Depot, Inc., 306 F.3d 1333, 1345 (3d Cir. 2002) ("the decision of whether or not an EEOC Letter of Determination is more probative than prejudicial is within the discretion of the trial court, and to be determined on a case-by-case basis"). At this early stage of the proceedings, and without any discovery having been performed, it is far too early to tell whether the information pertaining to the DDOL's investigative will prove to be admissible or not. As the EEOC's report

may prove not only relevant but fully admissible, there is certainly insufficient grounds to remove the information wholesale from the complaint through the strongly disfavored mechanism of a motion to strike. See Federal Civil Rules Handbook, at 401 ("[I]f any doubt remains as to the potential later relevance of the contested allegations, the motion [to strike] will be denied.") Were the motion to strike granted, Plaintiffs would suffer great prejudice, as it would significantly frustrate their ability to perform discovery on this matter in order to prove the ultimate admissibility of the DDOL investigative information, as the Third Circuit requires. Exxon, in contrast, will suffer no prejudice if the motion to dismiss is denied – if, following discovery, the Court determines the material to be inadmissible, the paragraph in question can simply be blacked out or otherwise redacted before any copy of the Complaint is submitted to the jury.

With respect to Defendant's refusal to attend a DDOL-ordered conciliation meeting, this factual reference is an important part of Plaintiffs' showing that Defendants have compounded their injuries in this case by refusing to investigate their complaints of discrimination or take any appropriate remedy. Plaintiffs allege in their Complaint that they repeatedly complained to Exxon management about discriminatory behavior, but that Exxon management refused to investigate the matter or take the complaints seriously (see Compl. ¶¶ 3, 21, 22, 26, 33); that they complained to Exxon headquarters' Human Resources department, but that Exxon headquarters similarly failed to investigate the matter or take it seriously (see Compl. ¶¶ 36, 52, 56); and that Exxon management also refused to investigate the reports of racial and religious discrimination made by several other Arab and Muslim coworkers of the Plaintiffs (see Compl. ¶¶ 35, 36). Exxon's utter refusal, without explanation, to attend the DDOL's *mandatory* conciliation meeting simply continued this pattern of unlawful behavior. Indeed, attendance at DDOL

7

conciliation meetings is legally required by statute. See Del. Code Ann. tit. 19, § 712(c)(3) ("All cases resulting in a 'reasonable cause' determination will require the parties to appear for compulsory conciliation."). The jury may certainly conclude that Exxon's thumbing its nose at the DDOL and at a conciliation meeting required by law is relevant to the Company's failure to promptly remedy Plaintiffs' complaints of discrimination, to a pattern of unlawful behavior by Defendant, and most certainly to possible punitive damages to be assessed against Exxon in this case.

Accordingly, the Court should deny Defendant's motion to strike paragraph 40 of the Complaint.

### C. Paragraphs 50, 51, 69, 70, 76, and 77 of the Complaint are Directly Relevant to Religious Discrimination Alleged by Plaintiffs Against Defendant

Defendant seeks to have stricken from Plaintiffs' Complaint paragraphs relating to religious discrimination, even though such allegations of religious discrimination are clearly relevant to the dispute between the Parties. As is perfectly evident from the paragraphs of the Complaint cited by Defendant – as well as Counts IV, V, VI, and VII of the Complaint – Plaintiffs Sofiene Romdhani, Michelle Maloney, and Bobbi Joe Zeller allege that Exxon discriminated against them because of their religion, in addition to their race and racial associations.[1] As the Complaint clearly indicates, Plaintiffs Maloney and Zeller filed charges of discrimination with the DDOL alleging, *inter alia*, religious discrimination. See Compl. ¶ 61 ("On October 2, 2007, Ms. Maloney initiated a Charge of Discrimination with the DDOL, alleging discrimination based on religion..."), ¶ 83 (same, with respect to Ms. Zeller). Defendant is well aware, both from Plaintiffs' Complaint and from having been directly

---

[1] Mr. Romdhani also alleges discrimination on the basis of his national origin. See Compl., Counts IV, V, VI, VII, and IX.

8

contacted by the DDOL regarding Ms. Maloney's and Ms. Zeller's charges of discrimination, that Ms. Maloney and Ms. Zeller allege discrimination on the basis of their religion. It cannot be said, therefore, that the questioned paragraphs "bear[] no possible relation to the parties' dispute," in which case a court must not grant a motion to strike. Federal Civil Rules Handbook, at 400-01; accord Seidel, 954 F. Supp. at 812.

Plaintiffs Maloney and Zeller have already requested from the DDOL the issuance of a right-to-sue letter, in order to seek leave to amend the Complaint to include their claims of religious discrimination and retaliation. See Exhibit A. This was in response to the DDOL's issuance of a determination that it was inclined to issue such right-to-sue notices, given the pendency of claims by Ms. Maloney and Ms. Zeller in court. See Exhibit B. As soon as Plaintiffs Maloney and Zeller receive such right-to-sue letters (which Plaintiffs' counsel was informed by the DDOL Administrator would be within a matter of days), Plaintiffs will seek leave to amend their Complaint to add in their DDEA claims.[2]

Furthermore, granting Defendant's motion would only serve to confuse and delay these proceedings. The only suitable purpose for a motion to strike is "to expedite, rather than delay," the proceedings of the case. CFMT, 1996 WL 33140642, at *1. Plaintiffs Maloney and Zeller will promptly, upon issuance of a right-to-sue letter, seek leave to amend the Complaint to add their claims of religious discrimination. Were the Court to strike these paragraphs of the Complaint relating to religious discrimination, therefore, it will then have to add them back in within a very short time period due to their obvious relevance to claims of religious

---

[2] The cases cited by Defendant in support of its Motion to Dismiss would not apply to Ms. Maloney and Ms. Zeller, who have brought no claims under Title VII, the federal statute whose remedies overlaps with the DDEA. Ms. Maloney and Ms. Zeller thus have asserted no federal claim that could provide them relief for their claims of religious discrimination, retaliation for complaining about religious discrimination, or retaliation for complaining about sexual harassment.

discrimination, as Defendant freely concedes in its Motion. This would require an unnecessary round of briefing by the parties, unnecessary motion consideration by this Court, and unnecessary delay to this litigation as a result.[3]

Accordingly, as paragraphs 50, 51, 69, 70, 76, and 77 of the Complaint relate to clear areas of dispute between the Parties, and as granting a motion to strike would serve to delay rather than to expedite this litigation, the Court should deny Defendant's motion to strike.

### D.    Under the Totality of the Circumstances Test, Paragraphs 71 and 75 of the Complaint are Relevant to Retaliatory Animus and Adverse Action Suffered by the Plaintiffs

Misstating Third Circuit law and citing cases overruled by subsequent Supreme Court precedent, Defendant seeks to have stricken paragraphs of the Complaint directly related to mistreatment of Ms. Maloney and Ms. Zeller by their Exxon supervisors. First, Defendant raises a complete red herring by erroneously suggesting, without reference to any authority, that each individual allegation in Plaintiff's Complaint must itself constitute an adverse action. To the contrary, the Third Circuit has emphasized that, in a discrimination or retaliation complaint, it is the "totality of the circumstances" that is important, and the plaintiff can prevail by showing a "pattern of antagonism." Merit v. Southeastern Pa. Transit Auth., 315 F. Supp. 2d 689, 707 (E.D. Pa. 2004) (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000) and Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)). Ms. Maloney's and Ms. Zeller's allegations that after they converted to Islam and complained about religious discrimination, they had paychecks inappropriately withheld and were berated for taking sick

---

[3] At a minimum, the Court should deny Defendants' motion to strike these paragraphs without prejudice and wait to consider Plaintiffs' upcoming motion for leave to amend the Complaint to include their claims of religious discrimination, as the decision on that motion will determine the strikeability of these paragraphs.

leave even while suffering from cancer and throwing up at work, are thus relevant to their overall showing of a pattern of antagonism. No further showing is required.

Even were the Court to accept Defendant's legally erroneous contention that each such allegation must independently meet the "adverse action" threshold, at this early stage of the proceedings, where all inferences must be drawn in Plaintiffs' favor, it is clear that Plaintiffs could make such a showing. Defendant's motion is based on case law since overruled by the Supreme Court. In <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, ___ U.S. ___, 126 S.Ct. 2405 (2006), the Supreme Court unanimously held that a challenged action is considered "materially adverse" when "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" <u>Id.</u> at 2415. The Supreme Court emphasized that this determination is a jury question. <u>Id.</u> at 2415-16. This is because this determination "depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" <u>Id.</u> at 2417 (quoting <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 81-82 (1998). Because a jury must ultimately make the determination as to whether the conduct in this case constituted an adverse action, it is completely inappropriate for the references to such conduct to be stricken from the Complaint.

Indeed, Defendant cites several cases, decided before <u>Burlington Northern</u>, which ruled that only a few pre-determined types of job actions could constitute possible adverse actions, without consideration of the circumstances of the particular case, as the Supreme Court now requires.[4]  While Defendant incorrectly suggests that a temporary delay in receipt of a benefit

---

[4] <u>See, e.g.</u>, Def.'s Mem. In Supp. at 15, citing <u>Toll v. American Airlines, Inc.</u>, 166 Fed. Appx. 633, 636 (3d Cir. 2006) (decided before <u>Burlington Northern</u>), <u>Taylor v. Small</u>, 350 F.3d 1286, 1293 (D.C. Cir. 2003), and <u>Despanie v. Henderson</u>, 32 Fed. Appx. 390, 392 (9th Cir. 2002).

cannot constitute an adverse employment action (see Def.'s Mem. In Supp. at 15), this is directly contrary to the more recent Burlington Northern decision. There, the Supreme Court specifically upheld the jury's determination that the temporary delay of paychecks to the plaintiff *did* constitute an adverse action, even where she later received the money in question. See Burlington Northern, 126 S.Ct. at 2417. The Court emphasized that "many reasonable employees" would find such temporary delay of benefits "to be a serious hardship." Id.

Accordingly, as the allegations in paragraphs 71 and 75 must be considered by the jury in terms of the totality of the circumstances, and as these events may be found by a jury to be adverse actions of their own right, Defendant's motion to strike these paragraphs 71 and 75 must be denied.

## CONCLUSION

For the reasons set forth above, Plaintiff consents to the dismissal of Counts VII, VIII, and IX of the Complaint. Defendant's Motion to Strike various paragraphs of Plaintiffs' Complaint is, however, unwarranted and inappropriate, given the clear relevance of those paragraphs to this dispute between the parties and the heavily disfavored nature of motions to strike. Accordingly, the Court should deny Defendant's Motion to Strike.

Respectfully submitted,

**MARTIN & WILSON, P.A.**

/s/ Timothy J. Wilson

**TIMOTHY J. WILSON, ESQ.** (DE Bar ID 4323)
**JEFFREY K. MARTIN, ESQ.** (DE Bar ID 2407)
1508 Pennsylvania Ave.
Wilmington, DE 19806
E-mail – Twilson@martinandwilson.com
(302) 777-4681

Debra S. Katz, Esq.
Avi Kumin, Esq.
Katz, Marshall & Banks, LLP
1718 Connecticut Ave., N.W., Sixth Floor
Washington, DC 20009
(202) 299-1140 (telephone)
(202) 299-1148 (facsimile)
Attorneys for Plaintiffs Sofiene Romdhani,
        Michelle Maloney, and Bobbi Joe Zeller

Dated: January 14, 2008

## CERTIFICATE OF SERVICE

I hereby certify this 14th day of January, 2008, that the foregoing was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following counsel of record that the document is available for viewing and downloading from CM/ECF:

Kathleen Furey McDonough, Esquire
Potter Anderson & Corroon, LLP
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
Attorney for Defendant

**MARTIN & WILSON, P.A.**

_/s/ Timothy J. Wilson_

**TIMOTHY J. WILSON, ESQ.** (DE Bar ID 4323)
**JEFFREY K. MARTIN, ESQ.** (DE Bar ID 2407)
1508 Pennsylvania Ave.
Wilmington, DE 19806
E-mail – Twilson@martinandwilson.com
(302) 777-4681

**EXHIBIT A**

## Avi Kumin

**From:**      Avi Kumin
**Sent:**      Wednesday, January 09, 2008 12:29 PM
**To:**        'julie.cutler@state.de.us'
**Subject:**   Right-to-sue letter request

Ms. Cutler,

This email will serve as written confirmation that I am requesting the issuance of right-to-sue letters on behalf of my clients, Michelle Maloney (No. 07110576W) and Bobbi Joe Zeller (No. 07110571W), who currently have discrimination charges pending with the Department of Labor. I would appreciate it if you could send me the right to sue letter by either fax or email, so that I may move things forward promptly on my end.

Thank you and your staff for your assistance with Ms. Maloney's and Ms. Zeller's charges.

Avi Kumin



Avi Kumin
1718 Connecticut Ave., N.W.
Sixth Floor
Washington, D.C. 20009
Tel: 202-299-1140
Fax: 202-299-1148
Email: Kumin@kmblegal.com
Website: www.kmblegal.com

*The information contained in this e-mail message is intended for the personal and confidential use of the designated recipient(s) named in the address box. Do NOT forward this message to any third party. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by telephone; delete this message from all your files, and return any printouts you may have made to us by regular mail.*

1

**EXHIBIT B**

STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS – OFFICE OF DISCRIMINATION

Bobbi J. Zeller                                          Case No. 07110571W
17b Hillside Road
Wilmington, DE 19804

vs.

EXXONMOBIL
800 Bell,
Houston, TX 77002

PRELIMINARY FINDINGS AND RECOMMENDATIONS

Pursuant to 19 Del. C. § 712 (c) (2), the parties in the above-captioned matter are hereby Noticed of the Department's Preliminary Findings and Recommendations.

1.  The Charge of Discrimination was filed and served upon the Respondent.

2.  The Respondent filed an answer.  If an answer was filed, a copy was served upon the Charging Party.

3.  Based upon the preliminary submissions referenced above, the Department recommends the following action:  **Dismissing the Charge unless additional information is received by January 10, 2008 and which would warrant further investigation.**

*Respondent states that this matter is already being litigated in U.S. District Court.  Accordingly, we will dismiss this case and issue a state notice of right-to-sue unless Charging Party provides information to the contrary.*

Thank you for your cooperation throughout this administrative process.

On behalf of the Department of Labor, Division of Industrial Affairs, Office of Discrimination,

December 27, 2007
                                    _____
                                    Julie Klein Cutler, Administrator

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

17C_DDOL_C-11-D Prelim Determ Dis : 09/07

STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS – OFFICE OF DISCRIMINATION

Michelle L. Maloney                                    Case No. 07110576W
3204 Kildoon Dr.
Newark, DE 19702

vs.

EXXON COMPANY, U.S.A.
540 Jfk Memorial Highway,
Newark, DE 19702

PRELIMINARY FINDINGS AND RECOMMENDATIONS

Pursuant to 19 Del. C. § 712 (c) (2), the parties in the above-captioned matter are hereby Noticed of the Department's Preliminary Findings and Recommendations.

1. The Charge of Discrimination was filed and served upon the Respondent.

2. The Respondent filed an answer. If an answer was filed, a copy was served upon the Charging Party.

3. Based upon the preliminary submissions referenced above, the Department recommends the following action: **Dismissing the Charge unless additional information is received by January 10, 2008 and which would warrant further investigation.**

*Respondent states that this matter is already being litigated in U.S. District Court. Accordingly, we will dismiss this case and issue a state notice of right-to-sue unless Charging Party provides information to the contrary.*

Thank you for your cooperation throughout this administrative process.

On behalf of the Department of Labor, Division of Industrial Affairs, Office of Discrimination,

December 27, 2007

_____
Julie Klein Cutler, Administrator

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

17C_DDOL_C-11-D Prelim Determ Dis : 09/07

Westlaw.

Slip Copy
Slip Copy, 2007 WL 2892707 (D.Del.)
**(Cite as: Slip Copy)**

**H**Abbott Diabetes Care, Inc. v. Dexcom, Inc.
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ABBOTT DIABETES CARE, INC., Plaintiff,
v.
DEXCOM, INC., Defendants.
**C.A. No. 06-514 GMS.**

Sept. 30, 2007.

Mary B. Graham, Rodger Dallery Smith, II, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, for Plaintiff.
Josy W. Ingersoll, Karen Elizabeth Keller, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Brian M. Kramer, David C. Doyle, M. Andrew Woodmansee, Pro Hac Vice, for Defendants.

### MEMORANDUM

GREGORY M. SLEET, United States Chief District Judge.

### I. INTRODUCTION

*1 On August 17, 2006, Abbott Diabetes Care, Inc. ("Abbott") brought this patent infringement action against DexCom, Inc. ("DexCom"). Presently before the court are the following motions: (1) DexCom's motion to strike Abbott's complaint; (2) Dexcom's motion to consolidate this proceeding with C.A. No. 05-590; and (3) Dexcom's motion to stay this proceeding pending reexamination of the patents-in-suit. (D.I.5.) For the reasons that follow, the court will deny DexCom's motion to strike, grant the motion to consolidate this proceeding with C.A. No. 05-590, and stay the consolidated proceeding until the Patent and Trademark Office (the "PTO") has completed the reexamintion of the seven patents-in-suit.

### II. BACKGROUND

#### A. Procedural Background

There are presently two patent infringement cases before this court in which Abbott and DexCom are parties, the 05-590 action and the present action. In the 05-590 action, Abbott alleges that DexCom infringes its U.S. Patent Nos. 6,175,752 (the "752 patent"), 6,284,478 (the "478 patent"), 6,329,161 (the "161 patent"), and 6,565,509 (the "509 patent") (collectively, the "Group I Patents"). Looking to add three more patents to the 05-590 lawsuit, namely U.S. Patent Nos. 6,990,366 (the "366 patent"), 5,899,855 (the "855 patent"), and 6,134,461 (the "461 patent") (collectively the "Group II Patents"), Abbott filed an amended complaint pursuant to Federal Rule of Civil Procedure 15(a) in the 05-590 action. (05-590, D.I.55.) DexCom subsequently filed a motion to strike the amended complaint, which the court granted on August 16, 2006. (D.I.61, 05-590.) Abbott responded by filing the present action, alleging patent infringement of the Group II Patents (D.I.1, 06-514), and DexCom filed the three motions presently before the court. Following the opening brief, Abbott filed an answering brief (D.I.9), to which DexCom responded with a reply brief (D.I.10).[FN1]

> FN1. Additionally, the parties filed letters (D.I.12, 13) that the court will disregard in making its rulings on the pending motions, because they fail to comply with District of Delaware Local Rule 7.1 .2(b), which states: "Except for the citation of subsequent authorities, no additional papers shall be filed absent Court approval."

#### B. The Technology at Issue in Abbott's Infringement Actions

Between both actions, Abbott alleges that DexCom infringes a total of seven patents: the Group I Patents, which are directed to methods, systems, and devices for continuously monitoring glucose levels in humans, and the Group II Patents, which are directed to a health monitoring system or an electrochemical sensor. The Group I Patents provide an alternative monitoring system for diabetics, who currently monitor their glucose levels by pricking their fingers to draw blood several times a day. (05-590, D.I. 32, at 3; see '752 Patent, Col. 1, ll 21-26; '509 Patent Col. 1, ll. 21-26.) The technology described in the Group I Patents was invented to address the need for a small and comfortable device that could continuously monitor glucose levels for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2892707 (D.Del.)
(Cite as: Slip Copy)

days at a time, while permitting a patient to engage in normal activities. (See '752 Patent, Col. 2, ll. 1-4; '509 Patent, Col 2., ll. 5-8.) Each of the Group I Patents relate to an aspect of the continuous glucose monitor, which involves implanting a glucose sensor in a patient and monitoring signals over the life of the sensor.[FN2](D.I. 32, at 3.)

