## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| SOFIENE ROMDHANI, MICHELLE MALONEY and **BOBBI JOE ZELLER**, | ) ) ) |
| Plaintiffs, | ) Civil Action No. ) 1:07-cv-715 |
| v. | ) ) |
| EXXON-MOBIL CORPORATION, | ) **JURY TRIAL DEMANDED** ) |
| Defendant. | ) ) ) |

### SECOND [FIRST]AMENDED COMPLAINT FOR
### DECLARATORY AND MONETARY RELIEF

### PRELIMINARY STATEMENT

1.      This is a civil action against defendant Exxon-Mobil Corporation ("Exxon") for declaratory and monetary relief, for injuries sustained by plaintiffs Sofiene Romdhani ("Mr. Romdhani"), Michelle Maloney ("Ms. Maloney"), and Bobbi Joe Zeller ("Ms. Zeller") as a result of defendant's religious, race, and national origin discrimination, harassment, and retaliation against them, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., [and the Delaware Discrimination, 19 Del. C. § 710 et seq., ]and as a result of defendant's race discrimination, harassment, and retaliation, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

2.      Mr. Romdhani's Exxon supervisor subjected him to harsh and disparate treatment because of his religion, race, and national origin, including denying him an annual salary increase, orchestrating false complaints and investigations against him in an effort to have him

1

terminated, and persistently undermining his managerial authority. This campaign of harassment was designed to drive Mr. Romdhani out of his position at Exxon. Similarly, once Ms. Maloney and Ms. Zeller converted to Islam and began associating more frequently with other Arab Exxon employees, their supervisors began harassing them about their conversion to Islam and their traditional Muslim dress. These supervisors also told Ms. Maloney and Ms. Zeller that they planned to terminate them and all other persons at the Station of "Mr. Romdhani's kind." After plaintiffs reported these and other similar acts of discrimination to Exxon management, and after Ms. Maloney and Ms. Zeller cooperated as witnesses in a government investigation into this discrimination, the harassment and retaliation against them escalated. Despite their complaints, Exxon failed to investigate the matter and failed to take any actions whatsoever to stop these actions from occurring. Ultimately <u>Mr. Romdhani and Ms. Maloney</u> [all three plaintiffs] were constructively discharged, <u>and Ms. Zeller was terminated by Exxon in retaliation for her complaints about a religiously and sexually hostile workplace.</u>

## JURISDICTION AND VENUE

4.      This court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

6.      Plaintiff Sofiene Romdhani is a citizen of the State of Delaware who resides at 54 Cheswold Blvd. #506, Newark, DE 19713. At all times relevant to this Complaint, Mr. Romdhani was the Manager of an Exxon Station on the Delaware Turnpike. Mr. Romdhani is

Arab, Muslim, and was born in Tunisia. Mr. Romdhani incorporates as though restated each of the paragraphs appearing under the factual sub-sections for Ms. Maloney and Ms. Zeller below.

7.      Plaintiff Michelle Maloney is a citizen of the State of Delaware who resides at 3204 Kildoone Drive, Newark, DE 19702. At all times relevant to this Complaint, Ms. Maloney was a Cashier at the Exxon Station on the Delaware Turnpike. Ms. Maloney is Muslim. Ms. Maloney incorporates as though restated each of the paragraphs appearing under the factual sub-sections for Mr. Romdhani and Ms. Zeller below.

8.      Plaintiff Bobbi Joe Zeller is a citizen of the State of Delaware who resides at 17B Hillside Road, Wilmington, DE 19804. At all times relevant to this Complaint, Ms. Zeller was a Cashier at the Exxon Station on the Delaware Turnpike. Ms. Zeller is Muslim. Ms. Zeller incorporates as though restated each of the paragraphs appearing under the factual sub-sections for Mr. Romdhani and Ms. Maloney below.

9.      Defendant Exxon-Mobil Corporation ("Exxon" or "the Company") is the largest petroleum corporation in the United States and the world, and operates thousands of gasoline service stations. It is headquartered at 5959 Las Colina Blvd., Irving, TX 75039-2298, and is incorporated in the State of New Jersey. At all times relevant to this Complaint, Exxon was the employer of Mr. Romdhani, Ms. Maloney, and Ms. Zeller.

## FACTS

### A.    Allegations Regarding Mr. Romdhani

10.     A native of Tunisia, Mr. Romdhani studied International Business at the Institute of Higher Commercial Studies in Tunisia. After earning his bachelors degree in that course of study, he moved to the United States in 2000. In July 2000, Mr. Romdhani developed his business skills working as an International Business Specialist for Genesis in Atlanta. On July

3

31, 2003, Mr. Romdhani accepted a position with Exxon as an Assistant Manager of the Delaware Turnpike Exxon ("the Station").

11.    Mr. Romdhani performed exceptionally well in his position.  In recognition of his outstanding performance, in February 2005, Leslie Mergner, Mr. Romdhani's Regional Territory Manager, sent him to the ExxonMobil Corporate training center in Virginia, the Center for Retail Excellence, for Management Training.  Ms. Mergner was subsequently replaced in the Regional Territory Manager position by Richard Arnold.  After completing his management training, Exxon named Mr. Romdhani Manager of the Station in May 2005.

12.    As the Station Manger, Mr. Romdhani was responsible for overseeing the general operations of the fueling and retail station and for managing and supervising 23 employees.  He worked six days a week, often more than 70 hours per week, and performed in an exemplary manner.

13.    In May 2005, Mr. Romdhani requested vacation time to visit his family in Tunisia.  Mr. Arnold initially denied this request, ostensibly because Mr. Romdhani did not provide him with enough notice.  Mr. Romdhani made a subsequent request for vacation in July 2005.  However, before Mr. Arnold approved this request, he asked Mr. Romdhani where Tunisia is and "what sort of country" it is.  Mr. Romdhani replied that Tunisia is a small North African Arab Muslim country, and explained that he too was an Arab Muslim.  Mr. Arnold appeared surprised by this information.

14.    On September 2, 2005, Mr. Romdhani's last day at the station before leaving for vacation, Quantum Services, ExxonMobil's inventory contracting service, performed an inventory assessment and accounted for all of the Delaware Station's inventory.  Prior to his departure, Mr. Romdhani alerted Mr. Arnold that the store's camera system was not functioning

4

properly and advised him that repairs were necessary. Mr. Arnold assured Mr. Romdhani that he would resolve the issue during Mr. Romdhani's absence.

15.    During Mr. Romdhani's approved absence, Mr. Arnold arranged to have the manager of an Exxon station in New York, Corey Harden, manage the Delaware Station. During this time period, Ms. Maloney, one of the Cashiers at the Station, asked Mr. Harden if he would be returning to New York after Mr. Romdhani returned from his vacation. Mr. Harden replied that, according to Mr. Arnold, he was going to be moving to Delaware as the permanent Manager of the Delaware Station – apparently replacing Mr. Romdhani.

16.    On October 5, 2005, immediately after he returned from Tunisia, Mr. Romdhani contacted Mr. Arnold to inform him that he would be back at work the following day. During this and susbsequent interactions, Mr. Arnold treated Mr. Romdhani in a hostile and aggressive manner. Mr. Arnold told Mr. Romdhani that the Delaware Station had a $16,000 shortage in its cigarette inventory. Mr. Romdhani reminded Mr. Arnold that all of the inventory had been accounted for prior to his departure and assured Mr. Arnold that he would report to work early the following day to investigate this issue.

17.    Upon returning to work, Mr. Romdhani confirmed that the station had indeed suffered an inventory problem during the time that Mr. Harden had been managing the station. Mr. Arnold contacted an ExxonMobil investigator to address this problem. During the course of this investigation, the investigator met with and interviewed members of the Delaware Station staff without Mr. Arnold's presence. However, when the investigator met with Mr. Romdhani, Mr. Arnold took the unusual step of sitting in on the meeting. During the course of this meeting, Mr. Arnold repeatedly attempted to implicate Mr. Romdhani as the cause of the shortage.

18.    Mr. Arnold told the investigator that Mr. Romdhani had failed to train the Station's Assistant Manager to perform management duties and suggested that he had failed to alert Mr. Arnold to the fact that the camera system was not functioning. Mr. Romdhani explained to the investigator that another manager had been assigned to the store in his absence, and that he had, in fact, informed Mr. Arnold of the malfunctioning of the camera system prior to his departure. Mr. Arnold's hostility towards Mr. Romdhani during this meeting escalated to the point that Mr. Romdhani requested a private meeting with the investigator. The investigator denied this request and instructed Mr. Romdhani that Mr. Arnold had the right to sit in on whichever interviews he chose.