> FN2. The '752 and '509 patents relate to glucose monitoring devices and their methods of use, while the '478 and '161 patents relate to subcutaneous glucose sensors.

*2 The Group II Patents are directed to a health monitoring system comprising a video game unit ('855 patent, Claims 1, 42, and 51), an electrochemical sensor ('461 Patent, Claims 1, 28, and 29), and a method for using an electrochemical sensor ('366 Patent, Claim 1). More specifically, the technology in the '855 patent was invented to take advantage of the processing and graphical presentation capabilities of a portable video game device, when used as a controller and display unit for a glucose monitoring device. ('855 Patent, Col. 4, l. 55-Col. 5, l. 13.) The '366 patent is "applicable to an analyte monitoring system using an implantable sensor for the in vivo determination of a concentration of an analyte, such as glucose or lactate, in a fluid. The sensor can be, for example, subcutaneously implanted in a patient for the continuous or periodic monitoring of an analyte in a patient's interstitial fluid."('366 Patent, Col. 5, ll. 40-50.) The '461 patent relates to an "analyte sensor which can be used for the in vivo and/or in vitro determination of a level of an analyte in a fluid ... such as glucose or lactate.... One embodiment of the invention is an electrochemical sensor [including] a substrate, a recessed channel formed in a surface of the substrate, and a conductive material disposed in the recessed channel."('461 Patent, Col 2, ll. 15-27.)

## III. DISCUSSION

### A. DexCom's Motion to Strike the Complaint

DexCom's motion to strike asserts that the complaint filed in the present case is redundant to the amended complaint that was filed and stricken by the court in the 05-590 action, in view of Rule 12(f) of the Federal Rules of Civil Procedure. Rule 12(f) states, in pertinent part, "[u]pon motion made by a party within 20 days after the service of the pleading upon the party ... the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."Generally, motions to strike are disfavored. *Am. Standard Life & Accident Ins. Co. v. U.R.L., Inc.,* 701 F.Supp. 527, 532 (M.D.Pa.1988). When ruling on such a motion, "the [c]ourt must construe all facts in favor of the nonmoving party ... and deny the motion if the defense is sufficient under the law."*Id.* Furthermore, courts prefer not to grant a motion to strike "unless it appears to a certainty that ... [the movant] would succeed despite any statement of the facts which could be proved in support of the defense."*Greiff v. T.I.C. Enterprises, L.L.C.,* No. Civ. 03-882, 2004 WL 115553, at * 2 (D.Del. Jan. 9, 2004).

In support of its motion to strike the complaint, DexCom provides two separate arguments: (1) the court's order striking the amended complaint in the 05-590 action required Abbott to ask for leave to file a supplemental amendment, and (2) the claims in the present complaint are redundant of the claims made in the complaint filed in the 05-590 case (the "2005 Complaint"). With respect to DexCom's first argument, the court agrees that the proper vehicle to introduce the Group II Patents into the 05-590 action would have been for Abbott to seek leave of the court under Federal Rule of Civil Procedure 15(d). Nevertheless, nothing in the court's August 16, 2006 Memorandum and Order could be construed as preventing Abbott from seeking relief by filing a new complaint.[FN3]Thus, the court rejects DexCom's first argument, as it is without merit.

> FN3. Indeed, the court did not strike Abbott's complaint on the merits but, rather, because it failed to comply with the requirements of Rule 15(d).

*3 In making its second argument, DexCom relies on Rule 12(f), but does not cite pertinent authority to support its position that the Rule empowers the court to strike Abbott's complaint in the present action because it failed to properly amend its complaint to allege infringement of the Group II patents in the 05-590 action.[FN4]The Federal Circuit has squarely addressed the particular legal issue involved here-whether a non-merits based dismissal of a patent claim in one action precludes a plaintiff from bringing that same patent claim in a subsequent infringement action-holding that preclusion does not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

apply. In *Abbey v. Mercedes Benz of North America, Inc.,* 138 Fed. Appx. 304 (Fed.Cir.2005), the plaintiff filed an amended complaint alleging infringement of a certain patent, which the district court did not consider and dismissed as moot. 138 Fed. Appx. at 306. Subsequently, the plaintiff filed a new action alleging infringement of the same patent. *Id.* The trial court dismissed the new action on res judicata grounds and the plaintiff appealed. The Federal Circuit reversed, holding that claim preclusion did not apply to the patent reasserted in the subsequent action, because "[e]ach patent asserted raises an independent and distinct cause of action," and the trial court did not reach the merits of that patent in the first lawsuit. *Id.* at 307 (quoting *Kearns v. General Motors co.,* 94 F.3d 1553, 1555-56 (Fed.Cir.1996)). Given the foregoing, the court concludes that Abbott's current complaint is not duplicative of complaint in the 05-590 action. Accordingly, the court will deny DexCom's motion to strike Abbott's complaint.

> FN4. DexCom cites to three cases to support the general rule that two causes of action are duplicative of each other where both are a consequence of one tortious action, *Munie v. Stag Brewery,* 131 F .R.D. 559, 560 (N.D.Ill.1989), *Davidson v. John Deere & Co.,* 644 F.Supp. 707, 712-13 (N.D.Ind.1986), and *Rogers v. Mount Union Borough,* 816 F.Supp. 308, 318 (M.D.Pa.1993). These cases, however, are inapposite to the present case, because they are not patent cases subject to the Federal Circuit's holdings on the issue, which, as will be discussed, are markedly different.

**B. DexCom's Motion to Consolidate this Action with C.A. No. 05-590**

DexCom next argues that the court should consolidate this action with the 05-590 action. Pursuant to Federal Rule of Civil Procedure 42(a), courts have the authority to consolidate actions involving a common question of law or fact. *Oracle Corp. v. EpicRealm Licencing, L.P.,* No. Civ. 06-414, 2007 WL 901543, *5 (D.Del. Mar. 26, 2007).* Decisions to consolidate cases are discretionary, but often courts balance considerations of efficiency, expenses, and fairness. *United States v. Dentsply Int'l, Inc.,* 190 F.R.D. 140, 142-43 (D.Del.1999). The court "[has] broad power ... to consolidate causes for trial as may facilitate the administration of

justice."*EllermanLines, Ltd. v. Atl. & Gulf Stevedores, Inc.,* 339 F.2d 673, 675 (3d Cir.1964).

To support its motion, DexCom argues that "both of Abbott's complaints accuse the same device (DexCom's STS device) of infringing patents which involve closely related subject matter."(D.I. 6, at 14.) DexCom further contends that "the witnesses, documents, and exhibits related to [its] accused device likely will be the same for all seven patents asserted in the two cases."(*Id.*) Finally, DexCom relies on Abbott's admission in its opposition to DexCom's motion to strike the amended complaint in the 05-590 action that it "could have filed a new complaint in this jurisdiction at any time, and that the new case would likely have been consolidated with the current case before this court."(05-590 case, D.I. 67, at 6.)

*4 Abbott advances two separate arguments against DexCom's motion to consolidate: the patented technologies in the Group II Patents are very different from the technologies in the Group I Patents, and consolidating this case with the 05-590 action will delay the advancement of the 2005 action. The court is not persuaded and concludes that the cases should be consolidated. First, with respect to the technologies at issue in each case, the court finds that the claimed subject matter of the Group I Patents is very similar to the subject matter of the Group II Patents.[FN5]Additionally, in each patent action before the court, Abbott alleges that the same DexCom device infringes its patents-the STS device. Moreover, Abbott's admission that a "new case would likely [be] consolidated with the current [05-590] case before this court," (05-590 case, D.I. 67, at 6), supports the court's conclusion that consolidation is warranted. The related technologies at issue in these patents, the fact that all claims of infringement are based on the same device, and that both cases involve the same parties lead the court to conclude that judicial resources likely will be conserved by consolidating these two cases. Thus, the court will grant the motion to consolidate.[FN6]

> FN5. In making this finding, the court determined in to which class the PTO has classified each of the respective Group I and Group II Patents. The PTO classified half of the Group I Patents and all of the Group II into class 600. Moreover, Subclass 345 of Class 600 was used to classify two patents in Group I and two patents in Group II. Based

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2892707 (D.Del.)
(Cite as: Slip Copy)

on this evidence, it is clear that the PTO found the technologies in the Group I and Group II Patents related. The PTO's classification of most of the patents into the same Class persuades the court that the Group I and II Patents claim related technologies.

FN6. Abbott argues that consolidation will prejudice it, because the Group I Patents are well into the reexamination process, and "the reexamination process will *likely* be finished much sooner than the reexamination [of the Group II Patents]...." (D.I. 9, at 17) (emphasis added). The court disagrees. Abbott's argument assumes that the Group I Patents will emerge from reexamination first. The court finds that this assumption, however, is not enough to demonstrate prejudice.

**C. DexCom's Motion to Stay**

Finally, DexCom asks this court to stay this proceeding in light of the reexamination by the PTO. Having determined that consolidation of the two actions is proper, the court must now determine whether to stay the entire proceeding until the PTO completes its reexamination of the Group I Patents, or whether to stay the entire proceeding until the PTO completes its reexamination of all seven patents-in-suit. The decision to stay a case is firmly within the discretion of the court. *See Cost Bros., Inc. v. Travelers Indem. Co.,* 760 F.2d 58, 60 (3d Cir.1985). This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988) (noting that "[c]ourts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted). In determining whether a stay is appropriate, the court's discretion is guided by the following factors: "(i) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (ii) whether a stay will simplify the issues in question and trial of the case; and (iii) whether discovery is complete and whether a trial date has been set."*Xerox Corp. v. 3 Com Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing cases); *cf. United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

The thrust of DexCom's argument to support its position that staying this case will not prejudice or present a clear tactical disadvantage to Abbott is, "the stay will conserve the resources of the parties and promote the efficient resolution of this case."(D .I. 6, at 21.) Against this reasoning, Abbott argues that DexCom's purpose for ordering the reexamination of the Group II Patents is to delay the process of this case. To support its argument, Abbott quotes *Remington Arms Co., Inc. v. Modern Muzzleloading, Inc.,* No. 2:97CV00660, 1998 WL 1037920 (M.D.N.C. Dec. 17, 1998), for the proposition that: "Generally, courts are reluctant to stay proceedings where a party is using the reexamination process merely as a dilatory tactic."1998 WL 1037920, at * 3. Abbott then states, "Here, DexCom is doing just that."(D.I. 9, at 14). The court disagrees and finds the facts and posture of *Remington Arms* easily distinguishable from the present case.

*\*5 In *Remington Arms,* there was record evidence suggesting to the court that the defendant was aware of uncited prior art during fact discovery, but failed to request a reexamination of the patents-in-suit until well after case dispositive motions by both partied were filed and briefed. 1998 WL 1037920, at * 3. Thus, the court found the defendant's unjustified delay in filing the reexamination the most compelling factor in denying the motion to stay. *Id.* Analyzing the facts, the court held, "[u]nder the circumstances, granting the motion to stay would not be judicially efficient, [because] [d]iscovery has closed, a trial date has been set, and both parties have submitted dispositive motions which are presently pending before the court."*Id.* at * 2. The court ruled that "staying the proceedings would only result in a waste of time and judicial resources, especially at this late stage of the litigation."*Id.* In contrast, in the present case, the court finds no such delay, where the court has not yet conducted a Rule 16(2)(b) scheduling conference, no scheduling Order is in place, no discovery has taken place, and little time has yet to be invested in the litigation. Accordingly, staying these proceedings will save time and judicial resources.

Additionally, staying the present case until the reexamination of the all of the patents-in-suit is complete will facilitate and simplify issues for trial."One purpose of the reexamination procedure is to eliminate trial of that issue (when the claim is canceled) or to facilitate trial of that issue by

Slip Copy
Slip Copy, 2007 WL 2892707 (D.Del.)
**(Cite as: Slip Copy)**

providing the district court with the expert view of the PTO (when a claim survives the reexamination proceeding)."*Gould v. Control Laser Corp.* 705 F.2d 1340, 1342 (Fed.Cir.1983). Even the *Remington Arms* court noted that it "would surely benefit from the expert opinion of the PTO, and ... awaiting the outcome of the reexamination process could possibly eliminate the need for trial if the claims are canceled...."1998 WL 1037920, at *3.

Simply put, given that this case is in its early stages and considering the ability of the PTO to narrow and simplify the issues of this case via the reexamination procedure, the court is convinced that a stay is appropriate. Further, as the accompanying order also consolidates this case with the 05-590 action, the court will stay the consolidated case until all of the Group I and Group II Patents complete reexamination.[FN7]

> FN7. The court appreciates Abbott's frustration with the delay associated with completing the reexamination process at the PTO. Nevertheless, Abbott's arguments against staying a case pending reexamination are better directed towards Congress than to this court. Despite more than six pages of argument in its brief (D.I. 9, at 10-17), Abbott fails to articulate any specific undue prejudice or clear tactical disadvantage it would suffer. Nor does Abbott provide any meaningful arguments as to why a stay in this case will not simplify the issues in question.

## IV. CONCLUSION

For the aforementioned reasons, the court will deny Dexcom's motion to strike the complaint, and grant DexCom's motion to consolidate this case with the 05-590 action and DexCom's motion to stay the proceeding.

### *ORDER*

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Strike (D.I.5) is DENIED.

2. The defendant's Motion to Consolidate (D.I.5) this proceeding with the 05-590 action is GRANTED.

*6 3. The defendant's Motion to Stay (D.I.5) this proceeding pending the reexamination of the patents in suit is GRANTED.

4. The parties shall notify the court when the PTO issues its reexamination decision on the Group I and Group II Patents.

D.Del.,2007.
Abbott Diabetes Care, Inc. v. Dexcom, Inc.
Slip Copy, 2007 WL 2892707 (D.Del.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1996 WL 33140642 (D.Del.)
(Cite as: Not Reported in F.Supp.)

**H**
CFMT, Inc. v. YieldUp Intern. Corp.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
CFMT, INC. and CFM TECHNOLOGIES, INC.,
Plaintiffs,
v.
YIELDUP INTERNATIONAL CORP., Defendant.
**No. CIV. A. 95-549-LON.**

April 5, 1996.

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire, Young, Conaway, Stargatt & Taylor, Wilmington, for plaintiffs.
Mary B. Graham, Esquire, Nichols, Arsht & Tunnell, Wilmington, for defendant.

MAGISTRATE'S REPORT AND RECOMMEND-
ATION

TROSTLE, Magistrate J.

BACKGROUND FACTS AND DISCUSSION

*1 This is a patent infringement action in which plaintiffs, CFMT, Inc. ("CFMT," the assignee and owner of the patent in suit) and CFM Technologies, Inc. ("CFM," the exclusive licensee), allege that defendant, YieldUp International Corp. ("YieldUp"), has infringed one or more claims of specified Patent No. 4,911,761 (" '761 patent") related to a process and apparatus for drying surfaces. (D.I.1). Presently before the Court is plaintiffs' motion to strike insufficient defenses and for a more definite statement pursuant to Rules 10(b), 12(e) and 12(f) of the Federal Rules of Civil Procedure (D.I.8).

Federal Rule of Civil Procedure 12(e) provides, in relevant part: "If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a re-

sponsive pleading." Fed.R.Civ.P. 12(e).Rule 12(e)"is plainly designed to strike at unintelligibility rather than want of detail. If the pleading meets the requirements of Rule 8 and fairly notifies the opposing party of the nature of the claim, a motion for a more definite statement will not be granted."Thomson S.A. v. Time Warner, Inc., C.A. No. 94-83-LON, slip. op. at 3 (June 2, 1994). See also Schaedler v. Reading Eagle Publication, Inc., 370 F.2d 795, 798 (3d Cir.1967) ("Although the motion for a more definite statement continues to exist in Rule 12(e), it is directed to the rare case where because of the vagueness or ambiguity of the pleading the answering party will not be able to frame a responsive pleading"); Beery v. Hitachi Home Electronics (America), Inc., 157 F.R.D. 477, 480 (C.D .Cal.1993); Wood & Locker, Inc. v. Doran & Associates, 708 F.Supp. 684 (W.D.Pa.1989) (unintelligibility, not lack of detail, is the basis for granting a Rule 12(e) motion); United States v. Board of Harbor Commissioners, 73 F.R.D. 460, 462 (D.Del.1977) .

Indeed, motions for a more definite statement under Rule 12(e), which are within the discretion of the Court, are looked upon with disfavor and are consistently denied "where the information sought by the motion could easily be obtained by discovery."Id. at 2, 4.See also Wilson v. United States, 585 F.Supp. 202, 205 (M.D.Pa.1984). Motions to strike under Fed.R.Civ.P. 12(f)[FN1] are likewise disfavored, except when they serve to expedite, rather than delay. Heller Financial, Inc. v. Midwhey Powder Co., Inc., 883 F.2d 1286, 1294-95 (7th Cir.1989) (appellate court upheld district court's striking of affirmative defenses as insufficient on the face of the pleading, where defenses were nothing but "bare bones conclusory allegations," omitting any plain and short statement of facts and totally failing to allege the necessary elements of the alleged claims); Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1274 (1990) ("[a]n affirmative defense may be pleaded in general terms and will be held to be sufficient, and therefore invulnerable to a motion to strike, as long

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1996 WL 33140642 (D.Del.)
(Cite as: Not Reported in F.Supp.)

as it gives plaintiffs fair notice of the nature of the defense").

> FN1.Fed.R.Civ.P. 12(f), Motion to Strike, provides that:

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

*2 Rule 8 of the Federal Rules of Civil Procedure states that, in addition to a declaration of jurisdiction and a demand for relief, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8. This requirement does not change in a patent infringement action. Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1251 (1990) ("[i]n drafting the complaint in an infringement action, plaintiff must identify the patent that has been infringed and indicate in what manner the patent has been encroached upon; however, no special laws of particularity of the statement is required.") (footnotes omitted). Nor does Fed.R.Civ.P. 10, Form of Pleadings, which states in relevant part: "All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances...Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth."Fed.R.Civ.P. 10(b).

In the case at bar, plaintiffs claim that defendant's defense of patent invalidity due to the patent's failure to meet one or more of the patentability conditions specified in 35 U.S.C. §§ 102(a), 102(b), 102(e), 102(f), 102(g) and 112 [FN2] is insufficient to comply with Fed.R.Civ.P. 8(e) and 10(b), where the alleged patent deficiencies are so inclusively as-

serted by defendant, without setting forth a ground of invalidity or any set of circumstances giving rise to any invalidity defense. Plaintiffs also argue that defendant has failed to specify the grounds of claimed invalidity as to which defendant asserts entitlement to declaratory judgment (D.I.8).[FN3]

> FN2. The cited parts of 35 U.S.C. § 102, Conditions for patentability; novelty and loss of right to patent, provide as follows:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country, or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or...

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102.

Section 112 of the United States Code, Specification, provides as follows:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1996 WL 33140642 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not serve as a basis for any other multiple dependent claim. A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112.

> FN3. YieldUp's invalidity defense is contained in paragraphs 19 and 20 of its answer:

19. Upon information and belief, the claims of the '761 patent are invalid because the invention allegedly patented thereby fails to meet one or more of the conditions for patentability specified in Title 35, United States Code, in particular one or more of Sections 102(a), 102(b), 102(e), 102(f), 102(g) and 112.

20. Upon information and belief, the claims of the '761 patent are invalid because the averred in-

vention allegedly patented thereby would have been obvious to a person of ordinary skill in the art at the time of the alleged invention and thus fails to meet the requirements of 35 U.S.C. § 103.

(D.I.4).

Defendant counters that the pleading at issue fully comports with the well-established practice in this district, meets the requirements of Fed.R.Civ.P. 8 and fairly notifies the plaintiffs of the nature of the claim, thereby supporting denial of plaintiffs' motion (D.I.13).