19.    As a result of Mr. Arnold's false statements to the investigator, the investigation concluded that Mr. Romdhani was at fault for failing to train his Assistant Manager properly and for not ensuring the camera system was operational before his departure. These conclusions were reached despite the fact that under ExxonMobil policy, inventory control is the direct responsibility of the Manager on site, and the inventory shortage occurred while Mr. Harden was the station manager. On October 26, 2005, ostensibly as a result of the finding of this investigation, Mr. Arnold placed Mr. Romdhani on a performance improvement plan, which stated that failure to complete the plan would result in his termination.

20.    In late October 2005, after the investigation had been concluded, it was discovered that Theresa Pierce, a subordinate of Mr. Romdhani, had created another problem with cigarette inventory. Ms. Pierce, who also worked part-time at a 7-11 convenience store, had noticed that the Delaware Station was out of a certain brand of cigarettes. On her own accord, she took some cartons from the Delaware Station and swapped them at the 7-11 for the popular brands. This practice was against ExxonMobil policy. When the inventory control system

6

revealed the swap, Ms. Pierce admitted that she had swapped out the brands. Although Mr. Arnold was fully aware that this action had not been sanctioned by Mr. Romdhani and was unconnected to the prior lost cigarette inventory, he called Ms. Pierce and instructed her to say that Mr. Romdhani had directed her to swap the cigarettes. Mr. Romdhani overheard this conversation, which occurred by speakerphone, and Ms. Pierce further informed him of Mr. Arnold's improper request.

21.    Mr. Romdhani was deeply troubled by Mr. Arnold's attempt to falsely implicate him for a violation of Company policy. Consequently, he left a detailed voicemail for Mr. Arnold's supervisor, John Killidgian, the Regional Operations Manager, detailing Mr. Arnold's discriminatory treatment of him. Mr. Romdhani informed Mr. Killidgian that he was being subjected to unfair discipline. Mr. Romdhani requested that Mr. Killidgian call him to discuss the situation. Mr. Romdhani also faxed Mr. Killidgian evidence that Mr. Arnold had in fact called in a maintenance request for the camera system in August before leaving for vacation, demonstrating that it was Mr. Arnold who failed to follow up on the maintenance request and had later lied to the Company's investigator about this matter. Mr. Killidgian did not respond to Mr. Romdhani's telephone call or fax.

22.    Mr. Killidgian failed to conduct an investigation of Mr. Romdhani's complaints of discrimination and took no remedial or corrective action to protect Mr. Romdhani from further discrimination or retaliation. Instead, in October 2005, Mr. Killidgian and Mr. Arnold held a meeting with Mr. Romdhani at which Mr. Killidgian dismissed Mr. Romdhani's concerns and threatened him with termination. Mr. Killidgian berated Mr. Romdhani and told him that if he wanted to keep working for Exxon, he better do whatever his supervisor, Mr. Arnold, told him to

do. By failing to perform an investigation and by immediately siding with Mr. Arnold, Mr. Killidgian set Mr. Romdhani up for further discrimination and retaliation from Mr. Arnold.

23.    Despite Mr. Arnold's open hostility toward him and his repeated attempts to undermine Mr. Romdhani, Mr. Romdhani successfully completed the performance improvement plan on December 26, 2005, and was removed from probation. Mr. Romdhani continued to perform his job well.

24.    In March 2006, notwithstanding Mr. Romdhani's positive performance, Mr. Arnold refused to give him an annual salary increase. Prior to Mr. Arnold becoming Regional Territory Manager, Mr. Romdhani always received regular annual increases from the Company. Mr. Romdhani asked Mr. Arnold why he was not given a raise. Mr. Arnold responded, falsely, that he tried to get Mr. Romdhani a raise but that it was not up to him, and that raises were decided by a vote. Mr. Romdhani informed Mr. Arnold that he felt his performance warranted an annual raise. Mr. Arnold told him that he would "work on it." Notably, other Arab and Middle Eastern Managers in Mr. Romdhani's region were also denied annual raises.

25.    During the spring and summer of 2006, Mr. Arnold began to call and visit the Station with a higher degree of frequency, especially at times when Mr. Romdhani was not there. On a number of these occasions, and in a further attempt to harass Mr. Romdhani, Mr. Arnold demanded that he return to the store during his time off to "check on things." On one occasion, on May 8, 2006, Mr. Arnold failed to notify Mr. Romdhani of a planned visit by Mr. Killidgian. When Mr. Arnold arrived at the station unannounced, Station employees informed him that Mr. Romdhani was out on his lunch break and offered to contact Mr. Romdhani to let him know that he should return to the station. Mr. Arnold instructed them not to call him, in order to make it appear to Mr. Killidgian that Mr. Romdhani was undependable and not available. Mr. Arnold

8

reprimanded a cashier who he thought had contacted Mr. Romdhani. Mr. Arnold then called Mr. Killidgian, who was on his way to the Delaware Station, and falsely informed Mr. Killidgian that Mr. Romdhani was nowhere to be found and that he should turn back around. Mr. Arnold added, also falsely, that Mr. Romdhani was rarely at the Station.

26.    When Mr. Romdhani returned to the station after lunch and learned from his subordinates what Mr. Arnold said to Mr. Killidgian, he contacted Mr. Killidgian and left him a voicemail message explaining that he was only on his lunch break and that he had returned to the Station. He also reported a second time to Mr. Killidgian that Mr. Arnold was treating him in a discriminatory and harassing manner and was deliberately misrepresenting his actions. As with Mr. Romdhani's earlier complaint of discrimination, Mr. Killidgian failed to return Mr. Romdhani's call, and took no action to prevent Mr. Arnold's ongoing harassment and retaliation against Mr. Romdhani.

27.    Throughout the summer of 2006, Mr. Arnold continued his efforts to undermine Mr. Romdhani and damage his reputation within the Company. On June 6, 2006, one of Mr. Romdhani's subordinates, Charisma Muwakkil, failed to report to work and did not call in to notify Mr. Romdhani that she would be out. The Company policy states that in a "no show, no call" situation, an employee is to be given a suspension for the first offense and to be terminated upon a second offense. Pursuant to the Company protocol, Mr. Romdhani contacted Mr. Arnold and obtained authorization to suspend Ms. Muwakkil for three days. Mr. Arnold told Mr. Romdhani that he would report the suspension to the Company Human Resources department as required by the policy, but did not do so. Just four days later, Ms. Muwakkil again failed to come to work or call in. Mr. Romdhani contacted Mr. Arnold, who initially advised him to send Ms. Muwakkil home and tell her she was terminated.

9

28.     Mr. Arnold then contacted Ms. Muwakkil and told her that Mr. Romdhani could not terminate her. Mr. Arnold advised her to report Mr. Romdhani to the ExxonMobil Human Resources Department for discrimination and for Termination without a Terminating Code. When Ms. Maloney asked Ms. Muwakkil about the complaint, she told Ms. Maloney and another Station employee, Richard Payne, that she had not wanted to file it, but that Mr. Arnold had pressured her to do so. Ms. Muwakkil further acknowledged that Mr. Arnold had actually filled out the paperwork for her and promised her job benefits in return if filed this baseless charge of discrimination against Mr. Romdhani.

29.     As a result of Mr. Arnold's third major attempt to sabotage Mr. Romdhani's career with Exxon, the Company initiated another investigation. While the Company cleared Mr. Romdhani on all allegations of discrimination and wrongdoing, it concluded that Mr. Arnold's failure to report the first no-show by Ms. Muwakkil was merely a "communication error." The Company took no action against Mr. Arnold for attempting to set Mr. Romdhani up for termination and for his aiding and abetting the filing of a false claim of discrimination against Mr. Romdhani. The Company required Mr. Romdhani to call Ms. Muwakkil back to work at the Station, thereby further undermining his authority as Station Manager.

30.     As the summer progressed, Mr. Arnold became increasingly hostile to Mr. Romdhani, and began to require him to work seven days a week, even though other Station Managers in the region were permitted to take off at least one day per week.

31.     At various times during Mr. Romdhani's employment, he requested permission to leave the station in order to attend Friday prayers at his mosque. Although there was no business reason for him to deny this request, since Assistant Managers were available to oversee station operations in Mr. Romdhani's absence, Mr. Arnold refused to accommodate his religious

10

practices. He told Mr. Romdhani that he was "in business to do business, not to grant religious accommodations," and refused to give Mr. Romdhani permission to attend his weekly Friday prayers.

32.    On July 11, 2006, Mr. Romdhani was in a car accident on the way to work, and had to miss a week of work. Although Mr. Arnold was well aware that Mr. Romdhani would not be able to work that week, he gave Mr. Romdhani's Assistant Manager, Wells Griscom, the week off for vacation, overriding Mr. Romdhani's previous instructions. After making sure the Station was devoid of managers, Mr. Arnold then contacted Mr. Romdhani at home while he was recuperating and told him that he needed to return to the Station because "the place is a mess." Mr. Romdhani responded that he could not report to work because he was injured.