It is well recognized that where a party is able to discharge his pleading obligations under the Federal Rules of Civil Procedure, a Rule 12(e) motion made to obtain a *better* affirmative pleading, thus enabling the moving party to provide a more enlightened or accurate response, will be denied, particularly if the matter sought is a proper subject for discovery. Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1377 (1990). With particular regard to patent infringement actions, for instance, plaintiff need not specify the claims of originality upon which he intends to rely at trial, or provide details of the respects in which defendant has infringed the patent; nor should defendant be required to explain his assertion of prior invention.*Id. See also Beery*, 157 F.R.D. at 480. Of course, federal law addresses potential deficiencies in this regard by requiring that a party (defendant) seeking to assert the defense of noninfringement or invalidity of the patent give the plaintiff 30 days written notice of certain elements of those defenses, if the defendant has chosen not to set forth those elements in his answer. 35 U.S.C. § 282; Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1251 (1990).

**\*3** In the answer at issue in the case at bar, defendant bases its invalidity defense on specifically identified statutory sections applying to anticipation (35 U.S.C. § 102), obviousness (35 U.S.C. § 103) and patent specification defects (35 U.S.C. § 112) (D.I.4). This Court has held that pleading invalidity in such general terms satisfies the requirements of notice pleading. *Calgon Corporation v. Nalco*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 33140642 (D.Del.)

**(Cite as: Not Reported in F.Supp.)**

*Chemical Company,* C.A. No. 89-90-JRR, slip op. at 12 (July 3, 1990). Thus, while it is generally true that Fed.R.Civ.P. 10 requires a party to plead in separate paragraphs short, plain and direct statements of the contended grounds "whenever a separation facilitates the clear presentation of the matters set forth," as would be the case with different legal theories, where a party fails to do so "is not necessarily fatal especially when the adversary makes no objection."*Vigor v. Chesapeake & Ohio R. Co., 101 F.2d 865, 869 (7th Cir.), cert. denied,*387 U.S. 635 (1939). And while the Court duly acknowledges plaintiffs' objections to defendant's form of answer, it nonetheless finds that YieldUp's affirmative defenses sufficiently comport with the Federal Rules of Civil Procedure, providing plaintiff with fair notice of the nature of the defense.

Furthermore, the parties have proceeded with discovery, serving interrogatories which ultimately will provide each party with the additional, more specific information required for litigation, effectively rendering plaintiffs' present motion moot. *See, e.g., Lert v. A.C. Nielsen Company,*1993 U.S. Dist. Lexis 4235 at 5 (N.D .Ill.1993).

Thus, in light of the aforementioned considerations, the Court must deny plaintiffs' motion to strike insufficient defenses and for a more definite statement motion. *See*Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1274 (1990).

CONCLUSION

In conclusion, for the reasons contained herein, I recommend that plaintiffs' motion to strike insufficient defenses and for a more definite statement be DENIED.

The appropriate Order consistent with this Report and Recommendation shall follow.

D.Del.,2001.

CFMT, Inc. v. YieldUp Intern. Corp.

Not Reported in F.Supp., 1996 WL 33140642 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 3072257 (W.D.Pa.)
**(Cite as: Slip Copy)**

Defazio v. River City Brass Band, Inc.
W.D.Pa.,2007.
Only the Westlaw citation is currently available.
United States District Court,W.D. Pennsylvania.
John DEFAZIO, Plaintiff,
v.
The RIVER CITY BRASS BAND, INC., Defendant.
**Civil Action No. 07-546.**

Oct. 19, 2007.

John Defazio, McMurray, PA, pro se.
Patricia A. Monahan, Danielle M. Vugrinovich,
Marshall, Dennehey, Warner, Coleman & Goggin,
Pittsburgh, PA, for Defendant.

*MEMORANDUM OPINION and ORDER OF
COURT*

AMBROSE, Chief District Judge.

*\*1 Pro se* Plaintiff, John DeFazio, filed a Complaint on April 25, 2007, against Defendant, The River City Brass Band, Inc., asserting that he was terminated in retaliation for expressing his religious belief in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.* (Docket No. 1). Thereafter, Plaintiff filed "Additional Amended Complaints" wherein he alleges he was slandered in retaliation for expressing his religious beliefs in violation of Title VII, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626(c)(1), and the PHRA. (Docket No. 5). Defendant filed a Partial Motion to Dismiss seeking dismissal of the additional PHRA claim based on retaliatory slander as premature pursuant to Rule 12(b)(6) FN1 and further requests that Plaintiff's averments related to the EEOC's determination and conciliation be stricken pursuant to Rule 12(f). FN2 (Docket No. 13). Plaintiff filed a response thereto. (Docket No. 19). The Motion is now ripe for review.

FN1. In deciding a motion brought pursu-

ant to Rule 12(b)(6) all factual allegations, and all reasonable inferences therefrom, must be accepted as true and viewed in the light most favorable to the non-moving party. *Haspel v. State Farm Mut. Auto. Ins. Co.,* 2007 WL 2030272 *1 (3d Cir. July 16, 2007).* However, "[f]actual allegations must be enough to raise a right to relief above a speculative level." *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). In order to survive a motion to dismiss, the complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id.* at 1969.

FN2.Rule 12(f) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows: "(f) Motion to Strike. Upon motion ... the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." F.R.C.P. 12(f).

First, Defendant asserts that Plaintiff's "Additional" PHRA claim should be dismissed as premature because Plaintiff did not plead that he cross filed a claim with the Pennsylvania Human Relations Commission ("PHRC") for the facts set forth in the "Additional Amended Complaints" or "that he received a decision or that one year had elapsed for the claims alleged in his second EEOC Charge. (Docket No. 14, pp. 2-3). Additionally, Defendant asserts that while Plaintiff pled allegations of retaliation by Defendant that began on September 15, 2006, in his second EEOC Charge, he did not set forth any allegations that occurred on February 25, 2006, or July of 2006. (Docket No. 14, p. 4). In response, Plaintiff alleges that his second EEOC Complaint was cross filed with the PHRC and that on October 2, 2007, he received his right to sue notice from the PHRC. (Docket No. 19, ¶¶ 1, 3). Plaintiff, however, does not argue that he asser-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2
Slip Copy, 2007 WL 3072257 (W.D.Pa.)
**(Cite as: Slip Copy)**

ted retaliatory conduct by Defendant on February 25, 2006, or July of 2006, nor does either party provide for review a copy of the EEOC Charge. Consequently, Plaintiff has failed to demonstrate that he exhausted his administrative remedies with regard to comments made on February 25, 2006, or July of 2006. Therefore, I am granting Defendant's Motion to Dismiss Plaintiff's second PHRA claim set forth in Plaintiff's "Additional Amended Complaints" at Docket No. 5. Nevertheless, I am permitting Plaintiff to file a "Second Amended Complaint" to set forth, in one document, all of Plaintiff's claims from the original Complaint and the Additional Amended Complaints, and to assert that he cross filed his second EEOC Charge with the PHRC and that he received a right to sue notice. Additionally, Plaintiff is permitted to allege retaliatory conduct by Defendant on February 25, 2006, and July of 2006, only to the extent that Plaintiff pled such conduct in his second EEOC Charge filed on November 22, 2006. Otherwise such allegations are not permitted.

**\*2** Second, Defendants assert that references to the EEOC's first determination set forth in ¶ 29 of the Complaint and the failure of the conciliation set forth in ¶ 30 must be stricken because they are immaterial, impertinent, and/or scandalous. (Docket No. 13, pp. 4-5). In response, Plaintiff argues that there is nothing scandalous or impertinent about the EEOC's determination and believes it is relevant. (Docket No. 19, ¶ 5). While I make no determination at this time as to whether the EEOC's determination letter will be admissible at trial, *see, Coleman v. Home Depot, Inc., 306 F.3d 1333 (3d Cir.2002)*, I do find that inclusion of the same within the Complaint is immaterial to state a cause of action for retaliation under Title VII or the PHRA. Therefore, Defendants' Motion to Strike with respect to ¶ 29 of the Complaint is granted. To that end, Plaintiff is instructed that when he files his Second Amended Complaint he should not include or mention that the EEOC found cause to believe that Title VII was violated by Defendant.

With respect to ¶ 30, Defendant argues that the allegation that the EEOC's conciliation efforts

failed should be stricken because "it is hornbook law that any references to settlement should be excluded from evidence."(Docket No. 14, p. 5). In response, Plaintiff argues that he did not introduce the substance of the settlement negotiations and therefore it should not be stricken. (Docket No. 19, ¶ 6). Like the EEOC determination, the fact that the EEOC conciliation failed is immaterial to state a cause of action for retaliation under Title VII or the PHRA. Therefore, Defendants' Motion to Strike with respect to ¶ 30 of the Complaint is granted. To that end, Plaintiff is instructed that when he files his Second Amended Complaint he should not include or mention that the EEOC conciliation process failed.

THEREFORE, this **19th** day of October, 2007, it is Ordered that the Defendant's Partial Motion to Dismiss (Docket No. 13), is granted.

It is further ordered, that Plaintiff is granted leave to file a Second Amended Complaint setting forth, in one document, all of Plaintiff's claims from the original Complaint and the Additional Amended Complaints by November 2, 2007. Therein, Plaintiff must assert that he filed a second EEOC Charge, that he cross filed it with the PHRC, and that he received a right to sue notice from the PHRC. Additionally, Plaintiff is permitted to allege retaliatory conduct by Defendant on February 25, 2006, and July of 2006, only to the extent that Plaintiff pled such conduct in his second EEOC Charge filed on November 22, 2006. Finally, Plaintiff is not permitted to mention in the Second Amended Complaint that the EEOC found cause to believe that Title VII was violated by Defendant or that the conciliation process failed.

W.D.Pa.,2007.
Defazio v. River City Brass Band, Inc.
Slip Copy, 2007 WL 3072257 (W.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**H**

Federal Deposit Ins. Corp. v. Parkway Executive
Office Center
E.D.Pa.,1997.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
FEDERAL DEPOSIT INSURANCE CORPORA-
TION Statutory Successor to RESOLUTION
TRUST CORPORATION In Its Capacity As Re-
ceiver For Atlantic Financial Savings, F.A.
v.
PARKWAY EXECUTIVE OFFICE CENTER
FEDERAL DEPOSIT INSURANCE CORPORA-
TION Statutory Successor to RESOLUTION
TRUST CORPORATION In Its Capacity As Re-
ceiver For Atlantic Financial Savings, F.A.
v.
Richard L. EVANS and Helene EVANS
**No. CIV. A. 96-121, CIV. A. 96-122.**

Aug. 18, 1997.

Miles H. Shore, Saul, Ewing, Remick & Saul,
Phila, PA, for Federal Deposit Insurance Corpora-
tion, Statutory Successor to Resolution Trust Cor-
poration Inits Capacity as Receiver for Atlantic
Financial Savings, F.A., Plaintiff.
Miles H. Shore Saul, Ewing, Remick & Saul, Phila,
PA, Jeffrey A. LessBazelon & Less Phila, PA, for
Parkway Executive Office Center, a Pennsylvania
General Partnership, Defendant.

*MEMORANDUM*

PADOVA, J.
    *1 Plaintiff, the Federal Deposit Insurance Cor-
poration ("FDIC"), statutory successor to the Resol-
ution Trust Corporation ("RTC") in its capacity as
Receiver for Atlantic Financial Savings, F.A.
("Atlantic"), brings this action to collect on promis-
sory notes extended to Parkway Executive Office
Center, a Pennsylvania General Partnership
("Parkway"), which were guaranteed by Richard
Evans and Helene Evans (hereinafter referred to
collectively as "Defendants"). Defendants have

filed various Counterclaims and affirmative de-
fenses. FDIC currently submits, for the Court's con-
sideration, its Motion to Dismiss the Counter-
claims, its Motion to Strike Defendants' Affirmat-
ive Defenses, and its Motion for Summary Judg-
ment.

    For the following reasons, FDIC's Motion to
Dismiss Defendants' Counterclaims shall be gran-
ted. The Court will deny FDIC's Motion to Strike
Defendants' Affirmative Defenses. The Court will
grant in part and deny in part FDIC's Motion for
Summary Judgment.

I. Background

A. Loan Agreements

    Richard Evans is Parkway's general partner. In
1985, Parkway purchased a building located at Five
Logan Square, 20th and Race Streets, in Phil-
adelphia, Pennsylvania. ("Five Logan"). Five Lo-
gan is a five story office building spanning approx-
imately 150,000 square feet. Both Atlantic and
Provident National Bank ("Provident") financed the
purchase. Provident supplied $8,500,000 through a
first mortgage, and Atlantic loaned $2,000,000
through a "Promissory Note," executed by Parkway
in favor of Atlantic. Under the Promissory Note,
Parkway "hereby promise[ed] to pay to the order of
ATLANTIC FINANCIAL FEDERAL ... the prin-
cipal amount of $2,000,000." (Def.s' Mem. Opp.
Pl.'s Mot.App. at 1 ("Def.s' App."); Pl.'s Mot.
Summ. J. Ex. AI ("Pl.'s Mot.")). In addition to re-
payment of the principal, Atlantic received an
"Enhancement Interest" entitling it to (1) 15% of
net cash flow from Five Logan until the Promissory
Note was paid in full and (2) at least 15% of the net
proceeds of any sale of Five Logan. (Def.s' App. at
4-5). Parkway also obtained $3,000,000 in letters of
credit from Atlantic designed to serve as further
collateral for the Provident loan. (Aff. of Richard L.
Evans, M.D. Opp. Pl.'s Mot. ¶ 3) ("Evans Aff.")).

    Four years after purchasing the building, Park-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 2
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

way decided to renovate Five Logan. (Evans Aff. ¶ 5). On August 24, 1989, Parkway signed two new agreements designed to finance the renovation: (1) the Note Modification Agreement ("Modification"), and (2) the Construction Loan and Security Agreement ("Construction Loan"). Parkway, Provident, and Atlantic were parties to the Construction Loan. As of August 24, 1989, (1) the outstanding principal owed to Provident by Parkway pursuant to the 1985 mortgage was $5,425,153.80, and (2) Parkway owed Atlantic $4,245,272.65 on the Promissory Note. (Def.s' App. at 43).

Under the Construction Loan, Provident agreed to lend Parkway up to $4,290,000, and Atlantic agreed to lend Parkway $7,410,000 "to renovate the existing improvements and develop [Five Logan]." (Def.s' App. at 15). The Construction Loan imposed the following obligations on Atlantic and Provident:

*2 [s]o long as there has occurred no Event of Default or any event or condition which, with the passage of time of giving notice or both could become an Event of Default, Provident shall be obligated to advance (40%) of the Funds (against the Second Note), and Atlantic shall be obligated to advance sixty percent (60%) of the Funds (against the Atlantic Note).

(Def.s' App. at 30).

The Construction Loan also required Richard Evans and his wife Helene Evans to personally guarantee the repayment of monies Atlantic loaned Parkway. (Def.s' App. at 25; Evans Aff. ¶ 8 (stating "Atlantic Federal also required my wife to execute the 1989 Guaranty and Suretyship Agreement, even though she was not an officer, partner, or principal in Parkway, and she had not cosigned on any of the prior loans. No reason was given ....")). Specifically, the Evans executed a Guaranty and Surety Agreement ("Guaranty") which provided, in part:

Guarantors hereby absolutely, irrevocably, and unconditionally guarantee to Lender, its successors, endorser, and assigns, and become surety for (a) the full, faithful and punctual payment when due (and not merely the collectibility), of any and all sums

required to be paid by Borrower, its successors and assigns under the note and the other Loan Documents ....

This Guarantee is an absolute and unconditional guaranty of prompt and full payment and performance and not merely of collection with Guarantors intending to be bound hereunder in the same manner and to the same extent as Guarantors would have been had they executed the Loan Documents ....

Guarantors hereby waive ... (b) all defenses, offsets and counterclaims which Guarantors may at any time have jointly or severally to any of the obligations of Borrower.

(Def.s' App. at 115-16).

The Modification, entered into between Atlantic and Parkway, set forth repayment terms, listed Parkway's balance as $12,045,272.65, and imposed a maturity date of February 24, 1991. (Def.s' App. at 103-05; Pl.'s Mot. Ex. A2). As of January, 1990, Atlantic had disbursed approximately $1,500,000 of its share of the $7,400,000 called for under the Construction Loan. (Evans Aff. ¶ 11).

B. Atlantic's Demise

"On January 11, 1990, the Director of the Office of Thrift Supervision, Department of the Treasury ("OTC"), declared that Atlantic Financial Federal was in an unsafe and unsound condition to transact business and ordered it closed." (Aff. of Richard S. Greenberg Supp. Pl.'s Mot. ¶ 2 ("Greenberg Aff.")). When Atlantic was closed, it immediately stopped funding its share of the loans, causing a massive budget shortfall on the project to renovate Five Logan. (Evans Aff. ¶¶ 13-14). The RTC was appointed as Receiver for Atlantic and thereby took possession of Atlantic's assets. (Greenberg Aff. ¶¶ 3-4).[FN1]

> FN1. The RTC entered into a "Purchase and Assumption Agreement" with Atlantic Financial Savings, F.A. ("Atlantic Savings"), a newly chartered institution, whereby Atlantic Savings purchased the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Promissory Note, the Modification, and the Guaranty. On January 11, 1990, however, the OTC took possession of Atlantic Savings and appointed the RTC as Conservator. On November 15, 1991, the OTC appointed the RTC as Receiver for Atlantic Savings. The RTC terminated on December 31, 1995, and the FDIC became its statutory successor.

Parkway unsuccessfully demanded that Atlantic and RTC continue funding, asserting the project could not be completed without the full loan amounts. (Evans Aff. ¶ 15; Def.s' App. at 133-41). On May 22, 1990, the RTC repudiated the undisbursed portion of the $12,045,272 loan commitment. (Greenberg Aff. ¶ 14; Evans Aff. ¶ 17; Def.s' App. at 142). Provident, initially recognizing that Atlantic was in default, then declared Parkway and the Guarantors in default and initiated a complaint for confession of judgment against Parkway and the Evans in the Court of Common Pleas of Philadelphia County. (Def.s' App. at 131 (letter from Provident to Parkway noting "[y]ou understand and acknowledge that the loan is in default due to Atlantic's failure to fund and that we may at any time refuse to make further advances of the loan"); 157 (Provident's Complaint in Confession of Judgment recognizing that "Atlantic has failed to fund its portion of certain advances of the Loan in accordance with the Loan Agreement")).

**\*3** According to Defendants, both Atlantic and the RTC were aware of the state court litigation, but took no action. (Evans Aff. ¶¶ 20-21; Def.s' App. at 151-59). Provident eventually assigned its loan documents to a third party and initiated a mortgage foreclosure on its first lien. Five Logan was then sold at a Sheriff's sale to Provident's assignee. (Evans Aff. ¶¶ 22-23; Def.s' App. 160-65). The Provident litigation settled in 1994. (Evans Aff. ¶ 29).

### C. Defendants' Proof of Claim

On August 17, 1990, Defendants submitted a proof of claim to the RTC in its capacity as Conser-

vator for Atlantic Savings, claiming $29,658,863.00 in actual direct compensatory damages. (Aff. of Linda S. Palombizio ¶ 4 (FDIC Claims Specialist) Pl.'s Mot. Ex. A1 ("Palombizio Aff.")). Thereafter, the RTC and Evans counsel entered into a series of time extensions over a period of almost four years agreeing to give the RTC more time to adjudicate Defendants' claim. (Evans Aff. ¶ 25; Palombizio Aff. ¶ 5). By letter dated September 8, 1994, the RTC notified the Evans that their claim was disallowed. (Palombizio Aff. ¶ 6). According to Evans:

By this time, no less earlier, Parkway, my wife and I had been entirely wiped out financially as a result of the failure of the project and we had told the RTC of our situation. As a direct result of the actions of Atlantic and RTC, we were financially unable to pursue our rights through the filing of a new lawsuit in federal court against Atlantic / RTC following the disallowance of the claim.