33.    In August 2006, Mr. Romdhani contacted Mr. Killidgian by phone to complain again of discrimination and to seek his assistance. Mr. Romdhani told Mr. Killidgian that Mr. Arnold's harassment of him had escalated, and that Mr. Arnold was now forcing him to work seven days a week, including on Sundays, unlike other managers in the region. Mr. Killidgian's only response to Mr. Romdhani's complaints was that if "[Mr. Arnold] wants you to work on Sundays you have to work on Sundays." Once again, Mr. Killidgian made clear that Mr. Romdhani's only recourse was to resign if he did not like the way Mr. Arnold was treating him.

34.    Through the end of the summer and early fall of 2006, Ms. Muwakkil, the employee who Mr. Arnold had pressured to file a false discrimination complaint against Mr. Romdhani, continued to have significant performance problems. Mr. Romdhani and his Assistant Manager were forced to give her numerous verbal and written warnings about her failure to carry out her responsibilities properly and her abusive and profane conduct. On September 17, 2006, after being asked by one of the Assistant Managers to carry out a job duty,

11

she responded by yelling "Fuck you" and calling him a "Motherfucker." Notwithstanding her outrageous and persistently uncooperative behavior, each time Mr. Romdhani raised with Mr. Arnold the issue of disciplining or terminating Ms. Muwakkil, Mr. Arnold ignored Mr. Romdhani's complaints. This had the foreseeable effect of undermining Mr. Romdhani's authority as Manager of the Delaware Station, as Ms. Muwakkil and other employees realized that there were to be no consequences for disregarding management directives.

35.    Ms. Muwakkil also began using extremely offensive and discriminatory anti-Arab language in the workplace, calling a Muslim Arab employee a "terrorist" and telling him to "go back to your country." In or about August 2006, several Arab and/or Muslim employees of the Station presented Mr. Romdhani with a written complaint regarding Ms. Muwakkil's discriminatory comments. Mr. Romdhani contacted Mr. Arnold and presented him with the employees' letter, and asked that he address this situation. Mr. Arnold took no corrective action.

36.    At about the same time, Mr. Romdhani discovered that someone had written the phrase "Fuck Morocco" and the word "Terrorists" on the wall of one the cashier's booth at the Station. These discriminatory writings, and Ms. Muwakkil's past discriminatory comments, were extremely offensive to Mr. Romdhani, Ms. Maloney, Ms. Zeller, and other Arab and Muslim employees at the Station. Mr. Romdhani informed Mr. Arnold about this incident, and once again detailed Ms. Muwakkil's prior discriminatory comments about Muslims and Arabs. Mr. Arnold told Mr. Romdhani that he would "take care of it." A few days later, Mr. Romdhani received a telephone call from a Human Resources representative, who advised him that Exxon would not perform any investigation into the matter. The Company told Mr. Romdhani that he should simply remove the graffiti writing from the cashier's booth and take no further action.

12

37.    As a result of Exxon's conduct, Mr. Romdhani was prevented from doing his job, humiliated, punished for actions he did not commit, exposed to racial and religious harassment, and denied the opportunity to be rewarded for his positive performance. This treatment caused a substantial amount of stress and anxiety for Mr. Romdhani and his wife, and it created a tremendous strain on his marriage and home life. Mr. Romdhani found the discriminatory conditions in which Exxon required him to work, as well as Exxon's failure to address these discriminatory conditions once he complained about them, to be intolerable.

38.    On September 21, 2006, Mr. Romdhani's Assistant Manager, Wells Griscom, told him that he had asked Ms. Muwakkil to take out the trash twice, but that she had ignored him each time. Removing the trash from the Station and depositing it in the dumpster is part of the Cashier's job. Mr. Romdhani spoke to Ms. Muwakkil and asked her to take out the trash, but she again refused. Mr. Romdhani called Mr. Arnold and told him that Ms. Muwakkil had repeatedly refused to perform a job duty, and sought permission to terminate her employment pursuant to Company policy. Mr. Arnold asked to speak to Ms. Muwakkil. While speaking to Mr. Arnold, Ms. Muwakkil smiled and laughed and kept repeating "Thank you, Mr. Arnold." She then informed Mr. Romdhani that Mr. Arnold told her that she would not be disciplined. Mr. Romdhani immediately called Mr. Arnold and told him that he had deprived him of any authority as a Manager, and if he had no authority, he could not do his job. He informed Mr. Arnold that he had no choice but to quit, and that he would file a Charge of Discrimination with the Delaware Department of Labor. In response, Mr. Arnold mocked Mr. Romdhani, mimicking his accent and goading him to resign. Despite his desire to remain at Exxon and continue to advance in the Company, Exxon's discrimination, harassment, and retaliation against Mr.Romdhani left him no choice but to resign his position.

13

39.     Just one week after Mr. Romdhani left the Station, Mr. Arnold appointed Mr. Harden to take over Mr. Romdhani's former position as Manager of the Delaware Station, making good on his promise, made a year earlier, to appoint him to that role.

40.     On October 31, 2006, Mr. Romdhani filed a Charge of Discrimination with the Delaware Department of Labor ("DDOL"), which was cross-filed with the U.S. Equal Employment Opportunity Commission ("EEOC"). On May 31, 2007, after a lengthy and thorough investigation, the DDOL issued a Final Determination in Mr. Romdhani's case, finding cause to believe that Mr. Romdhani had been subjected to unlawful discrimination during his employment at Exxon. The DDOL concluded that Mr. Romdhani had been subjected to unduly harsh treatment, unjustified discipline, and unfair pay decisions because of his race, religion, and national origin, and noted that "witnesses corroborated Charging Party's allegations that he was continually subjected to harassment by his supervisor in regards to his religious beliefs and national origin." When the DDOL scheduled a mandatory "Conciliation Meeting" between the parties in order to attempt to work out a resolution of the matter, Exxon's representatives refused to attend.

41.     Since the termination of his employment from Exxon due to the discrimination against him, Mr. Romdhani has been unable to find another management position. He has suffered through periods of unemployment and has lost considerable income. [He has lost confidence in his abilities and his past experiences with Mr. Arnold have strained relationships with subsequent managers.] This experience of discrimination — of being humiliated and treated like a second-class citizen — has caused him anxiety and emotional pain and suffering.

**B.      Allegations Concerning Michelle Maloney**

42.     In March 2005, just prior to Mr. Romdhani taking over as Manager of the Station,

14

Ms. Maloney was hired by Exxon to work at the Delaware Turnpike Station. In late 2005, due to her positive performance, Exxon offered Ms. Maloney the opportunity to be promoted to an Assistant Manager position, but declined this offer for personal reasons.

43.    In or about the spring of 2006, Ms. Maloney converted to Islam. She also began to associate more with Arab employees at the Station, including her fiancé, Bakharou Hsi, an Arab employee from Morocco. Because of her conversion, many Exxon employees assumed that she became more closely associated with Mr. Romdhani.

44.    Among other religious practices that she adopted, Ms. Maloney began wearing the traditional Muslim headwrap, the hijab. As soon as Mr. Arnold noticed this, his attitude towards Ms. Maloney changed dramatically for the worse, and he repeatedly asked Ms. Maloney about her conversion and her attire. Mr. Arnold suggested to Ms. Maloney that her conversion had somehow been coerced by Mr. Romdhani, and was due to her association with him. Mr. Arnold asked Ms. Maloney, "Did Sofiene recruit you? I think he's recruiting everyone in here," referring to the fact that several employees at the Station were Muslim and Arab.

45.    On a few occasions, Mr. Arnold asked Ms. Maloney "What's this?" as he pulled on her hijab. His touching of her was unwelcome and offensive. He asked Ms. Maloney why she "switched up" religions and "jumped the fence," clearly indicating that he viewed Islam and her conversion negatively. Ms. Maloney informed Mr. Arnold that her choice to convert to Islam was personal and had nothing to do with Mr. Romdhani.

46.    In the Fall of 2006, after Mr. Romdhani had been replaced as Manager by Mr. Harden, Ms. Maloney became very ill one day at work, vomiting several times. Concerned for her own health, as well as the health of her coworkers and the many customers with whom she was interacting, she knew it was necessary for her to take sick leave. Ms. Maloney first tried to

15

contact a manager to discuss this, but Mr. Harden and the other managers were not present at the station, and there was no number posted for her to reach Mr. Harden, which is required by Exxon policy. Ms. Maloney left word with one of the other employees to inform Mr. Harden as soon as he came in that she had had to leave because she was extremely sick. Despite the fact that she was quite ill and had made every attempt to reach a manager, Mr. Harden suspended her for several days without pay and informed her that he might terminate her.