Atlantic / RTC never declared Parkway, my wife or me in default prior to the filing of this lawsuit in January of 1996, which was six years after Atlantic defaulted on its obligation to fund the loan.

(Evans Aff. ¶¶ 31-32). The FDIC initiated the instant litigation against Parkway (to collect on the Construction Loan and Modification) and the Evans (to collect on the Guaranty) on January 10, 1996.

### II. Discussion

#### A. Motions to Dismiss Counterclaims and Strike Affirmative Defenses

##### 1. Standards of Review

FDIC moves to dismiss Defendants' Counterclaims and to strike Defendants' affirmative defenses. "When deciding a 12(b)(6) motion to dismiss, the counterclaims must be read in a light most favorable to the counter-claimant, and all of the factual allegations must be taken as true. However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *Government Guar. Fund of the Republic of Finland v. Hyatt Corp., 955 F.Supp. 441,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

449 (D.Vi.1997) (citing *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988); *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 23 (1st Cir.1990)).

Motions to strike under Fed.R.Civ.P. 12(f) are generally viewed with disfavor because of their potential to be used as a dilatory tactic. If there are either questions of fact or disputed questions of law, the motion to strike must be denied. However, a motion to strike is the primary procedure for objection to an insufficient affirmative defense." *Resolution Trust Corp. v. Farmer*, 823 F.Supp. 302, 305-06 (E.D.Pa.1993). Motions to strike "do [[[, however,] serve a useful purpose by eliminating insufficient defenses and saving the time and expense which would otherwise be spent in litigating issues that would not affect the outcome of the case .... [T]he district court has broad discretion in disposing of motions to strike. *United States v. Union Gas Co.*, 743 F.Supp. 1144, 1150 (E.D.Pa.1990) (citations omitted). "An affirmative defense is insufficient if as a matter of law it cannot succeed under any circumstances." *In re Sunrise Sec. Litig.*, 818 F.Supp. 830, 840 (E.D.Pa.1993) (citation omitted).

2. Defendants' Defenses and Counterclaims

**\*4** Defendants' Counterclaims allege generally that (1) Atlantic breached the Construction Loan agreement and Modification, (2) Atlantic defaulted on its obligations, and (3) the RTC wrongly repudiated those agreements. According to Defendants, the Five Logan project could not be completed because of the massive budget shortfall. Specifically, as of January, 1990, Atlantic had distributed only $1.5 million of its $7.4 million share of the Construction Loan and Modification. Defendants argue that Atlantic's failure to disclose its precarious financial condition destroyed the prospect that their real estate project would be successfully completed.

Defendants also put forth the affirmative defenses of (1) estoppel; (2) failure to give consideration; (3) statute(s) of limitations; (4) waiver; (5) failure to state a claim; and (6) laches. In addition, Defendants claim that "[a]s a result of Atlantic's de-

fault, Parkway has lost the property in foreclosure, it has been unable to pay its creditors, and it has suffered damages in excess of the amounts borrowed from Atlantic .... [Defendants lost their] investment, and [have] incurred liabilities to others." (Def.s' Am. Answer, Affirmative Defenses and Countercl. ¶¶ 15, 17). Attacking the Guaranty, Defendants claim "Atlantic's failure to disclose the facts concerning its true financial condition renders the Guaranty and Suretyship Agreement voidable, void and rescinded." (Def.s' Am. Answer, Affirmative Defenses and Countercl. ¶ 12).

Defendants' Counterclaims rest on the same theory, maintaining that "[a]s the successor to the RTC, Plaintiff FDIC is liable for all damages flowing from the RTC's repudiation and breach of Atlantic Financial Federal's obligations, and from Atlantic's defaults ...." (Def.s' Countercl. ¶ 4). In addition, Defendants assert that Atlantic's insistence on Helene Evans' executing the Guaranty violates the Equal Credit Opportunity Act, 15 U.S.C.A. §§ 1691-1691e (West 1982 & Supp.1997) ("ECOA") because it was done solely on the basis of Helene Evans' marital relationship with Richard Evans. According to Defendants, FDIC had actual or constructive knowledge of Atlantic's conduct when it acquired the Guaranty.

3. FDIC's Position

FDIC first moves to dismiss the Counterclaims, arguing the Court lacks subject matter jurisdiction because Defendants failed to file suit on the claim within 60 days from the date of notice of disallowance of the claim. FDIC points to 12 U.S.C.A. § 1821(d)(13) (D), which states that except as otherwise provided in this subsection, no court has jurisdiction over:

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

such institution or the Corporation as receiver.

**\*5** 12 U.S.C.A. § 1821(d)(13)(D) (West 1989 & Supp.1997). Sections 1821(d)(6)(A) and (B) dictate the appropriate procedure for obtaining judicial review:(6) Provision for agency review or judicial determination of claims

(A) In general

Before the end of the 60 day period beginning on the earlier of-

(i) the end of the period described in paragraph (5)(A)(i) with respect to any claim against a depository institution for which the Corporation is receiver; or

(ii) the date of any notice of disallowance of such claim pursuant to paragraph (5)(A)(i),

the claimant may request administrative review of the claim in accordance with subparagraph (A) or (B) of paragraph (7) or file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States for the district in which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim).

(B) Statute of Limitations

If any claimant fails to-

(i) request administrative review of any claim in accordance with subparagraph (A) or (B) of paragraph (7); or

(ii) file suit on such claim (or continue an action commenced before the appointment of the receiver),

before the end of the 60-day period described in subparagraph (A), the claim shall be deemed to be disallowed (other than any portion of such claim which was allowed by the receiver) as of the end of such period, such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such claim.

12 U.S.C.A. § 1821(d)(6)(A), (B).

FDIC claims the Court may only exercise subject matter jurisdiction over a claim under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), if the claimant exhausts the statutory claim procedure, pointing to *Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 391 (3d Cir.1991) (stating "we are satisfied that § 1821(d)(13)(D) ... prevails with respect to the subject matter jurisdiction of the district court. That the bar is a statutory exhaustion requirement is indicated by the language"), *cert. denied*,502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991); *Federal Deposit Ins. Corp. v. Shain, Schaffer & Rafanello*, 944 F.2d 129, 132 (3d Cir.1991) (stating the "FIRREA's claims procedure in section 1821(d) is exclusive. Congress expressly withdrew jurisdiction from all courts over any claim to a failed bank's assets that are made outside the procedure set forth in section 1821" and noting "the jurisdictional bar of § 1821(d)(13)(D) reaches (1) claims for payment from the assets of the failed bank, (2) actions for payment from those assets, and (3) actions for a determination of rights with respect to those assets").

FDIC admits that Defendants initially complied with the claims procedure when they submitted a proof of claim on August 17, 1990 to the RTC. Defendants did not, FDIC argues, file a lawsuit within 60 days of the RTC's response disallowing Defendants' claim-dated September 8, 1994-as required by § 1821. FDIC contends that Defendants' failure to satisfy this statutory prerequisite precludes the Court from exercising subject matter jurisdiction.

4. Defendants' Position

**\*6** Defendants assert that they fully exhausted their administrative remedies by submitting a timely claim, dated August 17, 1990, that was based on the same facts that give rise to the Counterclaims, *i .e.,* the breach by Atlantic of the Construction Loan and Modification. The RTC, contend Defendants, had a full opportunity to consider the claim, thus satisfying the narrow purpose of the FIRREA's exhaustion scheme. "The purpose under-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                            Page 6
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

lying [[[the] FIRREA's exhaustion scheme is to al-low the RTC to perform its statutory function of promptly determining claims so as to quickly and efficiently resolve claims against a failed institution without resorting to litigation." *Rosa,* 938 F.2d at 396.

As a result of the collapse of the project and the RTC's delay in adjudicating the claim (during which Defendants' financial condition deteriorated), Defendants maintain they had insufficient funds to litigate the matter in court and could not commence such an action. (Evans Aff. ¶ 31).

Defendants aim to distinguish the cases relied on by the FDIC that invoked the statutorily imposed 60 day deadline by arguing that the defendants in those cases either did not exhaust the remedy scheme set forth in the FIRREA or did not file a counterclaim. According to Defendants, the settled law is that a counterclaim arising out of the same transaction or occurrence is *never* time barred insofar as it seeks damages less than or equal to the amount of the FDIC's claim. Defendants maintain that their Counterclaims seek relief for breach of the very documents the FDIC issued, relate to the 'particular transaction' that is the subject of this litigation, and will at least reduce, if not eliminate, any judgment obtained by the FDIC.

**5. Counterclaim and Affirmative Defense Conclusion**

The Court concludes that the 60 day statute of limitations articulated in 12 U.S.C.A. § 1821(d)(6)(A), (B) precludes Defendants from asserting their Counterclaims but does *not* preclude Defendants from asserting their affirmative defenses.

With respect to the Counterclaims, the instruction from *Resolution Trust Corp. v. W.W. Dev. & Management, Inc.,* 73 F.3d 1298 (3d Cir.1996), is clear. There, Bell Savings Bank, PaSA ("Bell") extended a loan to W.W. Development and Management Company ("W.W."). Bell agreed to extend a second loan to W.W. designed to pay off the first

loan. Bell, however, never extended the second loan. W.W. defaulted on the first loan, and Bell confessed judgment against W.W. Subsequently, the RTC took over Bell, and, thereafter, W.W. filed (1) a petition to strike or open W .W.'s confessed judgment and (2) a separate action alleging breach of contract. Shortly before the deadline for filing claims under the FIRREA, Bell's lawyer and the RTC exchanged correspondence regarding the formal filing of a proof of claim with the RTC in compliance with the administrative procedures under that statute. A formal proof of claim, however, was *never* filed.

*7 The United States Court of Appeals for the Third Circuit ("Third Circuit") dismissed W.W.'s separate lawsuit.

In this case, treating W.W.'s petition to reopen the removed case and its counsel's August 5, 1991 letter to RTC's counsel as together constituting a properly filed claim, W.W. failed to bring the federal case in the district court within the statutorily prescribed time period .... If the RTC is correct so that W.W.'s petition, either independently or accompanied by its letter of August 5, 1991, did not constitute a claim, the district court would have lacked jurisdiction because W.W. would not have followed the proper administrative procedures. Nevertheless, since we find that even if a pleading can constitute a claim under [the] FIRREA, the district court lacked jurisdiction over this claim, we need not address this issue.

*Id.* at 1305 & n. 13.Defendants' assertion that *W.W. Dev.* does not provide support because W.W. did not file an administrative claim is unpersuasive. *W.W. Dev.* reached its conclusion *assuming* that W.W. complied with the administrative claims procedure. Thus, the instructional value of *W.W. Dev.* lies beyond situations where the debtor did not follow the administrative claims procedure and encompasses debtors who do file administrative claims but subsequently fail to file suit within the statutorily prescribed limitations period.

While W.W.'s separate lawsuit failed, its defenses in the lawsuit initiated by Bell to confess

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 7
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

judgment were not subject to the jurisdictional bar:

the defenses allege in the petition to open judgment are part of a pre-receivership action and thus under section 1821(d)(5)(F)(ii) and 1821(d)(13)(D) the district court may entertain them without regard for the jurisdictional bar in the latter section.

3

While the defenses to Bell's confession of judgment action pertain to the assets of W.W., the counterclaim clearly asserts a claim over Bell's assets. If in addition to raising defenses to an action or a claim, a party also raises *counterclaims,* such counterclaims would also fall under section 1821(D)(13)(D)'s jurisdictional bar.

3

The counterclaim brought by W.W., in contrast to its defense to the confessed judgment, is a claim against a failed financial institution, precisely the kind of post-receivership claim that Congress wanted resolved expeditiously and fairly, through the administrative claims process.

*Id.* at 1309.

*Resolution Trust Corp. v. Schonacher,* 844 F.Supp. 689 (D.Kan.1994) reached a similar result with respect to counterclaims, but employed different reasoning:

[T]his court concludes that a two step process is required to determine which counterclaims and affirmative defenses are subject to the mandatory administrative claims procedure.

The first step is to determine whether the claim embodied in the affirmative defense or counterclaim is of the type described in the statute. In *Rosa v. Resolution Trust Corp.,* 938 F.2d 383 (3d Cir.1991), the court undertook to define claims for which the administrative claims procedure is mandated under clause (i) of Section 1821(d)(13)(D): 'The bar embodied in clause (i) reaches (1) claims for payment from the assets of the failed financial institution], (2) actions for payment from those assets and (3) actions for a determination of rights with respect to those assets.' *Rosa,* 938 F.2d at 393. Clause (ii) of that section reaches claims 'relating

to any act or omission of such institution or the Corporation as receiver.' 12 U.S.C. 1821(d)(13)(D).<sup>FN2</sup>

FN2. *But see National Union Fire Ins. Co. v. City Sav., F.S.B.,* 28 F.3d 376, 393 (3d Cir.1994) (stating § 1821(d)(13)(D) bars jurisdiction over 4 categories of actions: "(1) claims for payment from assets of any depository institution for which the RTC has been appointed receiver; (2) actions for payment from assets of such depository institution; (3) actions seeking a determination with respect to assets of such depository institution; and (4) a claim relating to any act or omission of such institution or the RTC as receiver").

*8 If the claim is of the type included in the statute's language, the next step is to determine whether the claim could have been brought independently by the defendant against the institution or receiver. In making this evaluation, the determining factor is not whether a defendant labels his response as an affirmative defense or as a counterclaim. Instead, the court must evaluate whether an asserted defense or counterclaim could have been brought against the receiver or the institution independently.

*Schonacher,* 844 F.Supp. at 695 (citations omitted).

With this framework, *Schonacher* found defendant's claims for set-off and recoupment were actually claims for payment from the assets of the failed institution and therefore within the scope of § 1821(d)(13)(D)'s jurisdictional bar. *Schonacher* also struck (1) the ECOA affirmative defense and (2) the affirmative defense that the guaranty sued upon was void for want of consideration, finding these affirmative defenses could have been brought independently prior to the action taken by the failed bank or RTC. The other affirmative defenses-failure to join all necessary parties, waiver, estoppel, and failure to state a claim-were all *allowed* because they had no independent basis.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

In _National Union Fire Ins. Co. of Pittsburgh v. City Savs., F.S.B._, 28 F.3d 376 (3d Cir.1994), the Third Circuit remarked on _Schonacher_ and _Midwest_ but declined to take their approach. _National_ did not involve a confession of judgment. Rather, National Union Fire Insurance Company ("National") commenced a declaratory judgment action against the RTC, as receiver for City Savings, F.S.B. ("City Savings"), asserting National had the right to rescind the insurance policies issued to City Savings. The RTC moved to dismiss the declaratory judgment action and filed a counterclaim.

_National_ noted at the outset that National Union did _not_ comply with the administrative claims procedure. In short, _National_ found that the language of § 1821(d)(13)(D) bars declaratory judgment actions:

'No court shall have jurisdiction over-(i) any claim or action for payment from, or _any civil action seeking a determination of rights with respect to, assets of any depository institution_ for which the corporation has been appointed receiver'.... The term "any action" includes actions by debtors as well as creditors, and is not limited to actions asserting a right to payment .... [ § 1821(d)(13)(D)] bars National Union and Gulf's declaratory judgment action.

_Id._ at 385-89 (citations omitted). With respect to the affirmative defenses asserted by National in response to the RTC counterclaim, _National_ found "[w]e believe that the plain meaning of the language contained in § 1821(d)(13)(D) indicates that the statute does not create a jurisdictional bar to defenses or affirmative defenses which a party seeks to raise in defending against a claim." _Id._ at 393. More specifically:*9 We think it is plain enough that a defense or an affirmative defense is neither an 'action' nor a 'claim,' but rather is a _response_ to an action or a claim, and that therefore defenses and affirmative defenses do not fall under any of the above four categories of actions.[FN3]

> FN3. _See supra_ note 2 (articulating four categories of actions barred by §

1821(d)(13)(D)).

3

There is a conflict among courts concerning whether affirmative defenses are jurisdictionally barred by § 1821(d)(13)(D). _See_ cases cited in_RTC v. Schonacher_, 844 F.Supp. 689, 692-94 (D.Kan.1994). The only court of appeals to consider this issue has held that an affirmative defense of mutual mistake is not barred by § 1821(d)(13)(D), _RTC v. Midwest Fed. Sav. Bank of Minot_, 4 F.3d 1490, 1494-97 (9th Cir.1993). We agree with the outcome of _Midwest Federal_, but, as suggested in _supra_ at 386-92 and n. 8, our analysis does not mirror the reasoning of the Court of Appeals for the Ninth Circuit.

3

The jurisdictional bar contained in § 1821(d)(13)(D) therefore does not apply to defenses or affirmative defenses,

Of course, in addition to raising defenses or affirmative defenses to an action or claim, a party also raises _counterclaims_, such counterclaims would fall under § 1821(d)(13)(D)'s jurisdiction bar because a counterclaim is a 'claim .' ...Therefore, unless counterclaims were properly submitted to the administrative claims procedure of [the] FIR-REA, they would be subject to the jurisdictional bar of § 1821(d)(13)(D).

Whether an assertion is truly a defense, an affirmative defense, or a counterclaim is a question courts are competent to answer. As discussed above, a claim (or a counterclaim) is essentially an action which asserts a right to payment. Courts should not allow parties to avoid the procedural bar of § 1821(d)(13)(D) by simply labeling what is actually a counterclaim as a defense or affirmative defense.

_Id._ at 393-94 & n. 24 (citations omitted).

The Court concludes that the jurisdictional bar articulated in § 1821 bars Defendants' Counterclaims. Specifically, § 1821 precludes Defendants from obtaining an affirmative recovery as set forth in the Counterclaims because Defendants failed to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

file suit appealing the adverse adjudication of their proof of claim within 60 days. The jurisdictional bar does not, however, defeat Defendants' ability to proceed with their affirmative defenses which seek to set-off or reduce the FDIC's claim by the amount of Defendants' claim. Defendants have no right to affirmative payment. They do, however, have a right to reduce the FDIC's claim.

Because the affirmative defenses aim only to reduce the FDIC's claim, they technically do not seek payment from the assets of a failed savings and loan (Atlantic). The jurisdictional bar within this context only occurs when a party asserts a right to payment from the assets of a failed savings and loan. Defendants' Counterclaims seek such payment and are barred. Defendants' affirmative defenses do not attempt to reach the assets of a failed savings and loan and are therefore not barred.

*10 Accordingly, the Court will grant FDIC's Motion to Dismiss Defendants' Counterclaims and deny FDIC's Motion to Strike Defendants' Affirmative Defenses.

B. FDIC's Motion for Summary Judgment

1. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Furthermore, bearing in mind that all uncertainties are to be resolved in favor of the nonmoving party, a factual dispute is only "material" if it might affect the outcome of the case. Id.Rule 56(c) directs summary judgment "after adequate time for discovery ... against a party who fails to make a showing suffi-

cient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

2. Section 1823(e)(1), D'Oench, Duhme, and the Federal Holder in Due Course Doctrine

a. FDIC's Position

FDIC argues it has established a *prima facie* case for "money lent:" (1) the Notes are valid; (2) Atlantic funded $3,245,272 under the Promissory Note in 1985; (3) Atlantic disbursed an additional $2,316,620 under the Construction Loan; (4) Defendants admit Atlantic funded at least an additional $1,500,000; (5) the borrowers have defaulted and failed to make interest and payments from January, 1990 and thereafter; (6) the signatures are indisputably valid; (7) the Receiver has produced the relevant documents and modifications; and (8) the total due is $10,297,219.00. (Greenberg Aff. (disclosing loan history and amounts due)).