47.    Ms. Maloney contacted Mr. Arnold by telephone to explain what had occurred and to complain about her unfair suspension. She informed him that she was seriously ill and that she had done her best to comply with the notification policy. She further explained that despite the policy that manager numbers be listed for every shift, there were no managers' numbers posted for emergency contact. In response, Mr. Arnold became extremely hostile toward Ms. Maloney and told her that he was not going to override Mr. Harden's decision, in stark contrast to the numerous times he overrode Mr. Romdhani's managerial decisions. Mr. Arnold told Ms. Maloney, "I want to explain something to you. This is how it is. Ninety percent of the station is of Sofiene's kind and you've jumped to Sofiene's team." Mr. Arnold told Ms. Maloney that he and Mr. Harden were going to "clean house of the people of Sofiene's kind." Ms. Maloney asked Mr. Arnold what he meant by "the people of Sofiene's kind," and he replied, "You know exactly what I mean." It was clear to Ms. Maloney that Mr. Arnold was referring to the Arab and Muslim employees of the Station, as many of the Station's employees were Arab or Muslim, and as Mr. Arnold had previously used the phrase "Sofiene's team" to refer to her conversion to Islam. Ms. Maloney was so concerned about this conversation that she had her phone on speaker during the conversation, and her fiancé, Mr. Hsi, heard the conversation.

48.    A few days later, Ms. Maloney went to meet with Mr. Harden at his request to

16

discuss her suspension. Although she arrived at the time Mr. Harden had asked, he kept her waiting for more than an hour, and then had another employee inform her that he could not make the meeting at all. Upset by her unfair suspension and the Company's openly discriminatory response, Ms. Maloney called Mr. Arnold and left him a message informing him that she intended to complain to Exxon's Human Resources department regarding her treatment. Mr. Arnold called Ms. Maloney back and told her that she could file a complaint with whomever she wanted and that he was not scared. Mr. Arnold told Ms. Maloney that Mr. Romdhani had caused these problems for him, and that whether she chose to be Muslim now was up to her. Mr. Arnold later called Ms. Maloney back and informed her that Mr. Harden had decided not to terminate her.

49.    On another occasion, Mr. Arnold, attempting to justify his own negative conduct towards Muslim employees, told Ms. Maloney that he believed that Mr. Romdhani had given "special treatment" to Muslim employees while he was the Manager. Mr. Payne, a non-Muslim employee, told Mr. Arnold that this accusation was unfounded, and that he believed Mr. Romdhani had treated everyone fairly. Mr. Payne also told Ms. Maloney in a different conversation that he had never in his many years at Exxon seen a Regional Territory Manager who so heavily scrutinized the work of a station Manager as Mr. Arnold did with respect to Mr. Romdhani.

50.    In late 2006, Mr. Harden changed the work schedule for Ms. Maloney and several of her coworkers. Whereas Ms. Maloney previously had Fridays off, Mr. Harden informed her that she would now be working on Fridays. Ms. Maloney informed Mr. Harden that it was important for her to have Fridays off of work, or at least be given a brief leave period in the afternoon, so that she could attend her Muslim prayer services. There were many different

17

employees at the Station who worked many different schedules, and Mr. Harden could just as easily have given Ms. Maloney a schedule that permitted this religious accommodation. In response, Mr. Harden told Ms. Maloney that her request to attend prayer services was "not a legit reason" to have off, and refused even to permit her two hours off on Fridays to attend prayer.

51.    Ms. Maloney again contacted Mr. Arnold and notified him that she was entitled to be accommodated at work such that she could attend to her religious obligations. A few days later, he and Mr. Harden came into Ms. Maloney's cashier's booth and asked her "What's the problem, why are you and others screaming discrimination?" Ms. Maloney informed him that Mr. Harden had changed her schedule so that she could no longer attend her Muslim prayers on Fridays. Mr. Arnold replied, "I am not here to accommodate your religious beliefs. I am running a business, not a religious community." When Ms. Maloney advised Mr. Arnold that she believed he had to make her basic accommodations for her religious practices, he stated, "I don't have to do anything." Mr. Arnold told Ms. Maloney that "At the end, it'll be just me and Corey [Harden] standing." He further threatened "I'll get each and every one of you out of here."

52.    In November or December 2006, Ms. Maloney and Ms. Zeller, who had also converted to Islam, decided to file a complaint with Exxon's Human Resources Department regarding the discrimination and harassment that they and other Muslim employees had experienced at the Station. Ms. Maloney and Ms. Zeller telephoned Exxon's corporate office in Texas and spoke to Courtney, a representative in the Human Resources department. Ms. Maloney and Ms. Zeller reported that they and other Muslim employees were being discriminated against because of their religion and described some examples of the discrimination they had encountered at Exxon. They told Courtney that they would send her a

18

timeline of discriminatory events that they had been maintaining, which they did.  Courtney assured Ms. Maloney and Ms. Zeller that Exxon would conduct an investigation into their complaints of discrimination.  Following their call, however, Ms. Maloney and Ms. Zeller did not receive any follow-up from Exxon's Human Resources department, and were never contacted further about the matter.  Upon information and belief, Exxon did not perform any investigation into Ms. Maloney and Ms. Zeller's complaints of discrimination until nearly a year after their complaints – after they had both been forced out of Exxon.

53.    In late 2006, Exxon was in the process of hiring for a Cashier position at the Station.  When one or more Muslim employees applied for the position, Mr. Harden informed current employees of the Station that he "did not need any more Muslims in here."  Mr. Harden refused to forward the application of a qualified Muslim applicant to Exxon's Human Resources office.  Ultimately, Exxon hired three non-Arab, non-Muslim applicants for the position.

53.    In the spring of 2007, an investigator from the DDOL contacted Ms. Maloney regarding the discrimination complaint filed by Mr. Romdhani.  Ms. Maloney told the investigator what she knew, and stated that she believed that Exxon had discriminated against Mr. Romdhani, as well as other Muslim employees, including herself, because of their religion and association with other Arab employees.  Soon after Ms. Maloney spoke to the DDOL investigator, Mr. Harden became more harsh and negative towards her, criticizing her about issues that he had not criticized her for previously, and about which he did not criticize other non-Muslim employees.  Exxon also suspended other Muslim employees soon after they had spoken to the DDOL investigator based on justifications that non-Muslim employees had not been suspended for in the past.  For example, during the same week as the investigations, two Muslim employees were suspended for playing a portable DVD player, an activity in which

19

many non-Muslim employees — including managers — routinely engaged.

54.    In addition to discriminating against Muslim employees, Mr. Harden also refused to permit Ms. Maloney and Ms. Zeller to take breaks together. Other employees were allowed to take breaks with one another, and Ms. Maloney and Ms. Zeller were allowed to take breaks with other non-Muslim employees, but they were forbidden from taking breaks with each other. Mr. Harden threatened them with termination if he found them taking a break together.

55.    Mr. Harden retaliated against Ms. Maloney further on or about August 1, 2007, when he accused her of having stolen five cartons of cigarettes and threatened to have Exxon management perform an investigation of her. This charge was absolutely baseless, and was the exact same manner in which Mr. Arnold had previously discriminated against and retaliated against Mr. Romdhani and permanently damaged Mr. Romdhani's record at Exxon.

56.    On or about August 3, 2007, Ms. Maloney received a telephone call from Courtney, the Human Resources representative to whom she and Ms. Zeller had reported their complaints of religious discrimination in the Fall of 2006. Courtney told Ms. Maloney that she was calling because she learned that Ms. Maloney had recently complained of harassment and retaliation. Ms. Maloney reminded the Human Resources representative that the unlawful discrimination, harassment, and retaliation against her had been going on for a long period of time, and that she had complained about the matter nearly a year earlier. Ms. Maloney told the Human Resources representative that she recognized her voice from their previous conversation, and asked her why nothing was done the last time she had complained about harassment. Courtney stated that she did remember their previous conversation in 2006, in which Ms. Maloney and Ms. Zeller had complained about discrimination, but stated that she "thought it was resolved." Ms. Maloney told the Human Resources representative that nothing had been done to

20

address the issue, and reminded Courtney about the chronology of discriminatory events she had previously mailed her. She advised the Human Resources representative that the working environment had been made intolerable because of the discrimination, harassment, and retaliation against her, and that she intended to resign from her position as a result. Courtney requested that Ms. Maloney send her another copy of the chronology Ms. Maloney and Ms. Zeller had previously sent in 2006.

57.     As a result of Exxon's discriminatory conduct, Ms. Maloney was exposed to religious harassment, denied routine religious accommodations, threatened, humiliated, punished for actions she did not commit, retaliated against, and told on several occasions that she would be forced from the Company because of her religion and racial associations. Ms. Maloney found the discriminatory conditions in which Exxon required her to work, as well as Exxon's failure to address these discriminatory conditions once she reported them, to be intolerable. Despite her desire to remain at Exxon and continue to advance in the Company, Ms. Maloney determined that Exxon's discrimination, harassment, and retaliation against her left her no choice but to resign her position.