FDIC asserts that because this claim arises under federal law (12 U.S.C.A. § 1819(b)(2)(A) (West 1989 & Supp.1997) ("Federal Court Jurisdiction-In general")), federal common law controls, pointing to Central W. Rental Co. v. Horizon Leasing, Div. of Horizon Fin., F.A., 967 F.2d 832, 837 (3d Cir.1992) (remarking that FDIC's defense "was brought pursuant to 12 U.S.C.A. § 1819(b)(2)(A). Accordingly, this suit 'arises under' federal law, and we will look to federal common law for guidance"). FDIC claims that Defendants' affirmative defenses are barred by D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 47, 62 S.Ct. 676 (1942) and its statutory equivalent:

(e) Agreements against interests of Corporation

(1) In general

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

this title, either as security for a loan or by purchase as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement-

*11 (A) is in writing,

(B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e).

FDIC also seeks to invoke the holder in due course doctrine. "A holder in due course takes an instrument for value, in good faith, and without notice of any defense against it or claims to it." *Federal Savings and Loan Ins. Corp. v. Murray,* 853 F.2d 1251, 1256 (5th Cir.1988) (stating "[m]ost of the case law developed under *D'Oench* has in effect extended holder in due course status to federal banking regulators in purchase and assumption situations .... FDIC enjoys the rights of a holder in due course"). According to FDIC, as a holder in due course, Defendants cannot assert personal defenses on the note against the FDIC. *Resolution Trust Co. v. Brentwood Historic Assoc.,* No. 90-5742, 1991 WL 25586, at *4 (E.D.Pa. Feb.26, 1991) (stating "because the RTC is a holder in due course with respect to the note, Brentwood is precluded from asserting personal defenses on the note") (citations omitted).

b. Defendants' Position

Defendants attack the applicability of *D'Oench, Duhme* to the affirmative defenses asserted in the instant case. According to Defendants, the loan documents satisfy all four requirements of § 1823(e), and *D'Oench, Duhme* does not apply. Ac-

cording to Defendants, the loans are valid written agreements which created bilateral obligations between Atlantic and Defendants, and *D'Oench, Duhme* does not apply.

c. Section 1823(e)(1)

Section 1823(e)(1), the statutory codification of *D'Oench, Duhme,* bars any claim that (1) is "based upon an agreement that is *either* (a) unwritten *or* (b) if in writing, does not meet the stringent requirements of §§ 1823(e)(1)(B)-(D), *and* (2) would diminish or defeat the interest of the FDIC in an asset acquired by it in its capacity as receiver of a failed depository institution." *Murphy v. Federal Deposit Ins. Corp.,* 61 F.3d 34, 36 (D.C.Cir.1995).

Section 1823(e)(1) does not apply in the instant case. This provision bars the invocation of unwritten agreements that were not recorded in a bank's records as defenses against payment of a promissory note. The loans, specifically the Promissory Note, Construction Loan, and Modification, are (1) in writing, (2) executed by the depository institution contemporaneously with the acquisition of the asset by the depository institution, (3) approved by the board of directors of the depository institution, and (4) continuously, from the time of their execution, official records of the depository institution.

*12 Furthermore, the agreement on which the FDIC attempts to collect is the very same agreement Defendants allege Atlantic breached.

[W]hen the asset upon which the FDIC is attempting to recover is the *very same agreement* that the makers allege has been breached by the FDIC's assignors, none of the policies that favor the invocation of § 1823(e) are present because the terms of the agreement that tend to diminish the rights of the FDIC appear in writing on the face of the agreement that the FDIC seeks to enforce.

3

Section 1823(e) does not apply when the court determines if an asset is invalid for breach of bilateral obligations contained in that asset. In such cases the parties contend that no asset exists or an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 11
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

asset is invalid and that such invalidity is caused by acts independent of any understanding or a side agreement.

*Federal Deposit Ins. Corp. v. Bathgate,* 27 F.3d 850, 867 (3d Cir.1994) (citations omitted). The financial instruments in question imposed obligations on both parties. Atlantic was obligated under the Promissory Note to disburse funds to Defendants. Defendants had a concomitant obligation to make payments of interest and principal to repay those disbursements. Accordingly, § 1823(e)(1) does not apply.

d. *D'Oench, Duhme* and Federal Holder in Due Course Doctrine

"*D'Oench, Duhme* is a federal estoppel doctrine which prohibits borrowers or guarantors from using secret or unrecorded side agreements to defend against efforts by FDIC or its assignees to collect on promissory notes it has acquired from a failed bank." *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1502 (3d Cir.1996) (citation omitted). *D'Oench, Duhme* teaches that:

a debtor who lends himself to a scheme or arrangement tending to mislead bank examiners cannot raise any term or condition of that scheme or arrangement as a defense against the FDIC in a suit on a note. This doctrine is a rule of equitable estoppel which prevents those who give notes to federally insured institutions from asserting defenses based on side agreements with failed banks regarding the enforceability of promissory notes.

*Resolution Trust Corp. v. Bentwood Historic Assocs.,* No.1991 WL 25586, at *3 (E.D.Pa. Feb. 26, 1991). *See also DiVall Ins. Income Fund Ltd. Partnership v. Boatmen's First Nat'l Bank of Kansas City,* 69 F.3d 1398, 1400 (8th Cir.1995) (noting that in *D'Oench, Duhme,* the Supreme Court "created a federal common law rule barring the invocation of 'secret agreements' which were not recorded in a bank's records as defenses against payment of a promissory note"); *Resolution Trust Corp. v. Daddona,* 9 F.3d 312, 316 (3d Cir.1993)

(stating "[t]he rule emerging from *D'Oench, Duhme* is that no agreement between a borrower and a bank which does not plainly appear on the face of an obligation or in the bank's official records is enforceable against the FDIC") (citation omitted).

**\*13** The federal holder in due course doctrine "bars makers of promissory notes from asserting personal defenses against the FDIC and its successors even though the defenses are based on a written agreement." *DiVall,* 69 F.3d at 1401 (citations omitted).

The Court questions the ability of the FDIC to invoke *D'Oench, Duhme* and the federal holder in due course doctrine. The Court recognizes authority, supplied by FDIC, supporting the contention that the FDIC enjoys federal holder in due course status. In *Federal Sav. and Loan Ins. Corp. v. Murray,* 853 F.2d 1251, 1256 (5th Cir.1988), the United States Court of Appeals for the Fifth Circuit found:

[the Federal Savings and Loan Insurance Corporation ("FSLIC")] does not meet the technical requirements of a holder in due course in this case because it acquired these notes in bulk through a purchase and assumption transaction, rather than in the normal course of business. Nonetheless, the sensitive federal interests implicated when FSLIC rescues an insolvent savings and loan lead us to conclude that FSLIC should enjoy at least holder in due course status as a matter of federal common law.

Most of the case law developed under *D'Oench* has in effect extended holder in due course status to federal banking regulators in purchase and assumption situations. Many of these cases, however, have considered only whether the maker could assert a particular personal defense against FDIC without reference to a broader rule.

3

But several other courts have either held or suggested that FDIC enjoys the rights of a holder in due course .... The courts recognize that banking regulators faced with rescuing a shaky institution can choose to: (1) liquidate the institution and pay the depositors their insured amounts; or (2) arrange a purchase and assumption transaction, under which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 12
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

another institution buys and reopens the failed one with no service interruptions and no depositor losses. Purchase and assumption transactions provide an attractive option because they operate quickly, usually at lower cost to the government, and with less damage to depositor confidence.

   *Id.* at 1256.

   More recent decisions, however, reached different conclusions. In *O'Melveny & Meyers v. Federal Deposit Ins. Corp.,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), the FDIC, acting as Receiver of a federally insured bank, brought suit against the bank's former counsel, alleging legal malpractice and breach of fiduciary duty. *O'Melveny* assessed whether, in a suit brought by the FDIC "as receiver of a federally insured bank, it is a federal-law or rather a state-law rule of decision that governs the tort liability of attorneys who provided services to the bank." *O'Melveny,* 114 S.Ct. at 2051. *O'Melveny* found that:

   the FDIC as receiver 'steps into the shoes' of the failed S & L, obtaining the rights of the insured depository institution that existed prior to receivership. Thereafter, in litigation by the FDIC asserting the claims of the S & L-in this case California tort claims potentially defeasible by a showing that the S & L's officers had knowledge-any defense good against the original party is good against the receiver.

   3
   *14 It is hard to avoid the conclusion that § 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent S & L, to work out its claims under state law, except where some provision in the extensive framework of [the] FIRREA provides otherwise. To create additional 'federal common law' exceptions is not to 'supplement' this scheme, but to alter it.

   *Id.* at 2054 (citations omitted).

   Cases decided subsequent to *O'Melveny* have extrapolated its holding to diminish the significance of the *D'Oench, Duhme* doctrine and preclude invocation of the federal holder in due course doc-

trine. In *DiVall,* the United States Court of Appeals for the Eighth Circuit ("Eighth Circuit") concluded *O'Melveny:*

   removes the federal common law *D'Oench Duhme* doctrine and the federal holder in due course doctrine as separate bars to DiVall's defense. If DiVall's defense is to be barred, it must be barred either by a specific provision of [the] FIRREA or by state law.

   *Id.* at 1402. The United States Court of Appeals for the District of Columbia Circuit has also taken this approach. *See Murphy v. Federal Deposit Ins. Corp.,* 61 F.3d 34, 35-38 (D.C.Cir.1995) (finding that in *O'Melveny* "the Supreme Court does not flatly state that *D'Oench* has been preempted by the FIRREA, but it does set forth some more general propositions that, we think, lead ineluctably to that conclusion"). At least two other United States Circuit Courts of Appeals, *including* the Third Circuit, have suggested the same result, without specifically adopting the conclusions reached in *DiVall* and *Murphy. See Federal Deposit Ins. Co. v. Houde,* 90 F.3d 600, 605 n. 5 (1st Cir.1996) (noting "the continuing viability of the federal holder in due course doctrine is questionable"); *DiMuzio v. Resolution Trust Corp.,* 68 F.3d 777, 780 n. 2 (3d Cir.1995) ("we need not apply the federal law doctrine of *D'Oench, Duhme.* Indeed, we note that the *D'Oench, Duhme* doctrine may no longer be a separate bar to plaintiff's claims") (citing *O'Melveny* and *Murphy* ).

   The United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") has taken a contrary approach. In *Motorcity of Jacksonville, Ltd. v. Southeast Bank N.A.,* 83 F.3d 1317 (11th Cir.1996), *vacated,* 519 U.S. 1087, 117 S.Ct. 760, 136 L.Ed.2d 708 (1997), the Eleventh Circuit found "[w]e disagree with the analysis of the D.C. and Eighth Circuits and hold that the federal common law *D'Oench* doctrine has not been preempted by statute." *Id.* at 1327. In reaching this conclusion, the Eleventh Circuit reasoned, *inter alia,* that (1) "*Erie [R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)] did not destroy all types of common law;" (2) "federal courts have created and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 13
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

applied federal common law when necessary to protect certain uniquely federal interests;" (3) "federal common law is often merely a 'necessary expedient' in instances in which 'Congress has not spoken to a *particular* issue;" "'*Murphy* erred in relying on *O'Melveny;* " and (5) "federal courts are not free to contradict a congressional policy choice that 'speaks directly' to a particular question previously answered by federal common law." *Id.* at 1327-31 (citations omitted).

   **\*15** The differing conclusions reached in *DiVall* and *Motorcity* created a split among the United States Circuit Courts of Appeals. *See Houde,* 90 F.3d at 605 n. 5 (remarking "[a] circuit split has arisen as to whether the [[[federal holder in due course] doctrine is still valid after *O'Melveny* "); *Adams v. Zimmerman,* 73 F.3d 1164, 1168 n. 2 (1st Cir.1996) (noting "[a] circuit split appears to have developed over the question of whether § 1823(e) has preempted *D'Oench* ").

   The United States Supreme Court, however, appears to have resolved the conflict, at least indirectly. A recent decision, *Atherton v. Federal Deposit Insurance Corp.,* 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997), reenforces and strengthens the legal precepts articulated in *O'Melveny* with respect to the diminishing significance of federal common law in the FIRREA context. *Atherton* involved an action brought by the FDIC against the former officers of a failed savings and loan, alleging negligence, breach of fiduciary duty, and gross negligence. *Atherton* focused on the appropriate legal "standard for determining whether or not [the officer's] behavior was improper, [asking] where courts should look to find the standard of care to measure the legal propriety of the defendants' conduct-to state law, to federal common law, or to a special federal statute ... that speaks of 'gross negligence'?" *Id.* at 669.

   The *Atherton* Court concluded "state law sets the standard of conduct as long as the state standard (such as simple negligence) is stricter than that of the federal statute. The federal statute nonetheless sets a 'gross negligence' floor, which applies as a

substitute for state standards that are more relaxed." *Id.* This decision rested, in part, on the conclusion that "the federal common-law standards enunciated in [prior cases articulating corporate governance standards applicable to federally chartered banks] such as *Briggs [v. Spaulding,* 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1891)]* did not survive this Court's later decision in *Erie R. Co. v. Tompkins.* There is no federal common law that would create a general standard of care applicable to this case." *Id.* at 674.

   The Supreme Court's *Atherton* decision compelled the reversal of *Motorcity.* Specifically, the Supreme Court granted the petition for writ of *certiorari* to the Eleventh Circuit in *Motorcity* and vacated that decision, citing *Atherton. See Hess v. Federal Deposit Ins. Corporation,* 519 U.S. 1087, 117 S.Ct. 760, 136 L.Ed.2d 708 (stating "Judgment vacated, and case remanded to the United States Court of Appeals for the Eleventh Circuit for further consideration in light of *Atherton v. Federal Deposit Insurance Corporation,* 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997)"). By vacating *Motorcity,* the Supreme Court effectively resolved the split of authority among the United States Circuit Courts of Appeals.

   *Atherton* dictates that neither *D'Oench, Duhme* nor the federal holder in due course doctrine applies in the instant case. Those cases which have already reached this conclusion, *i.e., DiVall* and *Murphy,* rested largely on *O'Melveny. Atherton* 's instruction regarding federal common law augments *O'Melveny* 's precedential value and increases the momentum with which this Court proceeds toward the conclusions reached in *DiVall* and *Murphy.*

   **\*16** The Court's decision also comports, as much as possible, with the direction suggested by the Third Circuit. *See DiMuzio,* 68 F.3d at 780 n. 2 ("we need not apply the federal law doctrine of *D'Oench, Duhme.* Indeed, we note that the *D'Oench, Duhme* doctrine may no longer be a separate bar to plaintiff's claims") (citing *O'Melveny* and *Murphy* ).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

e. Conclusion

The Court holds, based upon the legal precepts articulated in the aforementioned cases, that federal common law is not applicable to the FIRREA issues presented in the instant case. There is no "federal" commercial code for negotiable instruments which would supply a federal holder in due course doctrine, and the Court refuses to extract a federal holder in due course doctrine from illusory federal common law. Recent decisions from the United States Supreme Court recognize state law, not federal common law, as the source for the standards to measure the validity of the affirmative defenses at issue. This direction rests, in large part, on a belief that there is no federal common law that would create a general standard of care applicable in a FIRREA case.

The FIRREA is a function of either statutory precepts or *state* common law. The Court will therefore examine whether FDIC is entitled to holder in due course status under Pennsylvania law. *See DiVall,* 69 F.3d at 1403 (noting Boatmen's "has not pointed to any specific provision of [the] FIRREA which confers holder in due course status on the FDIC. Accordingly, the holder in due course issue must be decided under state law").

3. State Holder in Due Course Doctrine

The critical question presented with respect to whether or not FDIC can assert holder in due course status under state law is whether the loan documents are negotiable or nonnegotiable instruments. The holder in due course doctrine only applies if the loan documents are negotiable instruments.

The Pennsylvania Uniform Commercial Code, Article 3, Negotiable Instruments, 13 Pa. Cons.Stat. Ann. §§ 3101-3120 (West 1984 & Supp.1997) ( "Article 3"), "applies to negotiable instruments." 13 Pa. Cons.Stat. Ann. § 3102(a). "Negotiable instrument" refers to:

an unconditional promise or order to pay a fixed amount of money with or without interest or other charges described in the promise or order, if it: (1) is payable to bearer or to order at the time it is issued .... (2) is payable on demand or at a definite time; and (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money.

13 Pa. Cons.Stat. Ann. § 3104(a) (West Supp.1997). In order to be negotiable, the instrument must contain an *unconditional* promise to pay. A promise is unconditional *unless* it states:(1) an express condition to payment; (2) that the promise or order is subject to or governed by another writing; or (3) that the rights or obligations with respect to the promise or order are stated in another writing. A reference to another writing does not itself make the promise or order conditional.

*17 13 Pa. Cons.Stat. Ann. § 3106(a)(1)-(3) (West Supp.1997).

The original Promissory Note constituted a negotiable instrument where Parkway "hereby promise[ed] to pay to the order of ATLANTIC FINANCIAL FEDERAL ... the principal amount of $2,000,000." (Def.s' App. at 1). At first blush, the Modification also appears to be a negotiable instrument: "[m] aker hereby promises to pay to the order of Payee at the office of Payee or at such other place as Payee shall designate in writing, the principal amount ...." (Def.s' App. at 103 ¶ 1).

The Court finds, however, that the Modification cannot be negotiable because it is subject to the other loan documents which contain additional rights and obligations with respect to the promise, making it conditional. Specifically, the Modification provides: "WHEREAS, Maker and Payee now desire to amend the Note in the fashion hereinafter set forth." (Def.s' App. at 103). Disbursements under the Modification depend on other agreements: "[t]his note is to be disbursed pursuant to a construction loan and security agreement of even date herewith among Maker, Payee and Provident ...." (Def.s' App. at 104 ¶ 2).

A panoply of other provisions in the Modifica-

tion incorporate the separate loan documents. These provisions include (1) paragraph 4, "Maker shall also pay to Payee additional interest upon a sale of the Mortgaged Property or any portion thereof or any interest therein ... in accordance with the following formula ...."; (2) paragraph 7, listing as an event of default, *inter alia*, the "occurrence of any default ... under the Mortgage, Loan Agreement or under any other Loan Documents;" (3) paragraph 8, authorizing the Payee to exercise "any right, power or remedy permitted by law or as set forth herein or in the Mortgage, Loan Agreement or in any other of the Loan Documents;" and (4) paragraph 9, making the Payee's rights and remedies "as provided herein and in any other Loan Document ... cumulative and current. (Def.s' App. at 105-06 ¶¶ 4, 7, 8, 9). The Modification also contains additional promises that depend on the other loan documents: "Maker promises to pay on demand any additional monies required to be paid or advanced by Maker or paid or advanced on behalf of Maker by Payee pursuant to the terms of the Loan Agreement, the Mortgage and the other Loan Documents." (Def.s' App. at ¶ 5.1).

The accompanying comment to 13 Pa. Cons.Stat. Ann. § 3106 expands on how other writings destroy negotiability and supports the Court's finding that the loan documents are nonnegotiable:

a promissory note is not an instrument defined by Section 3-104 [Negotiable instrument"] if it contains any of the following statements: 1. 'This note is subject to a contract of sale dated April 1, 1990 between the payee and maker of this note.' 2. 'This note is subject to a loan and security agreement dated April 1, 1990 between the payee and maker of this note' 3. 'Rights and obligations of the paries with respect to this note are stated in an agreement dated April 1, 1990 between payee and maker of this note.' It is not relevant whether any condition to payment is or is not stated in the writing to which reference is made. The rationale is that the holder of a negotiable instrument should not be required to examine another document to determine rights with respect to payment. But subsection (b)(i) permits reference to a separate writing for information with respect to collateral, prepayment, or acceleration.