58.     Because of the intolerability of working in such an environment, Ms. Maloney determined that she had no choice but to leave her position at Exxon and seek employment elsewhere. On or about August 4, 2007, Ms. Maloney hand-delivered her resignation letter to Mr. Griscom, the Assistant Manager of the Station. Ms. Zeller also faxed to Courtney at Exxon's Human Resources Department a copy of her resignation letter and a second copy of the timeline of events that she and Ms. Zeller had sent to her in 2006. In response to her resignation, both Mr. Griscom and Bill Rash, two non-Muslim employees, told Ms. Maloney "I don't blame

you" for leaving given the conditions in which she had had to work under Mr. Harden and Mr. Arnold.

59.    In September 2007, Ms. Maloney received a government-issued form from the Department of Social Services which she was required to fill out for day care and other socials services. The form required basic confirmation of her employment status with respect to her former job at Exxon. Ms. Maloney delivered the form to Mr. Griscom, who agreed to fill it out for her. Mr. Griscom subsequently informed Ms. Maloney that Mr. Harden had forbidden him to fill out the form for her, and that Mr. Harden had told him he would be fired if he did so. Because of Mr. Harden's refusal to allow anyone to complete the necessary paperwork, Ms. Maloney and her child could have potentially been denied vital social services.

60.    Since leaving Exxon because of the discrimination and retaliation against her, Ms. Maloney has been forced to accept a lower-paying job than her previous job at Exxon. Ms. Maloney had worked at that job for three years, and this discrimination has caused much stress and friction within her family. Ms. Maloney became very depressed and overwhelmed as she was also battling cancer and raising a small child. She had dreaded going into work even though she once loved her job.

61.    On October 2, 2007, Ms. Maloney initiated a Charge of Discrimination with the DDOL, alleging discrimination based upon religion, race, and national origin as well as retaliation, under the Delaware Discrimination in Employment Act ("DDEA") and Title VII. Ms. Maloney has exhausted her administrative remedies under Title VII [the DDEA] and received a right-to-sue notice from the [DDOL] EEOC, and has timely filed her Title VII claim with this Court.

22

C.    **Allegations Concerning Bobbi Joe Zeller**

62.    In early 2006, in preparation for her marriage to her Muslim fiancé who is now her husband, Ms. Zeller converted to Islam. At this time, Ms. Zeller also began to associate more with Arab and Muslim employees at the Station, including her fiancé, Hicham Boukra, from Morroco. Because of her conversion, many Exxon employees also assumed that she became more closely associated with Mr. Romdhani.

63.    Like Ms. Maloney, Ms. Zeller began wearing the traditional Muslim head wrap, the hijab. As soon as she began these practices, Mr. Arnold's attitude toward her changed and deteriorated markedly. He made negative comments about her Muslim faith almost every time he came to the Station. Mr. Arnold regularly asked Ms. Zeller why she was wearing the hijab and chided her for wearing it. On one occasion, when Ms. Maloney did not wear her hijab to work, Mr. Arnold mockingly stated that she must be "having problems at home" and remarked to Ms. Zeller, "Isn't that against your religion?" These comments were unwelcome and offensive, and Ms. Zeller was very uncomfortable with Mr. Arnold's constant references to her religion.

64.    Mr. Arnold also made clear to Ms. Zeller that he viewed her conversion to Islam as a negative event. As he did with Ms. Maloney, Mr. Arnold taunted Ms. Zeller, and on several occasions asker her why she "switched teams" religiously. As with Ms. Maloney, he accused her of "jumping the fence" to Islam.

65.    When he made these negative comments about her religion, Mr. Arnold also repeatedly suggested that Ms. Zeller's conversion was coerced by her association with Mr. Romdhani, asking Ms. Zeller if "Sofiene pushed [her] to do it [become a Muslim]." On one occasion Mr. Arnold specifically asked Ms. Zeller if she "switched teams" to become the same religion as her manager. Ms. Zeller repeatedly informed Mr. Arnold that her decision to become

a Muslim was personal and was not related to her job, but Mr. Arnold continued to bring up her new religion and conversion.

66.     Prior to her conversion, when Mr. Arnold visited the Station, he spoke politely and professionally to Ms. Zeller. Once she became a Muslim, however, he rarely spoke to her about anything but her religion and often mentioned the fact that Mr. Romdhani was a Muslim.

67.     In or about August 2006, Ms. Zeller noticed with shock that the words "Terrorists" and "Fuck Morocco" were written on one of the booths at the Station. She also learned that one of her coworkers, Ms. Muwakkil, had berated an Arab Muslim coworker about his background, calling him a "terrorist" and telling him to go back to his country. Ms. Zeller was extremely offended by these derogatory and discriminatory anti-Arab and anti-Muslim comments. Despite Ms. Zeller's complaints to Exxon management about this racial and religious harassment, Exxon did not perform any investigation into this matter.

68.     Immediately after Mr. Harden replaced Mr. Romdhani as Manager of the Station, Mr. Harden developed a hostile attitude toward Ms. Zeller. Like Mr. Arnold, Mr. Harden constantly made derogatory references to Ms. Zeller's Muslim faith, and heavily harassed her about her attire, including her wearing of the hijab.

69.     Although it had never been the practice of the Station in the past, Mr. Harden also began assigning Ms. Zeller to go into the men's bathroom to make sure there were enough towels and toilet paper. In the past, male employees checked the men's bathroom and female employees checked the women's bathrooms, since the bathrooms remained open while these checks occurred. In addition, even though the Station employed a contract employee who was assigned to clean the bathrooms three times a day, Mr. Harden assigned Ms. Zeller to clean the men's bathroom. When Mr. Harden asked her to do these things, Ms. Zeller explained to him

24

that her religion did not permit her to be in a location where men were undressed. She noted that there were plenty of male employees available to perform this task, as they had done in the past, and she offered instead to check the women's bathroom as she had done many times in the past. Mr. Harden refused this offer and told Ms. Zeller that she would have to bring in materials to him to "prove" the requirements of her religion.

70.    In response to Mr. Harden's request that she provide him with documentation regarding the requirements of her religion, Ms. Zeller brought him a book entitled Muslim Women's Dress Code and three chapters from the Qu'ran. Ms. Zeller had explained to Mr. Harden that she could not go into the men's bathroom while there were men using it, and also that her religion required that she not tuck in her shirt so that it did not reveal her figure. In a hostile and dismissive tone, Mr. Harden told Ms. Zeller that she had to read the materials out loud to him. Ms. Zeller advised him that she had brought the materials he asked for and that she thought it would be better if he would read them for himself. Mr. Harden responded that he did not have to do anything and that he was not running a religious community.

71.    In early October 2006, shortly after Mr. Harden became the new manager, Ms. Zeller noticed that she was missing several days of pay from her paycheck. She approached Mr. Griscom, the Assistant manager, about this issue, and Mr. Griscom said he would take care of the problem. Shortly thereafter, she learned from Mr. Griscom that the problem had not been fixed because Mr. Harden had refused to authorize the correction. When Ms. Zeller asked Mr. Harden about this problem, his attitude was hostile and dismissive.

72.    After Mr. Harden failed to correct her underpayment, on or about October 12, 2006, Ms. Zeller contacted Mr. Arnold and explained that Mr. Harden had refused to correct her paycheck, and that he was treating her in a hostile manner because of her religion. Mr. Arnold

25

accused Ms. Zeller of "nit-picking the new manager." He stated, "I don't care how many complaints you make to the Labor Board, Human Resources, Equal Opportunity Board or anywhere else, [Mr. Harden] is not going anywhere, I will bet my job on it. The only people going anywhere are the people of Sofiene's kind." Ms. Zeller asked Mr. Arnold what he meant by "Sofiene's kind" and he replied, "You know exactly what I mean." Mr. Arnold then said, "Get used to it, your old boss is gone and definitely not coming back, and Sofiene's kind of people will be gone soon as well." Ms. Zeller clearly understood Mr. Arnold to be referring to Muslims and Arabs. Ms. Zeller told Mr. Arnold that she did not think it was appropriate for him to bring up her supposed association with Mr. Romdhani, but that she simply wanted the discriminatory harassment to stop and to receive pay for the missing hours in her paycheck.

73.     In November or December 2006, frustrated by the discrimination against her because of religion and her association with other Arabs and Muslims, Ms. Zeller, along with Ms. Maloney, contacted Exxon's Human Resources office and made a complaint of discrimination. Following their complaint, however, Ms. Zeller and Ms. Maloney did not receive any follow-up from the Human Resources department, and were never contacted further about the matter.