*18 13 Pa. Cons.Stat. Ann. § 3106 cmt. 1 (West Supp.1997). In the instant case, the Modification does more than merely "reference" the other loan documents for record keeping purposes. Rather, it incorporates those documents and the rights articulated therein. The holder of the Modification must examine the other loan documents in order to determine obligations, rights, and responsibilities.[W]henever an instrument requires that reference be made to a separate agreement in order to determine whether there is a condition to payment, the instrument is not negotiable. The mere existence of the requirement that another agreement be consulted is sufficient to destroy negotiability; it is irrelevant that examination of the other agreement does not reveal a condition precedent to payment. No instrument can, therefore, be negotiable which (1) is subject to another agreement, (2) refers to another agreement for the rights of the parties, or (3) incorporates another agreement. But the existence of another agreement on the same sheet of paper as the instrument does not make the instrument conditional unless the instrument is expressly made subject to the attached agreement. By the same token, an instrument which lacks an essential element of negotiability cannot be made negotiable by reference to a separate agreement which contains the requisite element.

3

While an instrument which is expressly made subject to another agreement is nonnegotiable, an instrument which merely refers to the existence of another agreement is negotiable. As long as reference need not be made to the other agreement to determine the whether payment is due, the instrument is not deemed to be conditional. No condition to payment will be implied by the reference. Thus, a party may refer to another agreement for record keeping purposes without destroying its negotiability. An instrument may, therefore, be negotiable if it states that (1) it arises out of a separate agreement, (2) is drawn under a letter of credit, or (3) it is executed 'as per' or pursuant to another agreement.

4 Hawkland & Lawrence UCC Series §

3-105:02 (Rev Art 3) (1996) (citing cases).

Accordingly, the Court finds the loan documents at issue are nonnegotiable instruments. This conclusion applies equally to the Guaranty. *See* 5A Anderson UCC 3d § 3-104:34 (1994) ("[a] continuing guaranty is not a negotiable instrument and therefore is not governed by Article 3 of the Code. A separate written guaranty does not satisfy the requirements of UCC § 3-104 and therefore is not governed by Article 3").

FDIC cannot invoke holder in due course status because the notes sued upon are nonnegotiable instruments. "There cannot be a holder in due course of a nonnegotiable instrument." 6A Hawkland & Lawrence UCC Series § 3-302:01 n. 1 (Rev Art 3) (1996). *See Federal Deposit Ins. Co. v. Barness,* 484 F.Supp. 1134, 1145 (E.D.Pa.1980) ("[o]ur threshold task is to determine whether to use the Uniform Commercial Code or the common law of assignment in analyzing the issues in this case .... [T]he common law of assignment must be applied, for Barness' note to the Centennial Bank is not a negotiable instrument"); *Morgan Guar. Trust Co. of New York v. Staats,* 428 Pa.Super. 479, 631 A.2d 631, 636 (Pa.Super.Ct.1993) ("[e]very holder of a negotiable instrument is deemed, *prima facie,* a 'holder in due course' ") (citation omitted), *appeal discontinued,* 637 A.2d 288 (Pa.1994); *Stevwing v. Western Pennsylvania Nat'l Bank,* 468 Pa. 24, 359 A.2d 793, 796 (Pa.1976) ("at trial the parties stipulated that WPNB was not a holder in due course. In light of the fact that the note was not separately negotiable, this stipulation was unnecessary"); *Cheltenham Nat'l Bank v. Snelling,* 230 Pa.Super. 498, 326 A.2d 557, 560 (Pa.Super.Ct.1974) ("[a]ppellant contends, however, that Cheltenham cannot be a holder in due course because the instrument assigned to it ... [was] a non-negotiable note .... Under the law of this Commonwealth, the note assigned to Cheltenham was nonnegotiable and Cheltenham took it subject to any defenses appellant could assert against Goodway"), *cert. denied,*421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 453 (1975); 5A Anderson UCC 3d § 3-302:4 (1994) ("[b]y definition there cannot be a holder in due course

unless the paper is negotiable").

*19 Finally, the Court finds factual issues surrounding whether the FDIC took the loan documents in good faith without notice of any defenses against them or claims to them. Factual questions exist regarding whether the FDIC knew of Defendants' claims and defenses when it purchased the loan documents, especially in light of the fact that Defendants submitted a proof of claim. In addition, factual questions arise regarding whether the FDIC is actually the holder of the documents in question. (*Compare* Greenberg Aff. ¶ 19 ("I have knowledge of the matters contained in the payoff statement [-sent from Knutson Mortgage Corporation to RPC-Mitchell/Titus, Inc.-]"), *with* Evans Aff. ¶ 34 ("[i]n addition to the loans at issue in this case, Atlantic Federal had made two other loans to Parkway which were unrelated to Five Logan Square. Following the takeover of Atlantic Federal, RTC sold these other loans to third parties")).

Accordingly, the Court denies FDIC's request for summary judgment based on holder in due course status.

### 4. Remaining Affirmative Defenses

#### a. Waiver and Estoppel

FDIC claims the defenses of equitable estoppel and waiver may not be asserted against either the RTC and FDIC as receivers. The cases relied on by FDIC, however, fail to substantiate that contention. *Hachikian v. Federal Deposit Ins. Corp.,* 96 F.3d 502, 506 n. 4 (1st Cir.1996) (emphasis supplied) states only that "estoppel as a means of binding the federal government to *unauthorized* agreements has been almost universally rejected." *Federal Deposit Ins. Corp. v. White,* 828 F.Supp. 304, 310 (D.N.J.1993) rejected the assertion that no affirmative defense based on estoppel can be asserted against the FDIC, noting "that the many cases relied on by plaintiff do not hold that equitable defenses such as estoppel and waiver can *never* be asserted against the FDIC."*White* ultimately struck those defenses, but only because "public policy

clearly militate[d] against the assertion of the equitable defenses." *Id.* at 311. Finally, *Resolution Trust Corp. v. Farmer,* 823 F.Supp. 302, 313 (E.D.Pa.1993) remarked that "as a rule, courts have been reluctant to apply estoppel against the government .... based upon considerations of sovereign immunity, separation of powers and public policy." *Farmer* found, however, that "[f]or estoppel to be applied against the federal government, there must be at least some affirmative misconduct on the part of government upon which the defendant detrimentally relied ."*Id.*

FDIC has failed to demonstrate that it is entitled to judgment as a matter of law on the estoppel and waiver defenses. Accordingly, those defenses proceed to trial.

b. Statute of Limitations & Laches

Defendants' statute of limitations defense and laches defense both fail. FDIC filed its lawsuit in a timely manner. The FIRREA prescribes the limitations period applicable to this action:

(A) In general

*20 Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be-

(i) in the case of any contract claim, the longer of-

(I) the 6-year period beginning on the date the claim accrues; or

(II) the period applicable under state law;

3

(B) Determination of the date on which a claim accrues

For purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim ... shall be the later of-

(i) the date of the appointment of the Corpora-

tion as conservator or receiver;

or

(ii) the date on which the cause of action accrues

12 U.S.C.A. § 1821(d)(14)(A), (B). The FIRREA looks to the limitations period imposed under state law. The relevant Pennsylvania statute applies a 4 year limitations period *inter alia:*(7) An action upon a negotiable or nonnegotiable bond, note or other similar instrument in writing. Where such an instrument is payable upon demand, the time within which an action on it must be commenced shall be computed from the later of either demand or any payment of principal of or interest on the instrument.

(8) An action upon a contract, obligation or liability founded upon a writing not specified in paragraph (7), under seal or otherwise, except an action subject to another limitation specified in this subchapter.

42 Pa. Cons.Stat. Ann. § 5525(7), (8) (Supp.1997).

Because the 6 year period prescribed by the FIRREA is greater than the 4 year limitations period articulated by state law, the FIRREA controls. In the instant case, the RTC was appointed receiver on January 11, 1990. The six year statute of limitations begins to run on the later of (1) the date RTC becomes Receiver or (2) the date prescribed by state law. Here, the suits were filed on January 10, 1996, clearly within the six year period.

c. Failure of Consideration

The FDIC requests summary judgment with respect to the failure of consideration defense on the basis of the holder in due course doctrine, *D'Oench, Duhme,* and § 1823(e)(1). Since none apply in the instant case, the FDIC has failed to prove it is entitled to judgment as a matter of law with respect to the failure of consideration defense.

d. Repudiation

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)

**(Cite as: Not Reported in F.Supp.)**

Page 18

The FIRREA provides, with respect to repudiation:

(e) Provisions relating to contracts entered into before appointment of conservator or receiver

(1) Authority to repudiate contracts

In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease-

(A) to which such institution is a party;

(B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and

(C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

(2) Timing of Repudiation

*21 The conservator or receiver appointed for any insured depository institution in accordance with subsection (c) of this section shall determine whether or not to exercise the rights of repudiation under this subsection within a reasonable period following such appointment.

(3) Claims for damages for repudiation

(A) In general

Except as otherwise provided in subsection (C) [Measure of damages for repudiation of financial contracts] and paragraphs (4) [Leases under which the institution is the lessee], (5) [Leases under which the institution is the lessor], and (6) [Contracts the for sale of real property], the liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be-

(i) limited to actual direct compensatory damages; and

(ii) determined as of-

(I) the date of the appointment of the conservator or receiver; or

(II) in the case of any contract or agreement referred to in paragraph (8), the date of the disaffirmance or repudiation of such contract or agreement.

(B) No liability for other damages

For purposes of sub-paragraph (A), the term "actual direct compensatory damages" does not include-

(i) punitive or exemplary damages

(ii) damages for lost profits or opportunity; or

(iii) damages for pain and suffering.

12 U.S.C.A. § 1821(e)(1), (3).

This Court has already concluded that Defendants' failure to file suit within 60 days of the denial of their proof of claim precludes them from asserting Counterclaims for breach of contract and repudiation. Non-compliance with the administrative procedure, however, does not prevent Defendants from asserting repudiation as an affirmative defense. Defendants may off-set statutory damages for repudiation against the FDIC's recovery. The jurisdictional bar will not preclude repudiation damages which are actual, direct, compensatory damages-to the extent of the claim asserted by the FDIC.

Moreover, whether the repudiation took place within a reasonable period presents a fact sensitive question more appropriate for jury resolution and better addressed under Fed.R.Civ.P. 50 than Fed.R.Civ.P. 56(c). Accordingly, Defendants' repudiation defense proceeds to trial.

III. Conclusion

FDIC's Motion to Dismiss Defendants' Counterclaims shall be granted. The Court will deny FDIC's Motion to Strike Defendants' Affirmative Defenses. The Court will grant in part and deny in part FDIC's Motion for Summary Judgment. The Motion is granted with respect to Defendants' statute of limitations and laches defenses. The affirmative de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

fenses of estoppel, waiver, failure of consideration, and repudiation will proceed to trial.

An appropriate Order follows.

### *ORDER*

AND NOW, this 15th day of August, upon consideration of Plaintiff's Motion to Dismiss Counterclaims, Motion to Strike Affirmative Defenses, and Motion for Summary Judgment (Doc. Nos.22, 23), Defendants' Brief in Opposition thereto (Doc. Nos.26, 27), Plaintiff's Reply (Doc. No. 30), Defendant's Surreply (Doc. No. 32), Plaintiff's Supplemental Memorandum (Doc. No. 33), Defendants' Supplemental Brief (Doc. No. 34), and an Oral Argument held on December 11, 1996 (Doc. No. 32), IT IS HEREBY ORDERED THAT:

**\*22** 1. Plaintiff's Motion to Dismiss Counterclaims is GRANTED.

2. Plaintiff's Motion to Strike Affirmative Defenses is DENIED.

3. Plaintiff's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED with respect to Plaintiff's statute of limitations defense and laches defense. The Motion is DENIED in all other respects.

E.D.Pa.,1997.
Federal Deposit Ins. Corp. v. Parkway Executive Office Center
Not Reported in F.Supp., 1997 WL 535164 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 115553 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**C**

Greiff v. T.I.C. Enterprises, L.L.C.
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
James GREIFF and T.I.C. Enterprises, Inc.,
Plaintiffs,
v.
T.I.C. ENTERPRISES, L.L.C., NUI Capital Corp.,
NUI Sales Management, Inc., and NUI Corpora-
tion, Defendants.
**No. Civ. 03-882-SLR.**

Jan. 9, 2004.

Elizabeth M. McGeever, Prickett, Jones & Elliott,
Wilmington, DE, for Plaintiffs.
Jack Charles Schecter, Morris, Nichols, Arsht &
Tunnell, Wilmington, DE, for Defendants.

MEMORANDUM ORDER

ROBINSON, J.
  *1 At Wilmington, this 9th day of January,
2004, having reviewed defendants' motion to strike
plaintiffs' affirmative defenses and the papers sub-
mitted by the parties in connection therewith;

  IT IS ORDERED that defendants' motion to
strike plaintiffs' sixteen affirmative defenses
(D.I.69) is granted in part as to plaintiffs' seventh,
eighth, ninth, tenth, twelfth, and sixteenth affirmat-
ive defenses and denied in part as to plaintiffs' first,
second, third, fourth, fifth, sixth, eleventh, thir-
teenth, fourteenth, and fifteenth affirmative de-
fenses.

  1. On May 8, 2001, defendants agreed to pur-
chase plaintiffs' fifty-one percent remaining interest
FN1 in T.I.C. Enterprises, LLC for a total sum of
eight million dollars to be financed in two parts: (1)
five million dollars to be paid in cash upon closing
the sale transaction in May 2001; and (2) three mil-
lion dollars in promissory notes to be paid on a ma-
turity date of January 2, 2001. (D.I. 6 at ¶ 7; seeid.,
exh. A) On April 4, 2002, plaintiffs filed suit

against defendants in state court for failure to pay
the promissory notes as required under the purchase
agreement. (D.I. 36 at 2) Defendants removed the
case to the United States District Court for the
Northern District of Georgia on May 15, 2002.
Plaintiffs filed their first amended complaint on
June 17, 2002 alleging breach of contract, fraud,
and tortious interference with contractual relations.
(See D.I. 6) Defendants answered this first amended
complaint on July 15, 2002 denying the allegations
and contending that plaintiffs failed to state a claim
upon which relief may be granted for select counts.
(See D.I. 11) Defendants later amended their an-
swer on November 14, 2002 to raise affirmative de-
fenses. (See D.I. 26) On March 5, 2003, defendants
also raised counterclaims against plaintiffs alleging
breach of contract, unjust enrichment, and fraud.
(See D.I. 59) Plaintiffs filed a second amended
complaint on May 29, 2003 to refine their fraud
claims against defendants to include a charge that
defendants defrauded their creditors. (D.I. 60 at ¶
34) Plaintiffs answered defendants' counterclaims
on June 2, 2003 denying the allegations and, altern-
atively, pleading affirmative defenses. ( See D.I. 63)
Defendants moved to tranfer the case to the District
of Delaware on July 2, 2003 (D.I. 66; 02-CV-1323),
and the Northern District of Georgia granted this
motion on September 10, 2003. (D.I.86)

>  FN1. Plaintiffs previously sold their forty-
>  nine percent interest in T.I.C. Enterprises,
>  LLC to defendants.

  2. Plaintiff James Greiff is a resident of the
State of Georgia. (D.I. 6 at ¶ 1) Plaintiff T.I.C. En-
terprises, Inc. is a Georgia corporation with its prin-
cipal place of business in Georgia. ( Id. at ¶ 2) De-
fendant T.I.C. Enterprises, L.L.C. is a limited liab-
ility company organized under the laws of the State
of Delaware with its principal place of business in
Georgia. (Id. at ¶ 3) Defendant NUI Capital Cor-
poration is incorporated under the laws of the State
of Florida with its principal place of business in
Florida. (Id. at ¶ 4) Defendant NUI Sales Manage-
ment is incorporated under the laws of the State of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 115553 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Delaware with its principal place of business in New Jersey. (*Id.* at ¶ 5) Defendant NUI Corporation is incorporated under the laws of the State of New Jersey with its principal place of business in New Jersey. (*Id.* at ¶ 6) The court has jurisdiction over the instant suit pursuant to 28 U.S.C. § 1332.

**\*2** 3. Federal Rule of Civil Procedure 8 requires a party to set forth affirmative defenses in a responsive pleading with a "short and plain statement." Fed.R.Civ.P. 8(a) (2003).Rule 8(c) specifically enumerates a non-exhaustive list of nineteen affirmative defenses.[FN2]Federal Rule of Civil Procedure 12(f), in turn, states:

> FN2. The affirmative defenses recognized in the rule include: accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. SeeFed.R.Civ.P. 9(c) (2003).

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Fed.R.Civ.P. 12(f) (2003). Motions to strike affirmative defenses, however, are disfavored. *Proctor & Gamble Co. v. Nabisco Brands, Inc.,* 697 F.Supp. 1360, 1362 (D.Del.1988). When ruling on such a motion, "the court must construe all facts in favor of the nonmoving party ... and deny the motion if the defense is sufficient under the law."*Id.* Furthermore, courts prefer not to grant a motion to strike "unless it appears to a certainty that ... [the movant] would succeed despite any state of the facts which could be proved in support of the defense."*Salcer v. Envicon Equities. Corp.,* 744 F.2d

935, 939 (2d Cir.1984).

4. Plaintiffs' first affirmative defense asserts that the defendants' complaint fails to state a claim upon which relief can be granted. The court notes that the Federal Rules of Civil Procedure specifically permit this averment to be raised as either an affirmative defense or in a motion to dismiss. Rule 12(b) states, in pertinent part, that: "A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under Rule 7(a)."Fed.R.Civ.P. 12(b) (2003).Rule 12(h) also states, in pertinent part, that: "Every defense, in law or fact, to a claim for relief in any pleading ... may at the option of the pleader be made by motion [including]: ... failure to state a claim upon which relief can be granted."Fed.R.Civ.P. 12(h) (2003). Additionally, it is well settled that the concept of failure to state a claim may be included in an answer as an affirmative defense. See*S.E.C. v. Toomey,* 866 F.Supp. 719, 723 (S.D.N.Y.1992). Accordingly, the court denies defendants' motion to strike plaintiffs' first affirmative defense.

5. Plaintiffs' second through sixth affirmative defenses plead, respectively, an arbitration clause, estoppel, failure of consideration, release, and waiver. These averments are proper affirmative defenses under Rule 8(c) and likewise comply with the "short and plain statement" requirement of Rule 8(a). Additionally, the court finds that plaintiffs' pleadings adequately place defendants on sufficient notice of the nature of the defenses to be litigated against them. Defendants may ascertain the context of these averments through the discovery process, possibly via contention interrogatories. Furthermore, the court concludes that defendants will not be unnecessarily prejudiced if these affirmative defenses remain in the pleadings. The court, consequently, denies defendants' motion to strike the second through sixth affirmative defenses.

**\*3** 6. Plaintiffs' seventh affirmative defense alleges that any excessive punitive damages sought by defendants are barred by the Due Process Clause of the Fourteenth Amendment and the Due Process

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 115553 (D.Del.)

(Cite as: Not Reported in F.Supp.2d)

Page 3

Clause of the Georgia Constitution. Plaintiffs' eighth and ninth affirmative defenses plead, respectively, that defendants' counterclaims must fail because defendants have not incurred any damages and that defendants' damages are contractually limited by the purchase agreement. The court finds that these averments do not constitute affirmative defenses because they will not defeat defendants' counterclaims if proven. In other words, these averments entirely overlook liability or focus solely on potential relief. In contrast, "[a]ffirmative defenses, if accepted by the court, will defeat an otherwise legitimate claim for relief." *FDIC v. Haines, 3 F.Supp.2d 155, 166 (D.Conn.1997)* (quoting 2 James Wm. Moore et al., Moore's Federal Practice § 8.07[1] (3d ed.1997)). Moreover, it is clear that the concept of damages serves a purpose far different from an affirmative defense-damages are intended to redress injuries incurred by a plaintiff after liability has been established, not as a means to shield liability in the first instance. The court, therefore, grants defendants' motion to strike plaintiffs' seventh, eighth, and ninth affirmative defenses.