74.     After Mr. Romdhani filed his complaint of discrimination with the Delaware Department of Labor, Ms. Zeller spoke to the DDOL investigator and told the investigator that she had been discriminated against and that she believed Mr. Romdhani had been discriminated against, too. Shortly afterward, Mr. Arnold came to the Station, entered Ms. Zeller's cashier booth with Mr. Harden, and asked the Assistant Manager to leave. In an intimidating manner, Mr. Arnold told Ms. Zeller that he had "heard from the Department of Labor" and that we needed to "solve this now." Ms. Zeller explained to Mr. Arnold that she had simply sought his

26

assistance with a basic employee matter, a problem with her paycheck, but that he kept bringing up her supposed association with Mr. Romdhani and accusing her of being one of "Sofiene's kind." She stated that she had no other choice but to report the discrimination. Mr. Arnold stated, "So it's gonna be like that, you're gonna cause problems." Ms. Zeller told Mr. Arnold that she did not intend to "cause problems," and was simply trying to do her job. Mr. Arnold told her that she was "Only going to make it harder for yourself." Ms. Zeller responded that if he had further questions he should speak to the Department of Labor. This conversation with Mr. Arnold and Mr. Harden made Ms. Zeller feel extremely uncomfortable and intimidated.

75.     Shortly thereafter, on or about October 14, 2006, Ms. Zeller became ill in the booth, with vomiting and diarrhea. Ms. Zeller was concerned not only about her own health but about the health of the customers and other employees with whom she was directly interacting. Ms. Zeller told the Assistant Manager, Mr. Griscom, and he contacted Mr. Harden to ask him for permission for Ms. Zeller to leave. Mr. Harden denied Ms. Zeller permission to leave. Ms. Zeller contacted her husband, who then called Mr. Harden and again requested that she be permitted to leave work due to her health condition. Mr. Harden was hostile towards Ms. Zeller's husband over this issue, but ultimately permitted Ms. Zeller to leave. Ms. Zeller was subsequently rushed to the hospital by a coworker and was diagnosed with severe dehydration. She was so sick that she was unable to return to work until October 18, 2006.

76.     When she returned to work, Mr. Harden's harassment of Ms. Zeller escalated. He made more frequent mocking and derogatory comments about her religion, asked her repeatedly to clean the men's bathroom, and even stated on one occasion that "Maybe you should scrub the walls, too." No other women were asked to clean the bathrooms or scrub the walls. Mr. Harden

27

often followed such instructions with taunting comments like, "Oh, I forgot, you can't do that, you're Muslim."

77.     In or about October 2006, Ms. Zeller asked for two hours off to attend Ramadan prayers. Mr. Harden refused, stating "I'm going to tell you right now, you're not getting off." Ms. Zeller explained to Mr. Harden that she needed the time for religious observance. After Mr. Harden initially told Ms. Zeller that she could "Do it on your own time," Ms. Zeller replied that she was willing to take the two hours of time away unpaid and then return to work, and that there were plenty of employees available to allow for this. Mr. Harden then changed his mind and told Ms. Zeller that she could not take even unpaid leave to attend to her religious requirements, and told her that if she took two hours off of work to attend prayer she would be fired. In order to attend prayer, Ms. Zeller was thus forced to miss an entire day of work and lose a day of pay.

78.     In late 2006, upon information and belief, Mr. Arnold began working within a different region at Exxon. Mr. Harden's treatment of Ms. Zeller continued to worsen. Although other employees were routinely permitted to take breaks or lunch together, Mr. Harden prohibited Ms. Zeller and Ms. Maloney from taking their scheduled lunch breaks at the same time and separated them when he saw them together on other breaks. Mr. Harden escalated his harassment about Ms. Zeller's attire, regularly insisting that she tuck in her shirt, although he did not similarly harass other non-Muslim employees for not tucking in their shirts.

79.     Due to Mr. Harden's hostile treatment of her, Ms. Zeller began to suspect that Mr. Harden intended to fire her in retaliation for her participation in the investigations of Mr. Romdhani's complaints of discrimination, and for her own complaints about discrimination.

80.     In the Spring of 2007, Ms. Zeller walked into the Manager's office at the Station for a business reason and found the new Territory Manager, Carl, and an Inventory Manager,

28

Kevin, watching a pornographic video. Ms. Zeller was extremely offended and upset by seeing pornography in the workplace, and was especially offended as a Muslim woman, whose religion requires modesty in sexual matters. Ms. Zeller told them that they should not be viewing pornography in the workplace and that she was offended by this conduct. They simply laughed at her.

81.     On May 21, 2007, when Ms. Zeller arrived at the North Booth Station where she worked, there was a gas spill. It is part of the Cashier job to clean up gas spills for safety reasons, but Ms. Zeller did not have the supplies that she needed to do so. Although Ms. Zeller contacted Mr. Harden, informed him about the gas spill, and requested that he have someone bring over some cleaning supplies, he did not send anyone over with the necessary materials. On her lunch break, Ms. Zeller went to find Mr. Harden to discuss the spill and get the necessary materials. When she entered the Manager's booth, she was shocked to find Mr. Harden and an inventory clerk, Kevin, looking at pornographic magazines. They made no attempt to conceal them when she walked in the room, and instead simply laughed. Ms. Zeller was very offended and upset. She told Mr. Harden and the Station clerk that she found these materials sexually offensive and that she thought their behavior was harassing and extremely inappropriate. Ms. Zeller was so upset by this event that she called her husband, who in turn contacted Mr. Harden to complain about what had happened. Ms. Zeller's husband told Mr. Harden that she was extremely upset by his conduct, and that he thought Mr. Harden's behavior was highly inappropriate.

82.     Only a few minutes after Ms. Zeller's and her husband's complaints to Mr. Harden about pornography in the workplace, Mr. Harden telephoned Ms Zeller and instructed her to report to the managers' office before she left for the day. When she arrived at the office

29

after her shift, Mr. Harden told Ms. Zeller that he was terminating her effective immediately.

When Ms. Zeller asked why she was being terminated, Mr. Harden told her that it was due to her

"tardiness," which was a clearly pretextual explanation. Ms. Zeller had never received a formal

reprimand for tardiness or any other matter in the year and a half that she had worked for Exxon,

as required by Exxon's progressive discipline policy prior to a termination. Moreover, several

other non-Muslim employees, including Ms. Muwakkil, were late on a regular basis and were

never terminated.

83.    On May 24, 2007, Ms. Zeller initiated a Charge of Discrimination with the

DDOL, alleging discrimination based on religion, race, and national origin as well as retaliation,

under the DDEA and Title VII. Ms. Zeller has exhausted her administrative remedies under

Title VII [the DDEA] and received a right-to-sue notice from the [DDOL] EEOC, and has timely

filed her Title VII claim with this Court.

84.    The discriminatory treatment by Exxon has caused Ms. Zeller significant stress

and anxiety, and Ms. Zeller was constantly distressed about having to work at Exxon because,

financially, she needed the job but was not in a good position to leave. Exxon's discriminatory

and retaliatory termination of Ms. Zeller's employment caused severe financial hardship to Ms.

Zeller and her family, including their having to move out of their home.

**COUNT I**
**DISCRIMINATION IN VIOLATION OF**
**THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981**
**(By all Plaintiffs)**

85.    Plaintiffs hereby incorporate by reference as though restated each of the factual

allegations in paragraphs 1 through 84[3] above.

86.    The Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), prohibits

30

discrimination on the basis of race in the making, enforcement, performance, modification, and termination of contracts, including employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

87.    From about July 2005 until his separation in September 2006, defendant Exxon subjected Mr. Romdhani to discriminatory treatment on the basis of his race by, *inter alia*, denying Mr. Romdhani an annual salary increase, orchestrating false complaints and investigations against him, placing him on a performance improvement plan, persistently undermining his managerial authority, and condoning derogatory anti-Arab comments in the workplace. In addition, Exxon knowingly permitted conditions of discrimination in Mr. Romdhani's employment that were so intolerable, unpleasant, and difficult that a reasonable person in Mr. Romdhani's position would resign, which Mr. Romdhani did as a result of such intolerable conditions.

88.    From about early 2006, Exxon subjected Ms. Maloney and Ms. Zeller to discriminatory treatment because of their increased association with Arab employees or perceived increased association with Arab employees, by, *inter alia*, harassing them about their conversion and their association with Mr. Romdhani, harassing them about their conversion to Islam and religious dress requirements, condoning derogatory anti-Arab and anti-Muslim comments in the workplace, denying them justified sick leave, and requiring Ms. Zeller to enter the men's bathroom. Exxon also knowingly permitted conditions of discrimination in Ms. Maloney's employment that were so intolerable, unpleasant, and difficult that a reasonable person in Ms. Maloney's position would resign, which Ms. Maloney was forced to do as a result of such intolerable conditions.

89.    Defendant's actions described above constitute unlawful racial discrimination in

31

violation of Section 1981.