7. Plaintiffs' tenth affirmative defense asserts that any damages incurred by defendants are due to their own actions. The court construes this averment as an attempt to plead contributory negligence. Defendants, however, do not plead negligence as one of their counterclaims. The court, consequently, grants defendants' motion to strike this defense.

8. Plaintiffs' eleventh affirmative defense pleads that defendants' breach of the purchase agreement and unjust enrichment counterclaims must fail because defendants breached the contract at issue.[FN3] The court construes this averment to argue that plaintiffs could not have breached the purchase agreement because defendants breached it first, thereby rendering the purchase agreement invalid. In other words, plaintiffs appear to argue that they could not have breached the purchase agreement because it was invalid. Plaintiffs' thirteenth, fourteenth, and fifteenth affirmative defenses plead, respectively, that defendants' fraud in the induce-

ment counterclaim[FN4] must fail because (1) plaintiffs did not knowingly make any false representations or material ommissions; (2) plaintiffs did not knowingly make any false representations or material ommissions with intent to induce defendants to act or to refrain from acting; and (3) defendants did not justifiably rely on any alleged misrepresentation or material omission made by plaintiffs. The court interprets these averments as denying particular elements of defendants' breach of contract and fraud in the inducement counterclaims. The court finds that these specific denials give defendants notice of the particular issues to be litigated, despite plaintiffs' choice of nomenclature. Such is one of the main purposes for the affirmative pleadings requirement of Rule 8. Additionally, "as long as the pleading clearly indicates the allegations in the complaint that are intended to be placed in issue, the improper designation should not prejudice the pleader."5 Wright & Miller, Federal Practice and Procedure: Civil 2d § 1269 (1990). Accordingly, the court denies defendants' motion to strike plaintiffs' eleventh, thirteenth, fourteenth, and fifteenth affirmative defenses.

> FN3. An action for breach of contract requires proof of: (1) a valid contract; (2) breach of a duty imposed by the contract; and (3) damages resulting from the breach.
>
> FN4. An action for a fraud in the inducement under Delaware law, requires proof of: (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction [was] taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. *SeeLord v. Souder, 748 A.2d 393, 402 (Del.2000).*

*4 9. Plaintiffs' twelfth affirmative defense alleges that defendants' fraud in the inducement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 115553 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

counterclaim must fail because defendants breached the contract at issue. Plaintiffs have agreed to withdraw this affirmative defense. (*See* D.I. 73 at 15) "[I]f a defense has been withdrawn, a motion to strike it from the pleadings is proper." 5A Wright & Miller, Federal Practice and Procedure: Civil 2d 1381 (1990). Therefore, the court grants defendants' motion to strike plaintiffs' twelfth affirmative defense.

10. Plaintiffs' sixteenth affirmative defense alleges that "plaintiffs respond to the individually-numbered paragraphs in defendants' counterclaim as follows."(D.I. 63 at 4) The court construes this averment as attempt to offer plaintiffs' entire answer as an affirmative defense. The court finds this attempt illogical and grants defendants' motion to strike plaintiffs' sixteenth affirmative defense.

D.Del.,2004.
Greiff v. T.I.C. Enterprises, L.L.C.
Not Reported in F.Supp.2d, 2004 WL 115553 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 914776 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Ⓗ
McKesson Information Solutions, LLC v. Trizetto
Group, Inc.
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
MCKESSON INFORMATION SOLUTIONS,
LLC, Plaintiff,
v.
THE TRIZETTO GROUP, INC., Defendant.
No. Civ.04-1258-SLR.

April 20, 2005.

Thomas J. Allingham, II, Wilmington, DE, for
Plaintiff.
Rodger Dallery Smith, II, Wilmington, DE, for De-
fendant.

MEMORANDUM ORDER

ROBINSON, J.

I. INTRODUCTION

*1 On September 13, 2004, plaintiff filed this
action alleging infringement of its United States
Patent No. 5,253,164 ("the '164 patent") by defend-
ant. Defendant answered the complaint, denied' any
infringement and asserted that the '164 patent was
invalid and unenforceable. (D.I.10)

Pending before the court are plaintiff's motions
to strike defendant's affirmative defenses, dismiss
defendant's counterclaims or, in the alternative, for
a more definitive statement of such defenses and
counterclaims. (D.I.13) This court has jurisdiction
over this suit pursuant to 28 U.S.C. § 1338.

II. BACKGROUND

Plaintiff is a Delaware limited liability corpora-
tion with its principal place of business in Alphar-
etta, Georgia. (D.I.10) Defendant is a Delaware cor-
poration with its principal place of business in
Newport Beach, California. (D.I.10) The parties

create and distribute software for reviewing the ac-
curacy of healthcare claims and/or charges. ( Id. at
¶¶ 25-26)

III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8 requires a
party to set forth affirmative defenses in a respons-
ive pleading with a "short and plain statement."
Federal Rule of Civil Procedure 12(f), in turn,
states:

Upon motion by a party before responding to a
pleading or, if no responsive pleading is permitted
by these rules, upon motion made by a party within
20 days after the service of the pleading upon the
party or upon the court's own initiative at any time,
the court may order stricken from any pleading any
insufficient defense or any redundant, immaterial,
impertinent, or scandalous matter.

Motions to strike affirmative defenses,
however, are disfavored. SeeProctor & Gamble Co.
v. Nabisco Brands, Inc., 697 F.Supp. 1360, 1362
(D.Del.1988). When ruling on such a motion, "the
court must construe all facts in favor of the non-
moving party ... and deny the motion if the defense
is sufficient under the law." Id. Furthermore, courts
prefer not to grant a motion to strike "unless it ap-
pears to a certainty that ... [the movant] would suc-
ceed despite any state of the facts, which could be
proved in support of the defense." Salcer v. Envicon
Equities, Corp., 744 F.2d 935, 939 (2d Cir.1984).

IV. DISCUSSION FN1

FN1. Because plaintiff's motion to dismiss,
or in the alternative for a more definite
statement, depends solely on its motion to
strike, the motion is dismissed without pre-
judice to renew.

Defendant's answer to the complaint asserts
eight affirmative defenses and counter-claims for
declaratory judgment of noninfringement, unen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

forceability and invalidity. (D.I.10) Plaintiff has moved to strike defendant's second, sixth and seventh affirmative defenses. (*Id.* at ¶¶ 11, 15, 16-18)

A. Second And Sixth Affirmative Defenses-Invalidity & Misuse

Defendant's second affirmative defense argues that the '164 patent is invalid "for failure to comply with one or more of the conditions for patentability set forth in Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 102, 103 and 112."(*Id.* at ¶ 11) Plaintiff argues that this defense is too broad because it includes any and all of title 35, and it is repetitive of defendant's third, fourth and fifth affirmative defenses, which asserts specific violations of §§ 102, 103 and 112. (*Id.*)

**\*2** Defendant's sixth affirmative defense asserts that "[t]he '164 patent is unenforceable because [plaintiff] comes into Court with unclean hands. Plaintiff has committed patent misuse by attempting to enforce a patent it should reasonably know is invalid and not infringed." (D.I. 10 at ¶ 15) Plaintiff asserts that this defense does not meet pleading requirements because it does not allege bad faith or anti-competitive effect.[FN2]

> FN2. The basic allegation of patent misuse is that the patentee has "extend[ed] the economic benefit beyond the scope of the patent grant."*C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1372 (Fed.Cir.1998). Patent misuse "requires that the alleged infringer show that the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect."*Virginia Panel Corp. v. MAC Panel Co.,* 133 F.3d 860, 868-71 (Fed.Cir.1997). There is a two part test for patent misuse that requires the party alleging misuse to show a patentee's bad faith in alleging infringement and an anti-competitive effect or purpose behind the allegation. *See e.g.,Glaverbell Societe Anonyme v. Northlake Mktg. & Supply, Inc.,* 45 F.3d 1550, 1558 (Fed.Cir.1995); *Ad-*

*vanced Cardiovascular Systems, Inc. v. Scimed Systems, Inc.,* C-96-0950, 1996 WL 467277 at \*4 (N.D.Cal.1996).

In complex litigation, such as cases involving patent infringement, it is through the discovery process that the parties refine and focus their claims. At this stage in the litigation, the court declines to strike defendant's affirmative defenses until adequate discovery has been completed.

B. Seventh Affirmative Defense-Inequitable Conduct

Defendant's seventh affirmative defense states:
The patent-in-suit is invalid and unenforceable because it was obtained through the intentional failure of the inventors, and/or their agents, to disclose to the Patent Office, during prosecution of the patent-in-suit, information material to the patentability of the patent-in-suit, in violation of 37 C.F.R. § 1.56.
To the extent now known, and subject to further amplification as to the full extent of the withholding and misrepresentation of information, the inventors and/or their agents made a number of misrepresentations or omissions of material fact to the Patent Office, including but not limited to, false statements and omissions regarding prior art. In particular, and without limitation, the following intentional and material false statements or omissions were made by the inventors and/or their agents, including:
a) the failure by applicants to disclose to the Examiner one of the inventors' own material prior art publications, including "An Access-oriented Negotiated Fee Schedule-The Caterpillar Experience,"... and a presentation at the 107th Annual Meeting of The American Surgical Association ...;
b) the failure to disclose to the Examiner the fact that the claimed software to review claims was obvious and disclosed in commonly available books on expert systems as admitted by Marcia Radosevich, President of HPR, the assignee of the patent-in-suit, in a case study at the Harvard Business School in 1989;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 914776 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

c) the failure to disclose to the Patent Office that four programming and code review consultants participated in the development of the claimed software as described by some individuals who were employed by Boston University's Health Policy Institute, and that the work was funded by the U.S. Government sponsored research.

d) the failure to disclose to the Patent office that the invention was conceived by some individuals who were employed by Boston University's Health Policy Institute, and that the work was funded by the U.S. Government sponsored research.

The above false statements and omitted references and funding information would have been considered by a reasonable examiner to be material to a determination of allowability of the patent claims, and on information and belief, said statements and omissions were made with intent to deceive the Patent Office. Had the inventors and/or their agents made accurate representations to the Patent Office, the '164 patent would not have issued. Hence, the patent-in-suit is unenforceable for inequitable conduct.

*3 (D.I. 10 at ¶¶ 16-18)

Fraud is a clear exception to the otherwise broad notice-pleading standards under Fed.R.Civ.P. 9. A claim of patent unenforceability is premised upon inequitable conduct before the Patent & Trademark Office ("PTO"), which is a claim sounding in fraud. A plaintiff alleging unenforceability, therefore, must plead with particularity those facts which support the claim the patent holder acted fraudulently before the PTO. *See e.g.,Ferguson Beauregard/Logic Controls v. Mega Sys., LLC,* 350 F.3d 1327, 1343-44 (Fed.Cir.2003).

This court has previously found that pleadings that "disclose the name of the relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b)."*See, e.g.,EMC Corp. v. Storage Tech. Corp.,* 921 F.Supp. 1261, 1263 (D.Del.1996). In this case, defendant has satisfied the pleading requirements of Rule 9(b), as it states, with reasonable particularity, the prior art references and instances of fraud to which it is referring. Plaintiff is on notice of the misconduct alleged.

IV. CONCLUSION

Therefore, at Wilmington this 20th day of April, 2005;

IT IS ORDERED that:

1. Plaintiff's motion to strike certain of defendant's affirmative defenses (D.I.13) is denied without prejudice.

2. Plaintiff's motion to dismiss, or for a more definitive statement (D.I.13), is denied without prejudice.

D.Del.,2005.
McKesson Information Solutions, LLC v. Trizetto Group, Inc.
Not Reported in F.Supp.2d, 2005 WL 914776 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 1789077 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**

Papacoda v. A.I. Dupont Hosp. for Children of the
Nemours Foundation
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Edward PAPACODA, et al.
v.
THE A.I. DUPONT HOSPITAL FOR CHILDREN
OF THE NEMOURS FOUNDATION, et al.
**No. Civ.A. 05-CV-3003.**

June 26, 2006.

Theresa M. Blanco, Eaton & McClellan, Brian E.
Appel, Law Office of Brian E. Appel, Esq., Phil-
adelphia, PA, for Plaintiffs.
R. Nicholas Gimbel, Mark D. Villanueva, McCarter
and English, L.L.P., Philadelphia, PA, Sara Pet-
rosky, Suzanne N. Pritchard, McCann and Geschke,
P.C., Philadelphia, PA, for Defendants.

*MEMORANDUM AND ORDER*

KAUFFMAN, J.

*\*1* In this action, Plaintiffs Edward and Sarah
Papacoda ("Plaintiffs") bring claims both as Ad-
ministrators of the Estate of their deceased daugh-
ter, Kaitlyn Papacoda ("Kaitlyn"), and in their own
right, alleging fraud, conspiracy and fraudulent
concealment against The A.I. Dupont Hospital for
Children of the Nemours Foundation ("Dupont
Hospital"), The Nemours Foundation, William I.
Norwood, M.D. ("Dr.Norwood"), Christian Pizarro,
M.D. ("Dr.Pizarro"), John Murphy, M.D.
("Dr.Murphy"), Ellen Spurrier, M.D.
("Dr.Spurrier"), Deborah Davis, M.D.
("Dr.Davis"), and Russell Raphaely, M.D.
("Dr.Raphaely") (Count I); wrongful death, negli-
gent supervision, monitoring and retention of health
care providers against Dupont Hospital and The
Nemours Foundation (Count II and VIII); negli-
gence and wrongful death against Dr. Norwood and
Dr. Pizarro (Count III and IX); negligent infliction
of emotional distress against Dr. Norwood, Dr.

Pizarro, Dr. Murphy, Dr. Davis, Dr. Raphaely and
Dr. Spurrier (Count IV); negligence and wrongful
death against Daniel Duncan, M.D. ("Dr.Duncan")
and Paul Kerins (Count V and X); informed consent
against Dr. Norwood, Dr. Pizarro, Dr. Murphy, Dr.
Davis, Dr. Raphaely and Dr. Spurrier (Count VI);
and violations of the Rehabilitation Act, 29 U.S.C.
§ 701, *et seq.* against Dupont Hospital, The
Nemours Foundation, Dr. Norwood, Dr. Pizarro,
Dr. Murphy, Dr. Davis, Dr. Raphaely and Dr. Spur-
rier (Count VII). The Complaint seeks compensat-
ory, consequential and punitive damages, attorney's
fees and costs. Currently before the Court are Mo-
tions to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6)
and to Strike pursuant to Fed.R.Civ.P. 12(f).FN1
For the reasons stated below, the Motion to Dismiss
will be granted in part and denied in part and the
Motion to Strike will be denied. FN2

> FN1. Moving Defendants are Dr. Nor-
> wood, Dr. Pizarro, Dr. Murphy, Dr. Davis,
> Dr. Raphaely, Dr. Spurrier, Dr. Duncan
> and Paul Kerins.

> FN2. Moving Defendants also move to dis-
> miss the entire Complaint pursuant to
> Fed.R.Civ.P. 10(b) or for a more definite
> statement pursuant to Fed.R.Civ.P. 12(e).
> The Court finds that the remaining claims
> are sufficiently pled to allow Moving De-
> fendants to frame a responsive pleading.
> Accordingly, this Motion will be denied.

I. BACKGROUND

Taking Plaintiffs allegations as true, the relev-
ant facts are as follows. Plaintiffs are the parents of
Kaitlyn Papacoda who was born with a serious
heart condition and passed away on August 12,
2003, following two surgeries that were performed
at the Dupont Hospital. Plaintiffs' Complaint
("Complaint") ¶ 2. Mrs. Papacoda, a Connecticut
resident, delivered Kaitlyn in Delaware in order to
have her treated by Dr. Norwood at the Dupont
Hospital. *Id.* ¶ 14.Dr. Norwood was to be the

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 2006 WL 1789077 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

primary surgeon for Kaitlyn's procedure which was to require three separate surgeries. *Id.* ¶¶ 6, 23.

The first surgery was performed on February 26, 2003, two weeks after Kaitlyn was born.[FN3] The second surgery, a hemi-fontan procedure, was performed on June 26, 2003. *Id.* ¶ 21. At the time both surgeries were performed, Drs. Murphy and Norwood were studying to determine whether the third surgery could be performed in a "cath lab." *Id.* ¶ 25. In order to test this hypothesis, the second surgery was modified. *Id.* While Mrs. Papacoda was told that the third surgery would be performed in a "cath lab" and that modifications would be made to the second surgery to make this possible, Plaintiffs were never told that the second surgery was materially different from the standard procedure or that it was "experimental." *Id.* ¶¶ 24, 53. In addition, Plaintiffs allege that inadequate and harmful cooling and cardiopulmonary procedures were employed during both the first and second surgeries and that there was a conspiracy among Moving Defendants to conceal this from Plaintiffs. *Id.* ¶¶ 51, 52. Plaintiffs allege that, as a result of this deficient and "experimental" care, Kaitlyn passed away on August 12, 2003. *Id.* ¶ 129.

> FN3. As Moving Defendants note in their Motion to Dismiss, the Complaint states that Kaitlyn was born on March 12, 2003. However, her first surgery was performed on February 26, 2003. The Court will assume that the allegation of her birthdate is a typographical error and that Kaitlyn was born on February 12, 2003.

*2 Moving Defendants bring this 12(b)6 Motion to Dismiss Counts I, IV, VI, and VII of the Complaint as well the claim for punitive damages. In their Motion to Strike, Moving Defendants argue that certain references to Drs. Norwood and Murphy are scandalous and impertinent and should be stricken from the Complaint.

## II. LEGAL STANDARD

When deciding a motion to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6), the Court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential-Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.1985). A Rule 12(b)(6) motion will be granted only when it is certain that no relief could be granted under any set of facts provable by plaintiff. See *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

## III. CHOICE OF LAW

With respect to fraud, conspiracy and punitive damages, the laws of Pennsylvania and Delaware do not differ. Where the laws of potentially interested jurisdictions are in agreement, the choice of law question need not be decided and the Court may refer to either the forum law or the laws of the interested jurisdictions. *Lucker Mfg. v. Home Ins. Co.,* 23 F.3d 808 (3d Cir.1994).

However, with respect to negligent infliction of emotional distress and informed consent, Pennsylvania and Delaware law differ. In a tort case, if the states' laws differ, Pennsylvania courts conduct an "analysis of the policies and interests underlying the particular issue before the court." *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 21, 203 A.2d 796 (1964).[FN4] As Kaitlyn was not a Pennsylvania resident nor was she ever treated in Pennsylvania and all of the relevant conduct occurred in Delaware, Delaware law will apply to these two claims.[FN5]

> FN4. In a diversity action, a district court shall apply the choice of law rules of the forum state in determining which state's law will apply to the substantive issues before it. *Shuder v. McDonald's Corp.,* 859 F.2d 266, 269 (3d Cir.1988).

> FN5. Plaintiffs and Moving Defendants agree that Delaware law applies to these

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1789077 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

claims.

## IV. DISCUSSION

### A. Count I-Fraud, Fraudulent Concealment and Conspiracy[FN6]

> FN6. Fraudulent concealment is not a cause of action but rather a doctrine invoked when seeking equitable tolling. See *Gee v. CBS. Inc.,* 471 F.Supp. 600, 622-23 (E.D.Pa.1979). Accordingly, it will be dismissed as a separate claim from the Complaint. However, Plaintiffs may raise the doctrine of fraudulent concealment at a later stage if there is a challenge to the timeliness of their claims.