90.    Defendant engaged in its discriminatory actions with malice, with an evil mind, and with reckless indifference to plaintiffs' federally protected rights.

91.    Defendant's actions described above directly and proximately have caused, and continue to cause, plaintiffs to suffer loss of income and other financial benefits, damage to their professional reputation, emotional distress, anguish, pain and suffering, humiliation, and personal embarrassment.

**COUNT II**
**RETALIATION IN VIOLATION OF**
**THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981**
**(By All Plaintiffs)**

92.    Plaintiffs hereby incorporate by reference as though restated each of the factual allegations in paragraphs 1 through 91[0] above.

93.    Section 1981 prohibits any person from deterring, impeding, or obstructing an individual's access to the courts regarding a matter made unlawful by Section 1981 or attempts to engage in nonjudicial methods of adjudicating a contractual dispute covered by Section 1981, or from otherwise retaliating against an individual for engaging in such protected activity.

94.    After their complaints to the Delaware Department of Labor and Exxon management about the discriminatory treatment against them because of their real or perceived association with Arabs, Exxon retaliated against Ms. Maloney and Ms. Zeller by, *inter alia*, threatening them, denying them sick leave and other basic accommodations granted to other employees, framing Ms. Maloney for a disciplinary infraction, refusing to fill out a form required by Ms. Maloney for the receipt of government benefits, and terminating Ms. Zeller's employment. After his complaints about discriminatory treatment to Exxon management, Exxon

32

retaliated against Mr. Romdhani by, *inter alia*, purposefully and unjustifiably attempting to make him look bad to Exxon management, increasing and condoning the undermining of his managerial authority, and condoning derogatory anti-Arab comments in the workplace.

95.    Defendant's actions described above constitute unlawful retaliation in violation of Section 1981.

96.    Defendant engaged in its retaliatory actions with malice, with an evil mind, and with reckless indifference to plaintiffs' federally protected rights.

97.    Defendant's actions described above directly and proximately have caused, and continue to cause, plaintiffs to suffer loss of income and other financial benefits, damage to their professional reputation, emotional distress, anguish, pain and suffering, humiliation, and personal embarrassment.

## COUNT III
## HARASSMENT IN VIOLATION OF
## THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981
## (By All Plaintiffs [Romdhani])

98.    Plaintiff hereby incorporates by reference as though restated each of the factual allegations in paragraphs 1 through 97[6] above.

99.    Section 1981 also prohibits an employer from engaging in harassment that creates a hostile or offensive working environment by subjecting an employee to intimidation, ridicule, or insult because of the employee's race or because of his or her association with others of a particular race.

100.    Exxon subjected Plaintiff Romdhani [Plaintiff] to racial harassment by, *inter alia*, condoning derogatory anti-Arab comments in the workplace, failing to investigate incidents of racial harassment, and failing to take appropriate action against those who subjected Mr.

Romdhani to racial harassment. Exxon failed to take appropriate action when an employee called a Muslim coworker of Mr. Romdhani's a "terrorist" and refused to investigate when the graffiti "Fuck Morocco" and "Terrorists" appeared on the cashier booth.

101.    Exxon subjected Ms. Maloney and Ms. Zeller to harassment because of their increased association with Arab employees or perceived increased association with Arab employees, by, *inter alia*, harassing them about their conversion and supposed association with Mr. Romdhani, harassing them about their conversion to Islam and cultural dress requirements, condoning derogatory anti-Arab comments in the workplace, denying them justified sick leave, and requiring Ms. Zeller to enter the men's bathroom. Exxon also knowingly permitted conditions of discrimination in Ms. Maloney's employment that were so intolerable, unpleasant, and difficult that a reasonable person in Ms. Maloney's position would resign, which Ms. Maloney was forced to do as a result of such intolerable conditions.

102.    Defendant's actions described above constitute unlawful racial harassment in violation of Section 1981.

103.    Defendant engaged in its racial harassment with malice, with an evil mind, and with reckless indifference to Plaintiffs' federally protected rights.

104.    Defendant's actions described above directly and proximately have caused, and continue to cause, [p]Plaintiffs to suffer loss of income and other financial benefits, damage to [his] their professional reputations, emotional distress, anguish, pain and suffering, humiliation, and personal embarrassment.

34

**COUNT IV**
**DISCRIMINATION AND HARASSMENT IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e et seq.**
**(By all Plaintiffs [Romdhani])**

105.    Plaintiffs hereby incorporate[s] as though restated each of the allegations set forth

in paragraphs 1 through 104[2] above.

106.    Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits an employer from

discriminating against an employee on the basis of religion, race, or national origin with regard

to the terms, privileges, and conditions of employment, or engaging in harassment that creates a

hostile or offensive working environment by subjecting an employee to intimidation, ridicule, or

insult because of the employee's religion, race, or national origin.

107.    Defendant is an employer subject to the requirements of Title VII.  Plaintiffs [Mr.

Romdhani is an] are employees covered by Title VII, and have[s] exhausted their [his]

administrative remedies under Title VII.

108.    From about July 2005 until his separation in September 2006, Defendant Exxon

subjected Mr. Romdhani to discriminatory and harassing treatment on the basis of his religion,

race, and national origin by, *inter alia*, denying Mr. Romdhani an annual salary increase,

orchestrating false complaints and investigations against him, placing him on a performance

improvement plan, persistently undermining his managerial authority, and condoning derogatory

anti-Arab and anti-Muslim comments in the workplace.  In addition, Exxon knowingly permitted

conditions of discrimination in Mr. Romdhani's employment that were so intolerable,

unpleasant, and difficult that a reasonable person in Mr. Romdhani's position would resign,

which Mr. Romdhani was forced to do as a result of such intolerable conditions.

109.    From about early 2006, Exxon subjected Ms. Maloney and Ms. Zeller to

35

discriminatory treatment because of their religion and perceived racial associations by, *inter alia,* harassing them about their supposed association with Mr. Romdhani, harassing them about their conversion to Islam and religious dress requirements, condoning derogatory anti-Arab and anti-Muslim comments in the workplace, denying them justified sick leave, and requiring Ms. Zeller to enter the men's bathroom.  Exxon also knowingly permitted conditions of discrimination in Ms. Maloney's employment that were so intolerable, unpleasant, and difficult that a reasonable person in Ms. Maloney's position would resign, which Ms. Maloney was forced to do as a result of such intolerable conditions.

110.    Defendant engaged in its discriminatory and harassing actions with malice, with an evil mind, and with reckless indifference to Plaintiffs' [Mr. Romdhani's] federally protected rights.

111.    Defendant's actions described above directly and proximately have caused, and continue to cause, Plaintiffs [Mr. Romdhani] to suffer loss of income and other financial benefits, damage to [his] their professional reputations, emotional distress, anguish, pain and suffering, humiliation, and personal embarrassment.

**COUNT V**
**FAILURE TO PROVIDE REASONABLE RELIGIOUS ACCOMMODATIONS**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e et seq.**
**(By all Plaintiffs [Romdhani])**

112.    Plaintiffs hereby incorporate[s] as though restated each of the allegations set forth in paragraphs 1 through 111[08] above.

113.    Title VII provides that an employer must make reasonable religious accommodation to allow employees to practice their religion so long as the accommodation

36

does not have an undue burden on the business.

114.    Defendant is an employer subject to the requirements of Title VII.  Plaintiffs [Mr. Romdhani is an] are employees covered by Title VII, and have[s] exhausted their [his] administrative remedies under Title VII.

115.    At various times during Plaintiffs' [Mr. Romdhani's] employment, [he] they requested permission to be assigned a schedule that would permit them to [leave the station in order to] attend religious [Friday] prayer services [at his mosque].  Although such an assignment would not have caused Exxon undue hardship, [there was no business reason for him to deny this request, since Assistant Managers were available to oversee station operations in Mr. Romdhani's absence,] Exxon [Mr. Arnold] denied these requests, and told Plaintiffs [Mr. Romdhani] that it [he] was "in business to do business, not to grant religious accommodations.[,]" Plaintiffs were also denied other reasonable religious accommodation requests. [and refused to give Mr. Romdhani permission to attend his weekly Friday prayers.]

116.    Defendant denied Plaintiffs' [Mr. Romdhani] reasonable religious accommodation requests with malice, with an evil mind, and with reckless indifference to [Mr. Romdhani's] Plaintiffs' federally protected rights.

117.    Defendant's actions described above directly and proximately have caused, and continue to cause, Plaintiffs' [Mr. Romdhani] to suffer loss of income and other financial benefits, damage to their [his] professional reputations, emotional distress, anguish, pain and suffering, humiliation, and personal embarrassment.

37

**COUNT VI**
**RETALIATION IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e et seq.**
**(By all Plaintiffs [Romdhani])**

118.    Plaintiffs hereby incorporate[s] as though restated each of the allegations set forth in paragraphs 1 through 117[4] above.