### 1. Fraud

Plaintiffs allege that all defendants except Paul Kerins committed fraud when: (1) they falsified records and concealed evidence pertaining to both of Kaitlyn's surgeries, specifically with regard to cooling temperatures, blood-gas readings and the duration of circulatory arrest; (2) they misled Plaintiffs about the reason for Kaitlyn's deteriorating condition following the second surgery; (3) they misled Plaintiffs about the "experimental nature" of the second surgery; (4) they held themselves out as the best cardiac surgery center for treating their daughter's illness; and, (5) they failed to tell Plaintiffs that their negligence caused Kaitlyn's death.

To state a claim for fraudulent misrepresentation, a plaintiff must show: (1) a representation; (2) material to the transactions; (3) made falsely, with knowledge of its falsity or recklessness as to its falsity; (4) with the intent of misleading another to rely on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance. *Bortz v. Noon,* 556 Pa. 489, 729 A.2d 555 (1999). Additionally, facts that are intentionally concealed in order to deceive a party may give rise to a claim of fraud. *DeJoseph v. Zambelli,* 392 Pa. 24, 139 A.2d 644, (1958).

**\*3** Taking all of Plaintiffs allegations as true, the Complaint does state facts that could give rise to a claim of fraud. Plaintiffs have pled sufficient facts to clear the low hurdle used when considering 12(b)(6) motions to dismiss, particularly with regard to the effort to conceal the fact that the second surgery was "experimental." However, Rule 9(b) supplements the standard pleading requirements in cases alleging fraud and requires a plaintiff to go beyond the minimal requirements of Fed.R.Civ.P. 8(a).

Fed.R.Civ.P. 9(b) states:
In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Plaintiffs must plead the date, place or time of the fraud, or otherwise inject precision and some measure of substantiation into their allegations of fraud. *Lum v. Bank of America,* 361 F.3d 217, 223-34 (3d Cir.2004). Furthermore, when multiple defendants are involved, the complaint must specify the allegations of fraud applying to each defendant. *MDNet. Inc. V. Pharmacia Corp.,* 2005 WL 1385906, at \*5 (3d Cir. June 13, 2003)(not precedential).

Plaintiffs' Complaint falls short of these requirements. They charge multiple defendants with fraud but fail, with any specificity, to state when and where the alleged misleading statements were made or to attribute any specific misstatement to an individual defendant. While there are general allegations of fraud and misrepresentation, Rule 9(b), especially when multiple defendants are involved, requires greater particularity. Accordingly, Plaintiffs' claims of fraud will be dismissed without prejudice.

### 2. Conspiracy

Plaintiffs allege that Moving Defendants conspired to conceal the truth about the "experimental" nature of the surgeries, what happened during

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1789077 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Kaitlyn's surgeries and the circumstances surrounding her death. To state a cause of civil conspiracy, a plaintiff must show that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. *Skipworth by Williams v. Lead Indus. Ass'n, Inc.,* 547 Pa. 224, 236, 690 A.2d 169 (1997). In addition, "proof of malice, i.e ., an intent to injure, is essential in proof of a conspiracy."*Id .*

In the instant case, Plaintiffs are alleging a conspiracy to commit fraud. Because the Court is dismissing the underlying fraud claim for failure to comply with Rule 9(b), the conspiracy to commit fraud claim with also be dismissed without prejudice. See*Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985) ("[I]n actions alleging conspiracy to defraud or conceal, the particularity requirement of Rule 9(b) must be met."); *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972) (same).

B. *Count IV-Negligent Infliction of Emotional Distress*

Plaintiffs allege that they "suffered severe emotional distress and, and serious injuries to their nerves and other parts of their bodies" when they learned that Kaitlyn underwent "experimental" surgery and care that was "without proper safeguards." FN7To state a claim under Delaware law for emotional distress directly caused by another's negligence, the plaintiff must show that "the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance."*Lupo v. Med. Ctr. of Delaware, Inc.,* 1996 WL 111132 (Del.Super.Feb.7, 1996). In addition, Plaintiffs must show that the distress was sufficient to cause physical injury. *Lloyd v. Jefferson,* 53 F.Supp.2d 643, 675 (D.Del.1999).

> FN7. In their response to the Motion to Dismiss, Plaintiffs state that they are not claiming negligent infliction of emotional distress based on Kaitlyn's death but rather on the injuries they received upon learning of the "true reason" for Kaitlyn's death.

*4 Taking all the allegations in the Complaint as true, it would be premature to conclude that Plaintiffs could prove no set of facts which entitle them to relief. If Plaintiffs were lied to about their daughter's death and the alleged surrounding circumstances, a jury could find that Plaintiffs suffered emotional distress with physical ramifications when they learned of the "true reasons" for the daughters death. Accordingly, Moving Defendants' Motion to Dismiss Count IV of the Complaint will be denied.

C. *Count VI-Informed Consent*

In Count VI, Plaintiffs set forth a claim of medical malpractice based on lack of informed consent against Drs. Norwood, Pizarro, Murphy, Raphaely, Spurrier and Davis. Plaintiffs contend that they were not informed about the risks of the procedures or that they were "experimental" and that they therefore did not consent to the surgeries. In their Motion to Dismiss, Drs. Pizarro, Murphy, Raphaely, Spurrier and Davis move to dismiss the informed consent claim arguing that they were not active participants in the surgeries and, therefore, not required to obtain Plaintiffs' consent. Drs. Murphy and Pizzaro argue that they did not participate in the surgeries at all, and Drs. Raphaely, Spurrier and Davis, the anesthesiologists, argue that they only administered the anesthesia and that there are no allegations that Plaintiffs did not consent to the anesthesia.

In Delaware, informed consent in the context of medical malpractice is defined by statute. 18 Del. C. § 6852(a)(2). The patient must demonstrate that the health care provider failed to supply information "customarily given" by other "licensed health care providers with similar training and/or experience in the same or similar health care communities as that of the defendant at the time of the treatment, procedure or surgery."*Id.*

Delaware law defines informed consent:

"Informed consent" means the consent of a patient to the performance of health care services by a health care provider given after the health care pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1789077 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

vider has informed the patient, to an extent reasonably comprehensible to general lay understanding, of the nature of the proposed procedure or treatment and of the risks and alternatives to treatment or diagnosis which a reasonable patient would consider material to the decision whether or not to undergo the treatment or diagnosis."

18 Del. C. § 6801(6). The plain language of the statute requires a plaintiff to produce (1) evidence of the standard of care and, (2) evidence of whether the health care provider met that standard.

The Complaint is not clear as to what role, if any, Dr. Murphy played in providing Kaitlyn's care. It is not alleged that he participated in either of the surgeries. However, it is alleged that he was conducting the study, along with Dr. Norwood, to determine whether the third surgery, which Kaitlyn never received, could be performed in a "cath lab." Plaintiffs also claim that he recruited patients for the study. Taking these allegations as true, it would be premature to conclude that Plaintiffs could prove no set of facts establishing that Dr. Murphy failed to properly inform them when recruiting their daughter for the study of the "nature of the proposed procedure or treatment and of the risks and alternatives to treatment or diagnosis."Accordingly, Dr. Murphy's Motion to Dismiss the informed consent claim will be denied.

*5 Although Moving Defendants argue otherwise, the Complaint does allege that Dr. Pizarro participated in the surgeries. Complaint ¶ 7. He is also alleged to have recruited patients for the study. Accordingly, the Motion to Dismiss the informed consent claim against Dr. Pizarro will be denied.

Plaintiffs also bring informed consent claims against Drs. Raphaely, Spurrier and Davis, the anesthesiologists attending their daughter's surgical procedures. However, Drs. Raphaely, Spurrier and Davis did not perform the surgical procedures; they administered anesthesia. Plaintiffs do not allege anywhere that those doctors failed to secure consent for the anesthesia administered. Accordingly, the informed consent claims against Drs. Raphaely,

Spurrier and Davis will be dismissed.

D. *Count VII-Rehabilitation Act*

Plaintiffs allege that the Cardiac Center at the Dupont Hospital was not subject to the same quality control procedures and level of administrative oversight found in the rest of Dupont Hospital. They argue that their daughter, because of her disabling heart defects, was treated in a facility that provided less quality than was found throughout the rest of Dupont Hospital. As a result, they bring claims against DuPont Hospital, The Nemours Foundation, Drs. Norwood, Davis, Murphy, Raphaely, Spurrier and Pizarro alleging violations of the Rehabilitation Act, 29 U.S.C. § 701*et seq.*

To state a claim under the Rehabilitation Act, a plaintiff must allege that: (1) he is a "handicapped individual" under the Act; (2) he is "otherwise qualified" for the program sought; (3) he was excluded from the program "solely by reason of his handicap"; and (4) the program at issue receives federal financial assistance. *Wagner by Wagner v. Fair Acres Geriatric Center,* 49 F.3d 1002, 1009 (3d Cir.1995).

Dismissal at this stage of the proceedings would be premature as the viability of the Rehabilitation Act claim will depend, at least in some part, on factual allegations that are not yet part of the record. Accordingly, the Motion to Dismiss the Rehabilitation Act claim will be denied.[FN8]

> FN8. Although it would be premature to dismiss Count VII at this stage, the Court finds the Honorable Judge Berle Schiller's opinion on this issue in a case with almost identical facts to be persuasive. *SeeHolly Farrell, et al. v. The A.I Dupont Hospital for Children of the Nemours Foundation, et al.,* No. 04-3877 (E.D. Pa. June 5, 2006) (order granting partial summary judgment). Even assuming that the Rehabilitation Act can be applied to medical decisions, Plaintiffs must present some evidence of exclusion, denial, or discrimination

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1789077 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

to survive a summary judgment motion on this count.

### E. *Punitive Damages*

Moving Defendants move to dismiss the claim for punitive damages from the Complaint arguing that Plaintiffs "have failed to allege any intentional conduct that merits a finding of punitive damages or that could be considered reckless."

Pennsylvania has adopted the guidelines on punitive damages set forth in Section 908 of the Restatement (Second) of Torts which states that "punitive damages are damages, other than compensatory damages, awarded against a person to punish him for his outrageous conduct."*Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984). Comment (b) to Section 908 states that: "punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others."

To award punitive damages, a jury must find that a defendant's conduct was "outrageous." Taking all of Plaintiffs' allegations as true, it would be premature at this stage of the proceedings to conclude that Plaintiffs could prove no set of facts entitling them to punitive damages. Accordingly, the Motion to Dismiss the claim for punitive damages will be denied.

### F. *Motion to Strike*

**\*6** Moving Defendants move to strike the allegations contained in paragraphs 59, 76, 91-92, 109-111, 122-23, 196-98 and 210-211 of the Complaint, arguing that the material contained therein is impertinent and scandalous.

Motions to strike are viewed with disfavor and rarely granted. In order to prevail on a motion to strike: (1) the allegations must be clearly unrelated to the pleader's claims; and (2) the moving party must show how it will be prejudiced if the challenged allegations remain in the pleading. See*McInerney v. Moyer Lumber & Hardware, Inc.,* 244

F.Supp.2d 393, 402 (E.D.Pa.2002). The allegations contained in these paragraphs are clearly material to the allegations in the Complaint. Additionally, Moving Defendants have not alleged how they would be prejudiced if the allegations contained therein remain. Accordingly, the motion to strike will be denied.

### IV. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Moving Defendants' Motion to Dismiss and deny the Motion to Strike. An appropriate Order follows.

### *ORDER*

AND NOW, this 26TH day of June, 2006, upon consideration of Moving Defendants Motion to Dismiss and Motion to Strike (docket no. 7), and the response thereto, it is ORDERED that:

1. Plaintiffs' claims of fraud and conspiracy are DISMISSED without prejudice.

2. The motion to dismiss Plaintiffs' claim of negligent infliction of emotional distress is DENIED.

3. The motion to dismiss Plaintiffs' claim under the Rehabilitation Act is DENIED.

4. Plaintiffs' claims of lack of informed consent against Drs. Davis, Raphaely, and Spurrier are DISMISSED. The Motion to Dismiss the lack of informed consent claims against Drs. Murphy and Pizarro is DENIED.

5. The Motion to Dismiss Plaintiffs' claim for punitive damages is DENIED.

6. The Motion to Dismiss the Complaint for failure to comply with Rule 10(b) is DENIED.

7. The Motion to Strike is DENIED.

E.D.Pa.,2006.
Papacoda v. A.I. Dupont Hosp. for Children of the Nemours Foundation
Not Reported in F.Supp.2d, 2006 WL 1789077 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1000162 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**

Peltz v. Dahlgren's Mailing Service, Inc.
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Scott PELTZ, As Liquidating Trustee for the USN
Communications Liquidating Trust
v.
DAHLGREN'S MAILING SERVICE, INC.
**No. A-00-01886.**

April 24, 2002.

Becky Lynn Dahlgren, The Law Offices of Becky
Lynn Dahlgren, Ltd., Lombard, Illinois, for De-
fendant.
Mark Minuti, Tara L. Lattomus, Saul Ewing LLP,
Wilmington, DE, Michael J. Small, Frank W.
DiCastri, Foley & Lardner, Chicago, IL, for Scott
Peltz, as Liquidating Trustee for the USN Commu-
nications Liquidating Trust.
Dear Counsel:
WALSH, J.

*1 This is with respect to the motion (Doc. # 4)
of Dahlgren's Mailing Service, Inc. ("Defendant")
to strike and dismiss the complaint to recover
avoidable transfers ("Complaint"). I will deny the
motion for the reasons discussed below.

USN Communications, Inc. ("USN") and its af-
filiates (collectively, "Debtors") filed voluntary pe-
titions for relief under chapter 11 of the Bankruptcy
Code on February 18, 1999 ("Petition Date"). On
April 5, 2000, Scott Peltz ("Plaintiff") was appoin-
ted as Liquidating Trustee for the USN Communic-
ations Liquidating Trust. FN1 Subsequently, on
December 15, 2000, Plaintiff commenced the in-
stant action against Defendant seeking, pursuant to
11 U.S.C. § 547, FN2 to avoid alleged preferential
transfers ("Alleged Transfers") in the amount of
$26,156.35. FN3 (Pl.'s Obj'n (Doc. # 6) at 1.) There-
after, on January 16, 2001, Defendant filed its mo-
tion to strike and dismiss the Complaint.

FN1. This was done pursuant to the First

Amended Joint Consolidated Plan of Reor-
ganization ("Plan"), the confirmation order
(Doc. # 624, Case No. 99-383), and a li-
quidating trust agreement dated April 5,
2000.

FN2. 11 U.S.C. § 547 provides in pertinent
part:
(b) Except as provided in subsection (c) of this
section, the trustee may avoid any transfer of an in-
terest of the debtor in property-
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt
owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made-
(A) on or within 90 days before the date of the
filing of the petition; or
(B) between ninety days and one year before
the date of the filing of the petition, if such creditor
at the time of such transfer was an insider; and
(5) that enables such creditor to receive more
than such creditor would receive if-
(A) the case were a case under chapter 7 of this
title;
(B) the transfer had not been made; and
(C) such creditor received payment of such
debt to the extent provided by the provisions of this
title.

FN3. 11 U.S.C. §§ 101 et seq. is hereinafter
referred to as " § ___ ".

Defendant fails to cite the legal authority and/
or the statutory provision on which it bases its mo-
tion to strike and dismiss the
Complaint. FN4 Rather, Defendant simply argues
that its motion is proper because: (1) Defendant did
not do any business with Debtors prior to the dates
the Alleged Transfers allegedly took place (Def.'s
Mot. (Doc. # 4) ¶ 2); (2) Defendant was unaware
that Debtor was allegedly insolvent ( id. at ¶ 3); (3)
Defendant's services, given in exchange for the Al-
leged Transfers, were performed in the ordinary
course of business ( id. at ¶¶ 5, 10); and (4) the Al-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1000162 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

leged Transfers were intended to be a contemporaneous exchange for new value (*id.* at ¶ 9). In addition, Defendant also states that neither Defendant, nor Debtors engaged in any unusual collection or payment activity (*id.* at ¶ 11), that the transaction giving rise to the Alleged Transfers falls within the normal mailing industry practice (Def.'s Mot. (Doc. # 4) ¶ 12), that § 547(c)(2) is meant to protect customary credit transaction incurred and paid in the ordinary course of business (*id.* at ¶ 13), and that these transactions "are neither fraudulent nor preferential transfers"(*id.* at ¶ 13). None of these reasons support a decision to strike or dismiss the Complaint under Rules 12(f) ("Rule 12(f)") <sup>FN5</sup> and 12(b)(6) ("Rule 12(b)(6)") <sup>FN6</sup> of the Federal Rules of Civil Procedure.

> FN4. The Court presumes that Defendant brings its motion to strike pursuant to Fed.R.Civ.P. 12(f) and its motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). These rules are applicable in bankruptcy pursuant to Fed. R. Bankr.P. 7012.

> FN5.Fed.R.Civ.P. 12(f) provides:

> Motion to Strike. Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

> FN6.Fed.R.Civ.P. 12(b)(6) provides:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:

> 6) failure to state a claim upon which relief can be granted,

Motions to strike are disfavored and should only be granted where a defendant cannot reason-

ably be expected to frame a responsive pleading or to defend against those portions of the complaint which the defendant contends constitutes a "redundant, immaterial, impertinent, or scandalous matter", Fed.R.Civ.P. 12(f).*SeeFDIC v. Wise,* 758 F.Supp. 1414, 1420 (D.Colo.1991).

In addition, under Rule 12(b)(6), a defendant's motion to dismiss must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claims which would entitle [the plaintiff] to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). The Federal Rules of Civil Procedure do not require a plaintiff to set out detailed facts to support its claims. *Id.* at 47.All the Rules require is a short and plain statement of the claim that will give the defendant fair notice of the nature of plaintiff's claims and the grounds upon which they rest. *Id.;seealso*Fed.R.Civ.P. 8(a). In evaluating the sufficiency of a complaint for the purposes of Rule 12(b)(6), the Court must accept as true all allegations in the Complaint and construe all inferences in the light most favorable to the Plaintiff. *Rogin v. Bensalem Township* 616 F.2d 680, 685 (3d Cir.1980)."The issue is not whether a plaintiff will ultimately prevail but whether a claimant is entitled to offer evidence to support [its] claims."*Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), *overruled on other grounds,Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

**\*2** Applying these standards to the Complaint, I find the allegations contained therein sufficient to support Plaintiff's claims to avoid and recover allegedly preferential transfers pursuant to § 547. First, with respect to Defendant's motion to strike, Defendant does not allege that any portions of the Complaint are redundant, immaterial, impertinent, or scandalous. In addition, Defendant's arguments in support of both its motion to strike and to dismiss pertain solely to the strength and validity of Plaintiff's claims, not to the sufficiency of the allegations set forth in the Complaint. The fact that Defendant did not do any business with Debtors prior to the dates the Alleged Transfers allegedly took

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1000162 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

place is irrelevant for the purposes of § 547. So too is the fact that Defendant was allegedly unaware that Debtor was insolvent.

In addition, the fact that Defendant contends that the Alleged Transfers fall within the contemporaneous value and ordinary course of business exceptions set forth in § 547(c) does not support a decision to strike or dismiss the Complaint. As stated above, the issue at this stage of the proceedings is not whether Plaintiff will ultimately prevail on its claims, but whether the Complaint provides Defendant with fair notice of the nature and grounds for Plaintiff's claims. See *Scheuer*, 416 U.S. at 236; *Conley*, 355 U.S. at 47. I find that it does and therefore, Defendant's motion to strike and dismiss the Complaint (Doc. # 4) is *denied.*

SO ORDERED.

D.Del.,2002.
Peltz v. Dahlgren's Mailing Service, Inc.
Not Reported in F.Supp.2d, 2002 WL 1000162 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.