119.    Title VII prohibits an employer from retaliating against an employee for opposing such discriminatory conduct or filing a charge regarding such discriminatory conduct.

120.    Defendant is an employer subject to the requirements of Title VII.  Plaintiffs [Mr. Romdhani is an] are employees covered by Title VII, and have[s] exhausted their [his] administrative remedies under Title VII.

121.    After Mr. Romdhani complained about discriminatory treatment to Exxon management, Exxon retaliated against Mr. Romdhani by, *inter alia*, threatening him, increasing its undermining of his managerial authority, and purposefully and unjustifiably tarnishing his reputation with Exxon management.  After Ms. Maloney and Ms. Zeller complained about discrimination and harassment to Exxon management and to the Delaware Department of Labor, Exxon retaliated against them by threatening them, harassing them further, and, in the case of Ms. Maloney, refusing to fill out a government-issued form required for the receipt of benefits.

122.    After Ms. Zeller complained about a sexually hostile workplace to Exxon management, Exxon retaliated against her by terminating her employment.

123.    Defendant engaged in its retaliatory actions with malice, with an evil mind, and with reckless indifference to Plaintiffs' [Mr. Romdhani's] federally protected rights.

124.    Defendant's actions described above directly and proximately have caused, and continue to cause, Plaintiffs [Mr. Romdhani] to suffer loss of income and other financial

38

benefits, damage to their [his] professional reputations, emotional distress, anguish, pain and suffering, humiliation, and personal embarrassment.

[COUNT VII
DISCRIMINATION AND HARASSMENT IN VIOLATION OF THE
DELAWARE DISCRIMINATION IN EMPLOYMENT ACT, 19 Del. C. § 710 et seq.
(By Plaintiffs Maloney and Zeller)]

[121.   Plaintiffs hereby incorporate as though restated each of the allegations set forth in paragraphs 1 through 120 above.]

[122.   The Delaware Discrimination in Employment Act ("DDEA") prohibits an employer from discriminating against an employee on the basis of religion, race, or national origin with regard to the terms, privileges, and conditions of employment. The DDEA prohibits an employer from engaging in harassment that creates a hostile or offensive working environment by subjecting an employee to intimidation, ridicule, or insult because of the employee's religion, race, or national origin.]

[123.   Defendant is an employer subject to the requirements of the DDEA. Plaintiffs Maloney and Zeller are employees covered by the DDEA and have exhausted their administrative remedies under the DDEA.]

[124.   From about early 2006, Exxon subjected Ms. Maloney and Ms. Zeller to discriminatory treatment because of their religion and because of their perceived increased association with Arab employees, by, *inter alia*, harassing them about their conversion to Islam and their perceived association with Mr. Romdhani, harassing them about their religious dress requirements, condoning derogatory anti-Arab and anti-Muslim comments in the workplace, denying them justified sick leave, and requiring Ms. Zeller to enter the men's bathroom. Exxon also knowingly permitted conditions of discrimination in Ms. Maloney's employment that were

39

so intolerable, unpleasant, and difficult that a reasonable person in Ms. Maloney's position would resign, which Ms. Maloney was forced to do as a result of such intolerable conditions.]

[125.   Defendant engaged in its discriminatory and harassing actions with malice, with an evil mind, and with reckless indifference to plaintiffs' legally protected rights.]

[126.   Defendant's actions described above directly and proximately have caused, and continue to cause, Ms. Maloney and Ms. Zeller to suffer loss of income and other financial benefits, damage to their professional reputation, emotional distress, anguish, pain and suffering, humiliation, and personal embarrassment.]

## [COUNT VIII
## FAILURE TO PROVIDE REASONABLE RELIGIOUS ACCOMMODATIONS,
## IN VIOLATION OF THE DELAWARE DISCRIMINATION IN EMPLOYMENT ACT,
## 19 Del. C. § 710 et seq.
## (By Plaintiffs Maloney and Zeller)]

[127.   Plaintiffs hereby incorporate as though restated each of the allegations set forth in paragraphs 1 through 126 above.]

[128.   The DDEA provides that an employer must make reasonable religious accommodation to allow employees to practice their religion so long as the accommodation does not have an undue burden on the business.]

[129.   Defendant is an employer subject to the requirements of the DDEA.  Plaintiffs Maloney and Zeller are employees covered by the DDEA, and have exhausted their administrative remedies under the DDEA.]

[130.   At various times during the employment of Ms. Maloney and Ms. Zeller, Ms. Maloney and Ms. Zeller requested permission to leave the station for a short time on Friday for prayer.  Exxon unreasonably denied those requests for religious accommodation.]

[131.   Defendant denied Ms. Maloney and Ms. Zeller reasonable religious

40

accommodations with malice, with an evil mind, and with reckless indifference to their legally protected rights.]

[132.   Defendant's actions described above directly and proximately have caused, and continue to cause, Ms. Maloney and Ms. Zeller to suffer loss of income and other financial benefits, damage to their professional reputation, emotional distress, anguish, pain and suffering, humiliation, and personal embarrassment.]

[COUNT IX
RETALIATION IN VIOLATION OF
THE DELAWARE DISCRIMINATION IN EMPLOYMENT ACT, 19 Del. C. § 710 et <u>seq.</u>
<u>(By Plaintiffs Maloney and Zeller)]</u>

[133.   Plaintiff hereby incorporates as though restated each of the allegations set forth in paragraphs 1 through 132 above.]

[134.   The Delaware Discrimination in Employment Act ("DDEA") prohibits an employer from retaliating against an employee for opposing discriminatory conduct or filing a charge regarding such discriminatory conduct.]

[135.   Defendant is an employer subject to the requirements of the DDEA.  Plaintiffs Maloney and Zeller are employees covered by the DDEA, and have exhausted their administrative remedies under the DDEA.]

[136.   After and in response to their complaints to the Delaware Department of Labor and Exxon management about the discriminatory treatment against them because of their religion and their perceived association with Arabs, Exxon retaliated against Ms. Maloney and Ms. Zeller by, *inter alia*, threatening them, denying them sick leave and other basic accommodations granted to other employees, framing Ms. Maloney for a disciplinary infraction, refusing to fill out a form required by Ms. Maloney for the receipt of government benefits, and terminating Ms.

41

Zeller's employment.]

[137.  After and in response to her complaints about a sexually hostile work environment, Exxon retaliated against Ms. Zeller by terminating her employment.]

[138.  Defendant engaged in its retaliatory actions with malice, with an evil mind, and with reckless indifference to plaintiffs' legally protected rights.]

[139.  Defendant's actions described above directly and proximately have caused, and continue to cause, Ms. Maloney and Ms. Zeller to suffer loss of income and other financial benefits, damage to their professional reputation, emotional distress, anguish, pain and suffering, humiliation, and personal embarrassment.]

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment against the Defendant and in his favor for damages suffered by him, due to Defendant's actions, including, but not limited to:

1.  Issuance of a declaratory judgment that defendant violated the Civil Rights Act of 1866, 42 U.S.C. § 1981, with respect to its treatment of Plaintiffs;

2.  Issuance of a declaratory judgment that defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., with respect to its treatment of [p]Plaintiffs [Mr. Romdhani];

3.  [Issuance of a declaratory judgment that defendant violated the Delaware Discrimination in Employment Act, 19 Del.C. § 710 et seq., with respect to its treatment of Ms. Maloney and Ms. Zeller;] Order such injunctive relief as necessary to prevent any further violation of the statutory rights of Arabs and Muslims in the region of defendant's operations which encompasses its Delaware stations;

42

4.    An award to plaintiffs of economic and compensatory damages, punitive damages, reasonable attorneys' fees and costs; and all other relief the Court deems just.

 

 

Timothy J. Wilson, Esq. (DE Bar ID 4323)
Jeffrey K. Martin, Esq. (DE Bar ID 2407)
Martin & Wilson, P.A.
1508 Pennsylvania Ave.
Wilmington, DE 19806
(302) 777-4681 (telephone)
(302) 777-5803 (facsimile)
twilson@martinandwilson.com
jmartin@martinandwilson.com

Debra S. Katz, Esq.
Avi Kumin, Esq.
Katz, Marshall & Banks, LLP
1718 Connecticut Ave., N.W., Sixth Floor
Washington, DC 20009
(202) 299-1140 (telephone)
(202) 299-1148 (facsimile)

*Attorneys for Plaintiffs*

Dated: August 7, 2008

43

## CERTIFICATE OF SERVICE

I, Timothy J. Wilson, hereby certify this 7th day of August, 2008, that the foregoing was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following counsel of record that the document is available for viewing and downloading from CM/ECF:

Kathleen Furey McDonough, Esquire
Potter Anderson & Corroon, LLP
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801

Attorney for Defendant

Timothy J. Wilson