## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| SOFIENE ROMDHANI, MICHELLE MALONEY, and BOBBI JOE ZELLER, | ) ) ) ) | |
| Plaintiffs, | ) ) | C. A. No. 07-715 (JJF) |
| v. | ) ) | |
| EXXON MOBIL CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

### DEFENDANT EXXON MOBIL CORPORATION'S OPENING BRIEF
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

Joe Robert Caldwell, Jr.
Benjamin Kringer
Heather M. Souder
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 639-7700

Dated:  December 15, 2009
946531

Kathleen Furey McDonough (#2395)
Sarah E. DiLuzio (#4085)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19801
(302) 984-6000

*Attorneys for Defendant Exxon Mobil Corporation*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ....................................................................................5

   1.  The Station ...............................................................................................5

   2.  Sofiene Romdhani's Employment with ExxonMobil..............................7

       a.  Romdhani's job performance in 2005 was sub-standard .................7

       b.  Romdhani was denied a raise in the Spring of 2006.......................8

       c.  Romdhani's job performance in 2006 was sub-standard.................10

       d.  Romdhani did not work required business hours...............................11

       e.  Romdhani worked elsewhere while a Station Manager...................11

       f.  Romdhani quit ExxonMobil on September 21, 2006 ......................12

   3.  Maloney and Zeller's Employment at ExxonMobil ................................12

       a.  ExxonMobil's Progressive Discipline Policy for non-exempt employees ..........12

       b.  Maloney and Zeller repeatedly violated ExxonMobil policy .............................13

       c.  Zeller was terminated on May 21, 2007 ........................................13

       d.  Maloney filed a false work-site injury report ................................14

   4.  Status of Proceedings ..............................................................................14

SUMMARY OF ARGUMENT ..............................................................................14

LEGAL STANDARD.............................................................................................15

ARGUMENT ..........................................................................................................16

   I.  EXXONMOBIL IS ENTITLED TO SUMMARY JUDGMENT
      ON PLAINTIFFS' DISCRIMINATION AND HARASSMENT CLAIMS
      (COUNTS I, III AND IV)...................................................................18

      A.  PLAINTIFFS WERE NOT "QUALIFIED" ......................................19

         1.  ROMDHANI WAS NOT ELIGIBLE FOR A RAISE ..................19

         2.  ZELLER WAS PROPERLY TERMINATED ..............................21

      B.  PLAINTIFFS WERE NOT CONSTRUCTIVELY DISCHARGED .................21

         1.  ROMDHANI CANNOT ESTABLISH A *PRIMA FACIE*
            CASE OF HARASSMENT. .......................................................22

            •  Arnold properly investigated a cigarette shortage at the Station .............23

            •  Arnold properly submitted Charisma Muwakkil's harassment
              complaint to HR...................................................................23

            •  Romdhani was properly placed on an Action Plan...................24

- Arnold did not undermine Romdhani's "managerial authority" ............25
- Arnold had anti-Arab graffiti at the Station investigated and removed...........................................................................................27

   2.  NEITHER ZELLER NOR MALONEY CAN ESTABLISH A *PRIMA FACIE* CASE OF HARASSMENT.............................................................29

- Maloney was not suspended for leaving the Station while sick .............29
- Zeller was not prevented from leaving the Station while sick.................30
- Zeller was not made to clean the men's bathroom ..................................30

  C.  THERE IS NO EVIDENCE THAT THE BUSINESS REASONS PROFFERED FOR EXXONMOBIL'S ACTIONS WERE PRETEXTUAL.....31

II.  PLAINTIFFS WERE NOT SUBJECTED TO RETALIATION (COUNTS II AND VI) ........................................................................................34

  A.  ROMDHANI DID NOT SUFFER AN ADVERSE EMPLOYMENT ACTION BECAUSE OF ALLEGED RETALIATION ......................................34

  B.  NEITHER MALONEY NOR ZELLER SUFFERED AN ADVERSE EMPLOYMENT ACTION BECAUSE OF ALLEGED RETALIATION .........35

III.  PLAINTIFFS' REQUESTS FOR RELIGIOUS ACCOMMODATION WERE GRANTED (COUNT V) .................................................................................37

CONCLUSION........................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Ackah v. Commonwealth of Pa. Dept. of Corr.*,
   No. 4:08-cv-00376, 2009 WL 2951986 (M.D. Pa. Sept. 14, 2009)........................................16

*Aman v. Cort Furniture Rental Corp.*,
   85 F.3d 1074 (3d Cir. 1996)................................................................................................22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..........................................................................................................16

*Andreoli v. Gates*,
   482 F.3d 641 (3d Cir. 2007)..............................................................................................34

*Ansonia Bd. of Educ. v. Philbrook*,
   479 U.S. 60 (1986)............................................................................................................40

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006)............................................................................................................34

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..........................................................................................................16

*Clowes v. Allegheny Valley Hospital*,
   991 F.2d 1159 (3d Cir. 1993)............................................................................................22

*Crawford v. Carroll*,
   No. 1:04-cv-0089, 2007 WL 757666 (N.D. Ga. Mar. 8, 2007) .............................................30

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
   450 F.3d 130 (3d Cir. 2006)..............................................................................................35

*Despanie v. Henderson*,
   32 F.App'x 390 (9th Cir. 2002) .........................................................................................30

*Fuentes v. Perskie*,
   32 F.3d 759 (3d Cir. 1994)................................................................................................18

*Getz v. Pennsylvania*,
   802 F.2d 72 (3d Cir. 1986)................................................................................................37

*Griffiths v. Cigna Corp.*,
   988 F.2d 457 (3d Cir. 1993)..............................................................................................34

*Harris v. Forklift Sys.*,
   510 U.S. 17 (1993)..................................................................................................22

*King v. City of New Kensington*,
   No. 06-1015, 2008 WL 4492503 (W.D. Pa. Sept. 30, 2008)................................19

*Lewis v. Univ. of Pittsburgh*,
   725 F.2d 910 (3d Cir. 1983)..................................................................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..............................................................................................16

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)..............................................................................................17

*Mowafy v. Noramco of Del., Inc.*,
   620 F. Supp. 2d 603 (D. Del. 2009)................................................16, 17, 31, 33

*National R.R. Passenger Corp. v. Morgan*,
   536 U.S. 101 (2002)..............................................................................................23

*Parker v. State of Del., Dept. of Pub. Safety*,
   11 F. Supp. 2d 467 (D. Del. 1998)........................................................................19

*Pinsker v. Joint Dist. No. 29J of Adams & Arapahoe Counties*,
   735 F.2d 388 (10th Cir. 1984) ..............................................................................40

*Salkovitz v. Pioneer Electronics (USA), Inc.*,
   188 F.App'x 90 (3d Cir. 2006) ..............................................................................34

*Sarullo v. U.S. Postal Serv.*,
   352 F.3d 789 (3d Cir. 2003)..................................................................................18

*Shelton v. Univ. of Medicine & Dentistry of N.J.*,
   223 F.3d 220 (3d Cir. 2000)............................................................................18, 37

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993)..............................................................................................17

*Stanziale v. Jargowsky*,
   200 F.3d 101 (3d Cir. 2000)..................................................................................18

*Storey v. Burns Int'l Sec. Servs.*,
   390 F.3d 760 (3d Cir. 2004)............................................................................17, 19

*Texas Dept. of Cmty Afairs v. Burdine*,
   450 U.S. 248 (1981)..............................................................................................32

*Toll v. American Airlines, Inc.*,
  166 F.App'x 633 (3d Cir. 2006) ........................................................................................19

*United States v. Board of Educ.*,
  911 F.2d 882 (3d Cir. 1990).............................................................................................37

**STATUTES**

Civil Rights Act of 1866, 42 U.S.C. § 1981 ......................................................................1, 16, 17

Title VII of the Civil Rights Act of 1964,
  42 U.S.C. § 2000e *et seq*..........................................................................1, 16, 17, 34, 37, 40

**OTHER AUTHORITIES**

Fed. R. of Civ. P. 56........................................................................................................16

## INTRODUCTION

Plaintiffs Sofiene Romdhani, Michelle Maloney and Bobbi Joe Zeller (collectively "Plaintiffs") are former employees of Defendant Exxon Mobil Corporation ("ExxonMobil"), who worked at ExxonMobil station 25726 on Interstate 95 in Newark, Delaware (the "Station"), as Station Manager and cashiers, respectively.   They allege six counts of discrimination, harassment, retaliation and failure to accommodate religious requests against ExxonMobil, based on religion, race and national origin, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"). Plaintiffs' claims lack merit, and cannot overcome the fact that each of ExxonMobil's actions were prompted by legitimate and non-discriminatory business reasons, as summarized in the following.

**Romdhani's discrimination, harassment and retaliation claims: Counts I, II, III, IV and VI.** Romdhani asserts that he was the target of discrimination, harassment and retaliation because he is a member of the Muslim faith and comes from Tunisia.  Specifically, Romdhani claims that he was forced to terminate his employment with ExxonMobil because his supervisor, Richard Arnold, (i) denied him a pay raise, (ii) instigated allegedly unfounded investigations against him concerning a $17,000 cigarette shortfall, as well as an allegation by another employee that Romdhani had discriminated against her, (iii) wrongfully placed Romdhani on a Performance Improvement Plan ("Action Plan") for sub-par performance, (iv) undermined Romdhani's managerial authority over other Station employees, and (v) condoned derogatory anti-Arab comments at the Station. Romdhani's assertions are without merit.

*First*, Romdhani was not constructively discharged from ExxonMobil due to alleged mistreatment by Arnold.  Unrefuted evidence demonstrates that he was offered and accepted a higher paying job with Pepsi Bottling Group, Inc. ("Pepsi") some six weeks before he voluntarily

terminated his job with ExxonMobil. Indeed, despite the full-time demands of the job as Station Manager, Romdhani asked ExxonMobil if he could be allowed to work the ExxonMobil full-time job while also working the Pepsi full-time job, a request ExxonMobil denied. Plainly Romdhani did not believe he needed to give full-time attention to his full-time job.

*Second*, Romdhani was denied a pay raise and put on an Action Plan because his job performance was substandard. Multiple performance evaluations consistently showed that Romdhani did not manage the Station efficiently, demonstrating lack of organization, failure to complete and file required paperwork, and failure to perform inventory controls that were designed to prevent theft. Moreover, Arnold's supervisor, John Kiliddjian, received many phone calls from irate ExxonMobil executives complaining about the condition of Romdhani's station when they visited. The evidence demonstrates that one reason for Romdhani's deficient job performance was that he was not at the station when he should have been. Unbeknownst to ExxonMobil, Romdhani worked at least two other jobs that caused him to be absent from the Station, sometimes during the Station's core business hours, contrary to ExxonMobil policy. In fact, Romdhani was ultimately fired from his next job with Pepsi *because he worked another job during business hours.*

*Third*, Arnold did not initiate false investigations against Romdhani, undermine his managerial authority, or condone anti-Arab comments. The investigations were prompted by legitimate business concerns, i.e., that the Station experienced a $17,000 cigarette shortfall, and that another employee complained that Romdhani had discriminated against her. Similarly, Arnold's alleged "intrusion" into Romdhani's management was what a supervisor of a station manager was required to do, i.e., ensure that Romdhani was doing his job. And when anti-Arab graffiti was written at the Station, Arnold had the matter investigated and the graffiti erased.

In short, Romdhani's allegations are directly contradicted by the unrefuted evidence in the case, and each of ExxonMobil's actions was taken for legitimate business reasons.

**Zeller and Maloney's discrimination, harassment and retaliation claims: Counts I, II, III, IV and VI.** In support of their claims, Zeller and Maloney allege that (i) Zeller was wrongfully terminated, (ii) Maloney was "framed" for a cigarette shortage, (iii) Arnold harassed them about their conversion to Islam, (iv) Arnold and Corey Harden, Romdhani's replacement, condoned anti-Arab comments or threatened them, (v) Harden denied them sick leave, (vi) Harden required Zeller to clean the men's restroom in violation of her religion, and (vii) Harden refused to fill out a form for Maloney.

It is plain that Zeller was terminated for cause. Under ExxonMobil's progressive discipline guidelines, an employee may be terminated for a violation of the guidelines if the employee was previously suspended for a prior violation. In January, 2007, Zeller was suspended for failing a tobacco sting (selling tobacco without checking identification). Accordingly, Zeller's next violation of the disciplinary guidelines warranted termination. Then, in the three months before she was terminated, Zeller skipped work without calling ("no call/no show") three times, was late to work by at least five minutes eighteen times and was late to work by more than fifteen minutes three times (including on the day she was terminated). No other employee at the station came close to both the pervasiveness and severity of Zeller's infraction history.

Maloney and Zeller's remaining claims are equally unavailing. For example, ExxonMobil did not accuse Maloney of stealing cigarettes, as she asserts; but she did fail to count the cigarettes during her shift as required. Accordingly, she was responsible for the cigarette shortage that occurred during her shift. Moreover, initial questions by Arnold or

Harden about when or why Maloney and Zeller began to wear the Muslim headdress, the Hijab, do not amount to harassment under well established law. Additionally, Zeller was asked to clean the men's restroom because cleaning the restrooms was part of her job as a sales associate. Zeller confessed during her deposition that Harden only asked her to clean the restroom "5-6" times and that she was never actually made to clean the restroom once she requested a religious accommodation.

In short, ExxonMobil's conduct towards Plaintiffs was the result of the neutral enforcement of ExxonMobil's policies and an attempt to correct Maloney and Zeller's performance deficiencies, not discrimination.

**Plaintiffs' religious accommodation claims:  Count V.**  Although Plaintiffs claim that they were denied religious accommodations, they were actually granted every request but one, for which a reasonable, alternative accommodation was offered and accepted.  Plaintiffs claim that (i) Romdhani requested time off for prayers on Friday, (ii) Maloney requested time off for prayers on Friday, (iii) Maloney and Zeller asked to leave their shirttails un-tucked for religious reasons, (iv) Zeller asked to be relieved of the duty to clean the men's restroom, and (v) Zeller requested time off to attend to Ramadan.

The record establishes that Arnold had a consistent practice of allowing Muslim employees to take time off on Fridays to attend to prayer — Arnold's travel records show that he rarely visited the Station on a Friday and Maloney's time records demonstrate that she never worked a single Friday.  Indeed, another Muslim station manager in Arnold's territory confirms that Arnold always allowed him time off on Friday for prayer.  Moreover, though Harden initially instructed Maloney and Zeller to tuck in their shirttails per ExxonMobil policy, Harden reversed that instruction when HR determined that leaving the shirttails out was an acceptable

accommodation. Finally, Zeller claims that the *one time* she requested a few hours off on a Friday to attend a prayer service the requested was denied. However, Zeller acknowledges that she was allowed to take the day off from work to attend the prayer service and was not suspended or disciplined for missing work. Instead, she was simply not compensated for a day that she did not, in fact, work. That is a textbook reasonable accommodation.

In sum, because there is no material factual dispute with respect to each of plaintiffs' claims, defendant ExxonMobil requests that an order granting summary judgment be entered with respect to all of Plaintiffs' claims.

## STATEMENT OF FACTS

Station Operators Inc., d/b/a ExxonMobil CORS ("Station Operators"), a Delaware corporation, is a wholly-owned subsidiary of ExxonMobil Oil Corporation ("EMOC"), a New York corporation. Station Operators is responsible for operating the retail service stations owned or leased by EMOC. EMOC is a wholly-owned subsidiary of Mobil Corporation, a Delaware corporation, which in turn is a wholly-owned subsidiary of ExxonMobil, a New Jersey corporation. Station Operators formerly operated the Station.[1] Plaintiffs are former employees of the Station. The Station was part of Territory 7125 (the "Territory"), which was part of the Metro New York Operations Area (an area that included part of New York, New Jersey, Pennsylvania and Delaware).

### 1.   The Station

The Station was a flagship for ExxonMobil. It was located on Interstate 95 in Delaware, between the north and south lanes of I-95. Kiliddjian Decl., A1-2.[2] It was a high-volume store

---

[1] In January, 2008, ExxonMobil closed the Station because its lease with the Delaware Department of Transportation expired.

[2] Citations to the Appendix are referred to herein as A__.

with multiple pumping stations which received a significant amount of traffic, particularly during the summer months. *Id.*; Romdhani Dep., A19; Kiliddjian Dep., A388. In fact, the Station was routinely one of the top two ExxonMobil stores in the entire United States based on volume of gasoline sold. Kiliddjian Decl., A1; Arnold Dep., A321. The Station was difficult to maintain, not only because of the high traffic volume, but because it sprawled over a relatively large geographic area. In addition to a retail store, the Station had approximately 30 gasoline pumps that were housed in two different areas, one by the northbound lane and one by the southbound lane. Kiliddjian Decl., A1 The Station also included two sales kiosks: the north booth and the south booth. Both were operated by cashiers. Kiliddjian Dep., A380, A386. Moreover, the Station's restrooms were located in a separate building across a parking lot from the retail store. Kiliddjian Decl., A1; Mocsary Decl., A427.

ExxonMobil executives traveling on I-95 for summer vacation or on routine trips between New York and the ExxonMobil offices in Fairfax, Virginia, invariably stopped at the Station to refuel and see how the Station was operating. Kiliddjian Dep., A385 ("That store is unique in itself because of the many visits that we receive from our [executive group]"); Kiliddjian Decl., A2; Arnold Dep., A320. When Romdhani was SM, Executives often reported deficiencies in cleanliness or maintenance to the Operations Manager for the area, John Kiliddjian. Arnold Dep., A320 ("[s]o I constantly got e-mails from John about people that would say to him the conditions of the stores [were poor], and I mean these people were like the President of Fuels Marketing, a VP of Upstream. I mean people whose voices go a long, long way."); Kiliddjian Dep., A388; Kiliddjian Decl., A2.

The Station Manager ("SM") in charge before Romdhani, Manny Dominguez, had ten years experience and knew how to make a difficult store operate as smoothly as possible.

6

Kiliddjian Dep., A387.  Romdhani became the Station's Manager following a couple of months as a SM at a smaller, more remote station.  After a year and half in the position, Romdhani quit.

## 2.    Sofiene Romdhani's Employment with ExxonMobil.

Romdhani, a Muslim man native to Tunisia, was hired as an Assistant Manager of the Delaware Station on July 31, 2003.  Compl., A23.  In or about February of 2005, the supervisor for the Territory, Territory Manager ("TM") Leslie Mergner, sent Romdhani for training to become a SM.  While Romdhani was attending training, Mergner was replaced by a new TM, Richard Arnold.  When Romdhani graduated, Arnold assigned Romdhani to a station in New Jersey.  While there, Romdhani requested time off on Fridays so that he could attend religious services, and Arnold granted the request.  Arnold Dep., A328.  In or about May, 2005, Dominguez left ExxonMobil.  Arnold offered the Delaware Station Manager job to Romdhani, and Romdhani accepted.  Kiliddjian Decl., A2.

### a.    Romdhani's job performance in 2005 was sub-standard.

Romdhani's performance as a SM was evaluated three times in 2005, twice by Steve Oshetsky, a Field Operations Analyst for ExxonMobil, and once by Arnold.  The evaluations were recorded in a CORS Self-Assessment Report ("Assessment").  In the Assessments, Romdhani was graded on a 100-point scale.  A score above 84 was considered good, 60-84 was satisfactory, 40-59 was unsatisfactory, and below 40 was unacceptable.  Oshetsky Decl., A432.  The average score of an SM was between a 75 and 83.  *Id.*

On May 6, 2005, Oshetsky performed an Assessment and ranked Romdhani as "unsatisfactory" with a score of 59.  A60-62.  In the report, Oshetsky specifically noted that Romdhani was not properly keeping records or doing inventory invoicing/counts, noting, *inter alia*, that:

- "SM not processing day reports timely"

7

- "Daily Cig counts are not compared"
- "Lottery counts are not done correctly"
- "Trend charts are not being completed"
- "cash audits are not being completed"
- "multiple [credit card] transactions are not being reviewed"

On July 26, 2006, Oshetsky again evaluated Romdhani, and ranked him "satisfactory" with a score of 70 — still below the 75-83 average.  A63-65.  In an email forwarding the Assessment, Oshetsky specifically highlighted his concerns that Romdhani was not adequately performing shift procedures or maintaining paperwork, stating "I do have some concerns about [Daily Business Reports], Shift procedures, and Credit Cards."  *Id.*  In fact, Oshetsky specifically noted that "overall there has been very little improvement in Shift procedures."  *Id.*  Oshetsky highlighted his concerns because Romdhani's deficiencies increased the risk of theft at the Station.  Oshetsky Decl., A432.  In the Assessment, Oshetsky also noted, *inter alia*, that:

- "Cig counts, auto bank counts do not always match shift to shift"
- Cashiers were not "filling out shift sheets or documenting register accounts"
- "no cash audits completed"
- "SM has not been reviewing [credit cards] to each shift"

On December 15, 2005, Arnold conducted a separate Assessment and also scored Romdhani as "satisfactory", giving Romdhani a 71.  A66.  While Romdhani had made some improvements pursuant to the Action Plan described *infra*, Romdhani still was not properly following ExxonMobil's procedures.  The Assessment noted, *inter alia,* that:

- "SM not completing Weekly Reconciliation form"
- "SM not completing Daily Reconciliation form"
- "Time sheets not properly filled out by cashiers and SM"
- "SM Cigarette Running Inventory counts and/or reconciliation incomplete"
- "Incomplete Cigarette counts.  Incomplete Lottery Counts.  Incomplete Safe Counts."

### b.    Romdhani was denied a raise in the Spring of 2006.

Based on Romdhani's performance in 2005, ExxonMobil determined that he was not eligible for a raise.  ExxonMobil determined Station Manager raises in a nationwide procedure

that occurred in two stages.  In the first stage, the Territory Managers for each Operations Area met to rank the SMs in their Operations Area from best to worst based on their performance in 2005.  Prior to the ranking session, each SM listed their own view of their performance and accomplishments during the prior year in an Employee Assessment and Development Sheet (EADS).  Malave Decl., A68.  ExxonMobil also collected relevant statistical data for each station and compiled it into Individual Performance Worksheets ("IPW") by territory.  *Id.* at A69.  At the ranking meeting, ExxonMobil gave the TM's a copy of each station manager's EADS and each territory's IPW.  When each SM was up for consideration during the ranking meeting, the SM's supervising TM gave a five minute presentation on any of the SM's strengths that might not show up in the EADS or IPW.

The four TM's in Romdhani's Operations Area met in the Spring of 2006 to vote under the supervision of the Operations Manager, John Kiliddjian, and the Rank Facilitator, Connie Malave.  *Id* at A67-68.  To start the voting process, each TM placed the highest ranked SM from their own Territory on a board for consideration.  *Id.* at A70.  By majority vote, the TM's selected the best SM of that group, who was rated Number 1.  *Id.*  The TM of that SM placed his or her second best SM up for consideration, and the TM's voted again.  The best SM based on that vote was ranked second.  The procedure continued until all SM's in the Operations Area were ranked from first to last.  *Id.*  By vote of four TM's, under the supervision of Kiliddjian and Malave, Romdhani was ranked 28th best out of 32 SM's.

That ranking was then passed on to ExxonMobil's Human Resources Department ("HR"), which determined SM raises nationwide.[3]  While only the bottom 10% received no raise

---

[3] Within operations areas, SM's were grouped by performance, with the top grouping of SMs eligible for the highest raise, the middle grouping of SMs' eligible for a lower raise, and the bottom grouping receiving no raise at all.  Bryant Decl., A73-74.  Whether the SM's were

in 2005, the bottom 20% did not receive a raise in 2006 due to a nationwide change in ExxonMobil policy. Bryant Decl., A74. Romdhani was ranked 13% by vote of all the TMs in the operations area. Accordingly, although Romdhani would have been eligible for a raise in 2005, he was not eligible to receive one in 2006.

### c.   Romdhani's job performance in 2006 was sub-standard.

Romdhani received two Assessments in 2006. On February, 21, 2006, Oshetsky conducted an Assessment of Romdhani that resulted in a score of 77. A76-77. Although Romdhani's performance was "satisfactory", Oshetsky again noted that Romdhani was not following all of ExxonMobil procedures, stating:

- "SM not completing Daily Reconciliation form"
- "Changes to POS and time slip are not properly initialed by SM and employee."
- "SM not reconciling cash cards"
- "Vendor log not complete — missing cashier and vendor signatures"
- problems with "product variations" required check if "applicable control measure are in place

On March 31, 2006, Arnold conducted an Assessment of Romdhani, which resulted in a lower score of 65, also categorized a "satisfactory." A78. Again, Arnold noted Romdhani's continued failure to follow ExxonMobil procedures, including:

- "SM not reconciling Change Fund"
- "Changes to POS Time Slip are not properly initialed by SM and employee"
- "Weekly schedule is not included in payroll files"
- "Weekly schedule is not updated to reflect actual time"
- "Time sheet not signed by SM or employee"
- "Cash Audits incomplete"
- "SM needed to ensure Cigarette count sheet and Cigarette running inventory log are completed accurately"

---

grouped into fifths, thirds, or another fraction was decided by ExxonMobil senior executives, and could vary year to year. *Id.* at A73. A computer program would then calculate the percentage raise each grouping could receive based on the money available for salaries that year. *Id.*

### d.   Romdhani did not work required business hours.

The job of Station Manager for ExxonMobil is demanding and required the full attention and active management of the Station Manager onsite. For that reason, ExxonMobil requires that its SM's work at the Station a minimum of 40-48 hours per week. Musharraf Dep., A81-85; Romdhani Dep., A18. Those hours were expected to be performed primarily between 7:00 or 8:00 a.m. and 4:00 or 5:00 p.m., and evenings or weekend hours as necessary. Romdhani Dep., A16-17; Arnold Dep., A352. Despite the requirements, Romdhani did not work those hours. Richard Arnold made unannounced visits to the Station or called the Station and found that Romdhani was absent. Arnold Dep., A350, A352-353. Some Station employees covered for Romdhani, *Id.* at A353, while others reported that he was working other jobs during core business hours. *Id.* at A353.

### e.   Romdhani worked elsewhere while a Station Manager.

While employed as a Station Manager, Romdhani held jobs with Genesco (Johnston & Murphy), a shoe retail store, and BCI International, a fur coat retail store.[4] Romdhani Dep., A10-14. Additionally, store employees reported seeing Romdhani delivering Pizza for Dominos. Arnold Dep., A353. Romdhani asserts he only worked other jobs after 5:00 p.m. on weekdays — after core business hours. Romdhani Dep., A15. Not True. For Johnston and Murphy,

---

[4] If an SM pursues supplemental employment, the SM is required to disclose the potential for conflict to his or her supervisor so that ExxonMobil can determine if the second job poses a conflict, such as working with an ExxonMobil supplier or a job with conflicting time commitments. During training, SM's are shown a slideshow that specifically lists a part-time job as a conflict of interest, and instructs them to notify their TM of the potential conflict. A94-111. However, Romdhani never informed Arnold, or any other ExxonMobil supervisor, that he was working part-time jobs while employed as a SM. To the contrary, when Arnold specifically asked Romdhani if he was working another job, Romdhani claimed that he was not. Arnold Dep., 353. This pattern repeated itself at Romdhani's next job, working for Pepsi. While employed at Pepsi, Romdhani worked a second job without approval, lied about working the second job during core business hours when confronted, and was accordingly fired for violating Pepsi's work rules when caught. Provenzano Dep., A114-115, A120.

Romdhani worked during core business hours on weekdays 6 times in 2006 alone. Johnston and Murphy Timesheet, A122-125.

### f.      Romdhani quit ExxonMobil on September 21, 2006.

On August 4, 2006, Pepsi extended an offer of employment to Romdhani to become a Territory Support Coordinator.  The offer included a salary of $53,000 and a $2,000 signing bonus.  A126.   At ExxonMobil Romdhani was making $40,050 a year with a possibility of a bonus based on the Station's performance.  Kiliddjian Decl., A7.  Unbeknownst to ExxonMobil, Romdhani accepted the Pepsi offer on August 7, 2006.  A127.  Romdhani completed his final paperwork and background tests for Pepsi on September 21, 2006.  Casto Dep., A129-130.  That same day, Romdhani negotiated his start date with Pepsi and abruptly quit his job with ExxonMobil. *Id.*

### 3.      Maloney and Zeller's Employment at ExxonMobil.

Maloney, a Caucasian woman, was hired by Station Operators in March 2005 to serve as a cashier at the Station. Compl., A23, A34. Approximately one year later, Maloney converted to Islam.  *Id.* at A34-35.  She continued to serve as a cashier at the Station until she resigned on or about August 4, 2007.  *Id.* at A23, A41.  Plaintiff Bobbi Joe Zeller, also a Caucasian woman, was hired by Station Operators in December 2005 to serve as a cashier at the Station.  *Id.* at A23. Like Maloney, Zeller converted to Islam in "early 2006."  *Id.* at A42.  She continued to serve as a cashier at the Station until her employment was terminated on May 21, 2007.  *Id.* at A23, A49.

### a.      ExxonMobil's Progressive Discipline Policy for non-exempt employees.

Exxon Mobil has a clearly established procedure for its SM's to follow in disciplining station employees.  Discipline Guidelines, A132.  If an employee arrives fifteen minutes or more past their start time, the policy calls for a verbal warning for the first offense, written warning for

the second offense, suspension for the third offense, and termination for the fourth offense.[5] *Id;* Sprague Decl., A424. For a "no call/no show," an employee is subject to immediate suspension for the first offense and termination for a second. *Id.* at A425. Likewise, an employee who fails an ExxonMobil tobacco sting is subject to immediate suspension for the first offense, and termination for a second. *Id.* at A424-425.

### b.    Maloney and Zeller repeatedly violated ExxonMobil policy.

There is no dispute that Maloney and Zeller repeatedly violated ExxonMobil's policy. Maloney and Zeller were among the most tardy of all Station employees. In the period from mid-October through May 30, 2007,[6] Zeller was late to work 55 times, including 11 times by 15 minutes or more. Keelty Decl., A438. During the same time period, Maloney was late 66 times, including 19 times by 15 minutes or more. *Id.* However, neither Maloney nor Zeller was suspended and then terminated solely for her excessive tardiness.

### c.    Zeller was terminated on May 21, 2007.

On the day Zeller was terminated, she was late by more than 15 minutes, an infraction subject to discipline under ExxonMobil's progressive discipline guideline. Moreover, Zeller had already been suspended for three days on January 30, 2007 because she failed a tobacco sting. A143, A144. Under the discipline guidelines, she could be terminated for her next infraction. A132, Sprague Decl., A424-425. Following her suspension, Zeller had three "no call/no shows" and was late 20 times — twice by more than 15 minutes, including the day she was finally terminated. Work Schedule Store 25726, A430; Written Warning, A142; Keelty Decl. at 438-439. Zeller's conduct warranted termination under ExxonMobil's progressive discipline policy.

---

[5] If the employee is late less than fifteen minutes but on multiple occasions, the SM may still discipline the employee under ExxonMobil policy. Sprague Dep., A135.

[6] This was the last pay cycle in which Zeller was employed by ExxonMobil.

### d.    Maloney filed a false work-site injury report.

Maloney filed a report with ExxonMobil Human Resources ("HR") claiming that she was injured while lifting bags at the Station on July 10, 2007.  However, an investigation conducted before she resigned revealed that she was not injured on the job.  Unser Report, A145-146.  On August 4, 2007, two days before the investigation was completed and the report released, Maloney resigned.  *Id.*

### 4.    <u>Status of Proceedings</u>

Romdhani filed a claim of discrimination with the DDOL on October 31, 2006.  Zeller filed a claim with the DDOL on May 24, 2007 and Maloney filed a claim on October 2, 2007.  Plaintiffs filed their initial Complaint in this Court on November 5, 2007, and subsequently amended their Complaint two times.  The parties completed discovery on September 30, 2009.

## SUMMARY OF ARGUMENT

It is incontrovertible that Plaintiffs were sub-par employees.  During his time as a SM, Romdhani was given five Assessments by ExxonMobil.  His scores were generally below average for an SM and he never once scored "good."  In all, Romdhani scored merely satisfactory four times and unsatisfactory once.  *Supra* at 7-8, 10.  Moreover, the Assessments highlighted that Romdhani was deficient in key areas for an ExxonMobil station manager — organization and record keeping.  *Id.*  Without proper inventory logs, it was difficult to prevent inventory shortages, or to determine the cause of the shortage when it happened.  *Id.*  Without proper maintenance logs, any store, but especially one the size of the Delaware Station, would have problems with cleanliness and keeping the store fully operational.  Romdhani's deficiencies as an SM were only compounded by the fact he was operating one of ExxonMobil's highest profile stations.  *Supra* at 6.  However, despite his deficiencies, Romdhani was not terminated.

Instead, ExxonMobil worked with Romdhani to improve his performance until the day Romdhani abruptly quit for a higher-paying job with Pepsi.

Similarly, Maloney and Zeller were far from model employees. Even their own witnesses concede that they were regularly late to work. Griscom Dep., A155, A158-159; Rash Dep., A176-177. In fact, Maloney and Zeller were not just late to work, they were often late to work by more than 15 minutes — an offense ultimately punishable with termination under ExxonMobil's guidelines. *Supra* at 13. Between October 19, 2006 and May 30, 2007, Maloney was late by 15 minutes or more 19 times, and Zeller was late by more than 15 minutes 11 times. *Id.* Harden could have terminated either employee for that reason alone. Nevertheless, Harden did not terminate Maloney, and only terminated Zeller after she also was (i) suspended for failing a tobacco sting, (ii) committed a "no call/no show" and (iii) followed it with being late by 15 minutes 3 more times. *Id.* And, despite being repeatedly late even after Zeller was terminated, Maloney was permitted to continue working at ExxonMobil until the day she abruptly quit.

Plaintiffs' misconduct is well documented and indisputable. Nevertheless, Plaintiffs claim that their supervisors, in trying to improve Plaintiffs' performance, committed discrimination, harassment, retaliation and failed to make religions accommodations. However, Plaintiffs' supervisors were correctly trying to enforce ExxonMobil's established policies and guidelines to ensure the Station operated optimally. No matter how Plaintiffs try to spin it, they simply cannot establish an actionable wrong. Plaintiffs' case is insufficient as a matter of law, and ExxonMobil is entitled to summary judgment.

## LEGAL STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment "if the pleadings, the discovery and disclosure material on file" show that

there is no genuine issue as to any material fact. To withstand summary judgment, the plaintiff must "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal citations omitted). A mere "scintilla of evidence" will not suffice, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and a party resisting summary judgment must do more than simply show "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 249-50 ("If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted"). "[T]he mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue." *Mowafy v. Noramco of Del., Inc.*, 620 F. Supp. 2d 603, 611 (D. Del. 2009) (citing *Anderson*, 477 U.S. at 249). Bald assertions of discrimination and "self serving declarations parroting the allegations from the complaint are insufficient to demonstrate any factual dispute" and cannot withstand a motion for summary judgment. *Ackah v. Commonwealth of Pa. Dept. of Corr.*, No. 4:08-cv-00376, 2009 WL 2951986 (M.D. Pa. Sept. 14, 2009).

## ARGUMENT

Plaintiffs have alleged counts of discrimination, harassment and retaliation under Section 1981 and Title VII, as well as a failure to accommodate their religion under Title VII. The requirements for the establishment of discrimination, harassment and retaliation are the same under Section 1981 and Title VII. *See Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 915 n.5 (3d Cir. 1983) (holding that the legal standards applicable to Section 1981 and Title VII cases are interchangeable).

For claims of discrimination, harassment and retaliation, a plaintiff bears the initial burden of establishing a *prima facie* case of by a preponderance of the evidence. *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 763 (3d Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).   If a plaintiff demonstrates a *prima facie* case, it creates a presumption in favor of the plaintiff that can be rebutted if the defendant demonstrates a "legitimate, nondiscriminatory reason" for the employment action. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993) (the defendant must set forth the reasons for its employment actions which "would support a finding that unlawful discrimination was not the cause of the employment action"); *McDonnell Douglas*, 411 U.S. at 802.   If the defendant demonstrates a non-discriminatory reason for the employment action, the burden shifts back to the plaintiff to demonstrate that the given reason is pretextual. *See St. Mary's*, 509 U.S. at 508 (the plaintiff "retains that 'ultimate burden of persuading the [trier of fact] that [the plaintiff] has been the victim of intentional discrimination'") (quoting *Texas Dept. of Cmty Afairs v. Burdine*, 450 U.S. 248, 256 (1981).   A plaintiff can only meet its "difficult" burden if it demonstrates that the defendant's reasons are "so weak, incoherent, implausible or inconsistent such that they lack credibility." *See Mowafy*, 620 F. Supp. 2d at 612 (noting society's commitment to free decision making by the private sector in economic affairs) (citing *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994)).   "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact finder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (internal citations omitted); *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000) (emphasis in original).   Similarly, for a claim of religious accommodation, a

17

plaintiff must first establish a *prima facie* case, in which case the burden then shifts to the employer to show that either a different, reasonable accommodation was offered, or that the accommodation requested would have imposed an undue hardship on the defendant. See *Shelton v. Univ. of Medicine & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000).

Plaintiffs Romdhani, Maloney and Zeller cannot carry their burden. There is no evidence in this case to support a *prima facie* case beyond Plaintiffs' own self serving allegations. To the contrary, the evidence in the case conclusively establishes that the incidents of which Plaintiffs complain did not occur at all, or did not occur even remotely as alleged. Moreover, there is a legitimate, business reason for every action taken by ExxonMobil — the application of ExxonMobil's established, neutral policies and guidelines. Ultimately, Plaintiffs cannot establish that ExxonMobil enforced its guidelines for discriminatory purposes.

## I. EXXONMOBIL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' DISCRIMINATION AND HARASSMENT CLAIMS (COUNTS I, III AND IV).

To establish a *prima facie* case of intentional racial or religious discrimination, a plaintiff must show: "(1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer . . . [sought] out individuals with qualifications similar to the plaintiff's to fill the position," *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802).

Assuming Plaintiffs can establish the first element of the *prima facie* case, there is no credible evidence to indicate that Plaintiffs were subject to an adverse employment action, despite being qualified, under circumstances that give rise an inference of discrimination. There are two kinds of adverse employment actions: (i) changes to the terms of employment and (ii)

changes to the conditions of employment. For the first, a plaintiff must demonstrate a tangible change to the terms of employment — either the plaintiff was not hired, was fired, or there were major changes to salary or benefits. *Storey*, 390 F.3d at 764; *Toll v. American Airlines, Inc.*, 166 F.App'x 633, 636 (3d Cir. 2006) (unpublished) (examples of tangible adverse actions include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a significant change in benefits"). For the second, a plaintiff must demonstrate constructive discharge — the plaintiff must establish the conditions of employment constituted a *prima facie* case of harassment (a hostile work environment) and make the further showing that a reasonable person would be compelled to resign. *Parker v. State of Del., Dept. of Pub. Safety*, 11 F. Supp. 2d 467, 476 (D. Del. 1998); *King v. City of New Kensington*, No. 06-1015, 2008 WL 4492503, at *10 (W.D. Pa. Sept. 30, 2008) (examples of adverse employment actions include termination, cuts in pay or benefits, or circumstances amounting to constructive discharge).

Plaintiffs cannot make either showing. *First*, only Romdhani and Zeller suffered a change to the terms of their employment, but the evidence conclusively demonstrates that both actions were taken because of Romdhani and Zeller's numerous performance issues. *Second*, even taking Plaintiffs' allegations in the complaint as true, they would not constitute the kind of pervasive and severe harassment required for constructive discharge. *Third*, even if the Court assumes that Plaintiffs can establish a *prima facie* case, ExxonMobil's legitimate, business reasons for its conduct are supported by ample evidence.

## A.    PLAINTIFFS WERE NOT "QUALIFIED"

### 1.    ROMDHANI WAS NOT ELIGIBLE FOR A RAISE

Romdhani makes the unsupported allegation in the Complaint that he was qualified for a raise because, as he claims, he had "positive performance." Compl., A28. The facts of record

establish conclusively, however, that Romdhani's 2005 and 2006 performance ranked him in the bottom twenty percent of all the station managers in his area. As discussed *supra*, Romdhani had three evaluations in 2005 and never reached the 75-83 average of station managers, and once scored "unsatisfactory." *Supra* at 7-8. By any objective criteria, Romdhani's performance in 2005 was not "positive."

Moreover, Romdhani wrongly asserts that Arnold denied him a pay raise for discriminatory reasons. Compl., A28. To the contrary, Arnold did not, and could not under established ExxonMobil procedure, grant or deny Romdhani a raise. Romdhani was ranked by a vote of four Territory Managers under the watch of two supervisors. *Supra* at 7-8, 10. The personnel in attendance at the meeting confirm that (i) Romdhani was properly ranked 28th out of 32 based on his actual performance and (ii) Arnold did nothing to try to sabotage Romdhani's ranking. Malave Decl., A70; George Decl., A181; Kiliddjian Decl., A4. Based on that impartial ranking, ExxonMobil Senior Management determined that Romdhani did not meet a pre-established eligibility criteria. *Supra* at 9-10. In 2006, ExxonMobil had previously determined that the bottom 20% of each Operations Area should not receive a raise, and Romdhani ranked at 13%. However, with that exact same ranking, Romdhani would have received a raise in 2005. *Id*. Accordingly, Romdhani was not denied a raise because of some discriminatory scheme by Arnold, but because of his own poor performance and a little bad timing.[7]

---

[7] Even assuming *arguendo* that a *prima facie* could be established, then for the same reasons discussed above, ExxonMobil has established a legitimate, business related reason for denying Romdhani a raise: four people, under the guidance of two supervisors, looked at the job performance of Romdhani when compared with the other SM's in the operations area, and ranked him by his performance. There is no evidence to indicate that ExxonMobil's procedure for determining raises is flawed, or that Romdhani's ranking was inconsistent with his performance. As such, it is not for this Court to determine whether ExxonMobil made the best ranking, or even the correct ranking, of its SM's. *See Mowafy*, 620 F. Supp. 2d at 613. The question is whether Romdhani can carry the high burden of demonstrating that his ranking by the

## 2.    ZELLER WAS PROPERLY TERMINATED.

As described *supra*, Zeller was properly terminated under ExxonMobil's discipline guidelines. In the five months before she was terminated, she was late to work 55 times, including 11 times by 15 minutes or more. *Supra* at 13. For that reason alone, Zeller could have been terminated. However, Zeller was not terminated just for being tardy. Before Zeller was terminated, she was suspended for three days for failing a tobacco sting. *Id.* Following the tobacco sting, Zeller's continued tardiness and her no call/no shows demanded termination under ExxonMobil's guidelines. Sprague Decl., A424-425. Accordingly, Zeller did not have the necessary qualifications to continue in her job.[8]

## B.    PLAINTIFFS WERE NOT CONSTRUCTIVELY DISCHARGED.

To prevail on their constructive discharge claims, Plaintiffs must establish that "the workplace [was] permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal citations omitted). To establish a hostile work environment, a plaintiff must show: "(1) that he or she

---

TM's, and the raise calculation made by ExxonMobil Corporate, was so "incoherent, implausible or inconsistent" that it lacks credibility. *Id.* at 612.

[8] Even assuming *arguendo* that plaintiffs could establish a *prima facie* case, for the foregoing reasons ExxonMobil has established a legitimate, business reason for the termination — she was disciplined in accordance with ExxonMobil's discipline guidelines. Zeller can only prevail on her allegation if she carries the heavy burden of proving that the proffered reason is purely pretextual. *Supra* at 17. Plaintiffs' have no evidence that Zeller was treated differently. *Subh v. Wal-Mart Stores Inc.*, 2009 WL 4015649, at *7 (D. Del. Nov. 19, 2009) (it is plaintiffs' burden to demonstrate that employees outside the protected class were treated more favorably). Zeller does, however, allege that on the day she was terminated she had complained to Harden about pornography at the Station. ExxonMobil fully investigated this claim and determined it was without merit. The magazines at the Station where magazines like *FHM, Maxim* and *Stuff.* Kause Decl., A183-184. Not only are such magazines not pornography, but the magazines were delivered to the Station through complimentary subscriptions that began while Romdhani was manager. *Id.*; Harden Dep., A283. Zeller was fully aware of the magazines long before she was terminated. *Id.*

suffered intentional discrimination because of race [or religion]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race [or religion] in that position; and (5) the existence of *respondeat superior* liability." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996). A hostile work environment is more than an "offhanded comment," "sporadic ... abusive language," or the "mere utterance of an [ethnic or racial] epithet which engenders offensive feelings" in the plaintiff. *Id.*; *Harris*, 510 U.S. at 21; *Caver*, 420 F.3d at 262, *Faragher*, 524 U.S. at 788 ("the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" do not support a hostile work environment claim). Moreover, an employee's subjective perceptions of unfairness or harshness do not govern a claim — the focus is on how a reasonable person would react. *Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159, 1162 (3d Cir. 1993).

Courts can consider a number of factors as indicative of constructive discharge, such as: (i) a threat of discharge; (ii) suggestions or encouragement of resignation; (iii) demotion or reduction in pay or benefits; (iv) involuntary transfer to a less desirable position; (v) alteration of job responsibilities; (vi) unsatisfactory job evaluations. *Id.* at 1161. In general, Courts look at: (i) the frequency of the discriminatory conduct (ii) its severity and (iii) whether it is physically threatening or humiliating. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). Plaintiffs' claims do not have the hallmarks of a hostile work environment. There is no allegation of pervasive use of offensive slurs at the Station, and none by Plaintiffs' supervisors.

### 1. ROMDHANI CANNOT ESTABLISH A *PRIMA FACIE* CASE OF HARASSMENT.

Romdhani was not subjected to harassment of any sort, much less pervasive and severe harassment that could amount to constructive discharge.

**Arnold properly investigated a cigarette shortage at the Station.** Romdhani alleges that Arnold tried to convince a cashier, Theresa Pierce, to blame Romdhani for improperly swapping ExxonMobil's cigarette inventory with another store. Compl., A26-27. However, Arnold spoke to Pierce *as part of his official investigation* into a major cigarette shortage and asked her if Romdhani was involved.[9] There was an obvious, business reason for the investigation — to determine whether the manager knew of, or was involved in, conduct that violated not only ExxonMobil policy, but the law. Romdhani may disapprove of the way Arnold questioned Pierce, but that is a matter of managerial style, not discrimination. There is no allegation that Romdhani was punished for the cigarette swapping incident. Pierce stated that Romdhani was not involved, Pierce alone was terminated for the incident, and Romdhani was not blamed for stealing the cigarettes. Individual Report of Irregularity, A191-192.

**Arnold properly submitted Charisma Muwakkil's harassment complaint to HR.** There is no dispute that Charisma Muwakkil, a sales associate at the Station, came to Arnold and complained that Romdhani had harassed her because of her race. However, Romdhani claims that Muwakkil would not have made a subsequent complaint to HR if Arnold had not forced her to. Compl., A29-30. Even if Romdhani is correct, the assertion does not demonstrate discrimination. Once Muwakkil, an African American, informed a manager that another employee had discriminated against her based on her race, she had officially invoked ExxonMobil's discrimination complaint procedure. If Arnold had not referred the matter to HR, he could have been disciplined by ExxonMobil himself. However, far from evidencing dislike

---

[9] "So the conversation I had with Ms. Pierce was Theresa, I know you went and did the cigarette thing, and you know, whatever happens with you, happens with you. But what I need you to tell me is this something you've done before or was this a one time incident. Is this something that you did and did Sofiene know about this happening. I need to know. Because if this is a regular occurrence, this is a problem." Arnold Dep., A351.

for Romdhani, the investigation actually proves that Arnold supported Romdhani. The investigation summary contains a short outline of an interview with Arnold regarding Muwakkil's claims. Arnold told the investigator that there was likely a non discriminatory reason for Romdhani's treatment of Muwakkil — that Muwakkil was not a good employee. Investigation Summary, A186-189.

**Romdhani was properly placed on an Action Plan.** Romdhani suggests that he was punished for a cigarette shortage which occurred in September 2005 and that "ostensibly as a result of the finding of the [cigarette] investigation, Mr. Arnold placed Mr. Romdhani on a [Action Plan]." Compl., A26. However, Romdhani was not disciplined as a result of the cigarette shortage.[10] An investigation of the shortage was conducted by Arnold with the assistance of Leo Hurley, an ExxonMobil security expert. The findings of the investigation are summarized in the Individual Report of Irregularity ("Investigation Report"). A191-192. The Investigation Report clearly states that only two people were disciplined as a result of the shortage — Wells Griscom and Theresa Pierce. Griscom was suspended for three days because he did not change the security camera tapes, which made it impossible for the investigation to determine who stole the cigarettes. *Id.* Pierce was terminated after confessing to swapping ExxonMobil cigarettes with cigarettes at another store. The investigation summary does not reflect any discipline for Romdhani.

---

[10] The details of the shortage are as follows: because Romdhani was away from the store for an extended vacation, Arnold had to ask other SM's in the Operations Area to volunteer to cover the station. Because of the remote location, no one could cover the Station the entire time, so Arnold took three volunteers — the first two weeks were covered by two different SM's, and Harden covered the last two weeks. Ltr. to Leo Hurley, A190. Harden started around September 19, 2005 and he discovered a significant cigarette shortage of $16,000 on or about September 29, 2005. *Id.*

A month after the cigarette shortage, on October 26, 2005, Romdhani was placed on an Action Plan, which listed various steps Romdhani had to take to improve his performance. The Action Plan does not mention or reference the cigarette shortage. A193-194. Romdhani was placed on an Action Plan because of his deficient performance in certain areas of his Assessments. *Supra* at 7-8, 10. At most, the cigarette shortage simply confirmed what the Assessments conducted by Oshetsky had already noted — Romdhani's failure to follow ExxonMobil's procedures and lax security created the risk of theft.[11] *Supra* at 8.

Romdhani was not disciplined as a result of the Action Plan. Over the next two months, Arnold worked with Romdhani to make sure he did a better job on inventory counts and ExxonMobil's paperwork. Arnold removed Romdhani from the Action Plan after two months, and Romdhani received his two highest Assessment scores during Assessments conducted immediately after he was put on the Action Plan. *Supra* at 8, 10.

**Arnold did not undermine Romdhani's "managerial authority."** Romdhani asserts that Arnold undermined his managerial authority by: (a) visiting him too frequently, including an unannounced visit, (b) not allowing Romdhani to terminate an employee, (c) making Romdhani return early from recovery from an accident, and (d) making Romdhani work seven days per week. Compl., A28-31.

*First,* it is not discrimination for a territory manager to visit a station manager whose performance has been sub-standard. Indeed, frequent visits are not an adverse employment action. Nevertheless, the evidence indicates Arnold did not visit the Station more often. 2006

---

[11] Because Romdhani did not properly train Griscom, the tapes were not changed on a daily basis and the theft was not recorded. Because Romdhani did not conduct regular cigarette counts or train his employees do so, ExxonMobil could not identify on whose shift the cigarettes went missing. Even Plaintiffs' witnesses concede that Romdhani did not conduct cigarette counts before the shortage. Rash Dep., A162-163.

Mileage Record, A231-239. Moreover, there is no ExxonMobil rule or policy that obligated Arnold to give notice of the March 8, 2006 visit. To the contrary, notifying Romdhani of the visit would have defeated the very purpose of the visit — to see if Romdhani was at the Station during core business hours. Both Kiliddjian and Arnold had been told by ExxonMobil employees that Romdhani was working other jobs on company time. *Supra* at 11; Kiliddjian Decl., A7. In fact, Romdhani's work records from another employer confirm he worked a second job during core ExxonMobil business hours. *Supra* at 12. Although Romdhani claims he was at lunch during the visit, Arnold visited after normal lunch hours (arrived at 1:20 p.m.) and he stayed for an hour and ten minutes (left at 2:30 p.m.) without Romdhani returning to the Station. Site Visit Report, A198.

*Second*, Romdhani complains that Arnold prevented Romdhani from terminating Muwakkil in June 2006. Compl., A29-30. However, Muwakkil could not be terminated in June because she had not received a valid three-day suspension in accordance with ExxonMobil's progressive discipline guidelines. Although Romdhani had suspended Muwakkil, no suspension of an employee is valid under ExxonMobil policy if the supervisor does not first obtain a suspension code. That did not occur regarding Muwakkil. Discipline Endorsement Form, A199. Because Muwakkil was not properly suspended, as a matter of ExxonMobil's Discipline Progression Guideline, Muwakkil could not be terminated. Sprague Decl., A425. That failure of procedure does not demonstrate undermining of his managerial authority, nor evidence discrimination.

*Third*, Romdhani alleges that once, when Romdhani was injured, Arnold allowed assistant SM Griscom to go on vacation, and then tried to get Romdhani to return to the station

because "the place is a mess."[12] Compl., A31. However, Arnold did not make Romdhani return

to the station. *Id.* Indeed, Arnold merely asked when Romdhani would be able to return because

the store was in bad shape. Arnold Dep., A356. There is no allegation that Romdhani was

disciplined for not being at the store while injured.

*Finally,* Romdhani claims that, unlike other SMs, Arnold made him work seven days a

week. To the contrary, Romdhani was only told that he needed to work both Saturdays and

Sundays *during the summer* to ensure that the Station was properly operated during the busiest

time of the year. Arnold Dep., A355. In exchange for working Sundays, Romdhani was

permitted to take a day off during the week.[13] *Id.* While Romdhani claims that other SMs were

not made to work Sundays, there is no evidence to support this assertion. However, even if true,

there would still be a legitimate, business reason for treating Romdhani differently — he was the

SM of the only station situated on Interstate 95, the only station that received significantly

greater travel during summer months, and the only station visited by a significant number of

ExxonMobil executives on weekends. *Supra* at 5-6.

**Arnold had anti-Arab graffiti at the Station investigated and removed.** Romdhani

alleges that Arnold failed to investigate anti-Arab graffiti in one of the Station's cashier booths.

Compl., A32. However, Arnold properly reported the graffiti to HR, and HR conducted a full

investigation. Investigation Summary, A202-204. Because no one witnessed the graffiti, HR did

---

[12] Arnold actually told Griscom that if Romdhani did not come back to the store, Griscom, as
Assistant Station Manager, could not take a vacation, and if Griscom went on vacation anyway
because he had already paid for his tickets, Griscom could face discipline for it. Arnold Dep.,
A356.

[13] Kiliddjian confirms that when Romdhani complained about the issue, he did not say he was
working seven days a week, he only complained about having to work Sundays. Kiliddjian
Decl., A6-7. In fact, in a letter Romdhani drafted to ExxonMobil HR, but which he never sent,
Romdhani complains only about having to work Sundays, not that he was forced to work seven
days a week. A200-201.

not discipline anyone, but the graffiti was painted over. *Id.* There was nothing more Arnold could have done.[14]

Thus, in sum, Romdhani was not subjected to the kind of pervasive and severe harassment needed to demonstrate a hostile work environment. Romdhani was not demoted, given reduced pay, transferred to a less advantageous job, subjected to altered job responsibilities, or told to quit. While Romdhani received negative evaluations, they were provided not only by Arnold, but by an independent Field Control Analyst. And, Romdhani was not subjected to any slurs, much less physically threatened or humiliated, by his supervisor. Courts have routinely granted summary judgment where a plaintiff has alleged far worse conduct.[15] Moreover, Romdhani cannot establish that he was compelled to resign, much less that

---

[14] Romdhani also claims that he gave Arnold a letter complaining of misconduct by Muwakkil, but that Arnold did not investigate the matter. Arnold specifically denies that he ever received such a letter. Arnold Dep., A334. Ultimately, there is no way to prove whether Arnold, in fact, received the letter. However, even if true, Arnold's failure to investigate a single allegation of harassment by a non supervisor would hardly constitute pervasive and severe harassment by ExxonMobil.

[15] *See Woodard v. PHB Die Casting*, 255 F.App'x 608, 608-609, (3d Cir. 2007) (granting summary judgment where the plaintiff alleged "he was twice asked questions using the phrase 'you people,' once asked what his race was, once asked if he intended to complete a drug deal during a bathroom break," and the company left KKK-related graffiti on its wall for three months); *Perry v. Harvey*, 332 F.App'x 728, 731-33 (3d Cir. 2009) (granting summary judgment where defendant had a business related reason for the majority of it alleged discriminatory conduct, and the alleged racist statements by a supervisor, such as "men of color as being dumb and useless" and "[w]hat are you doing here, boy?" were not considered severe or pervasive); *See Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005) (no hostile work environment where the offensive comments were not made to the Plaintiff); *Harris v. SmithKline Beecham*, 27 F. Supp. 2d 569 (E.D.Pa. 1998), (granting summary judgment where the racial comment by a supervisor was isolated and not severe, and the "undesirable assignments" were sporadic); *Morgon v. Valenti Mid-Atl. Mgmt.*, No. 01-134, 2001 WL 1735260 (E.D. Pa. Dec. 14, 2001) (dismissed complaint where plaintiff alleged her supervisor called a "n____," made a comment about not hiring Jamaicans, was told she was illiterate, and was assaulted by her supervisor"); *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 607, 611 (E.D.Pa. 2001) (granting summary judgment where plaintiff alleged that supervisor subjected plaintiff to "constant and unremitting negative comments and evaluations" based on race, referred to black community as a "baby factory," stated that blacks are incapable of thinking analytically, and warned the plaintiff, not to

a reasonable person would have been compelled to resign, because of the alleged incidents in this case. The evidence conclusively demonstrates that Romdhani quit because he was offered a higher-paying job at Pepsi, not because of workplace conditions at ExxonMobil.[16]

## 2.   NEITHER ZELLER NOR MALONEY CAN ESTABLISH A PRIMA FACIE CASE OF HARASSMENT.

There is also no evidence that Zeller and Maloney were subjected to the kind of serious and pervasive harassment that would constitute a hostile working environment.

**Maloney was not suspended for leaving the Station while sick.** Maloney claims that she was "suspended for several days" in "the fall of 2006" for taking sick leave without permission. Compl., A35-36. There is no record of a suspension in ExxonMobil's discipline database for Maloney. Likewise, there is no record of any discipline, much less suspension, for taking sick leave in Maloney's file. Even assuming that Maloney is alleging that Harden somehow unofficially suspended Maloney, Maloney's work records demonstrate that she was not suspended by Harden. While "Fall of 2006" is not specific, in a letter to HR she claims the incident occurred on a Tuesday, 9/26/2006, and that she was told not to show up for work on her next work day, Thursday, 9/28/2006. A205-210. However, far from being suspended, the evidence shows that she was given credit for working a full day on 9/26/2006 and was also given credit for working a full day on 9/28/2006. Employee Time Detail, A211.

---

talk to white women); *Francis v. Chemical Banking Corp.*, 62 F. Supp. 2d 948, 959-60 (E.D.N.Y. 1999) (granting summary judgment where plaintiff alleged that a supervisor had called a group of African-American employees "f ___ g moolies," another supervisor referred to a co-worker as "n ___," a third supervisor questioned the use of giving money to the United Negro College Fund, and plaintiff found written on his workstation, "All 'n ___ s' should go back to Africa with a Jew under each arm.").

[16] In fact, even with the new job, Romdhani did not want to leave ExxonMobil. Romdhani continued working at the Station for six weeks after he accepted the new job with Pepsi and left only after (i) Kiliddjian told him ExxonMobil would not match Pepsi's salary, (ii) Kiliddjian told him he could not work both jobs and (iii) he received his start date with Pepsi. *Supra* at 12; Kiliddjian Decl., A7.

**Zeller was not prevented from leaving the Station when sick.** Zeller alleges that she became sick while working at the Station on October 14, 2006, but was initially denied permission to leave the Station by Harden. Compl, A47. However, as the Complaint acknowledges, Zeller was permitted to leave by Harden; she was merely delayed for an unspecified period of time. A mere delay in the receipt of a benefit does not support a *prima facie* case of discrimination. *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (delay in receiving performance evaluation); *Despanie v. Henderson*, 32 F.App'x 390, 392 (9th Cir. 2002) (initial denial of sick leave pay); *Crawford v. Carroll*, No. 1:04-cv-0089, 2007 WL 757666 (N.D. Ga. Mar. 8, 2007). Moreover, she was only delayed in leaving the Station because she refused an ambulance and did not have a ride home. Harden Dep., A309. Once a co-worker was able drive her home, Zeller was allowed to leave. Compl., A47.

**Zeller was not made to clean the men's room.** Zeller alleges that Harden required her to clean the men's restroom, even though it was against her religion. Compl., A44. Under ExxonMobil policy, it was a cashier's job to clean and maintain the restroom. Mocsary Decl., A427; Kiliddjian Dep., A390. While ExxonMobil brought in a third-party contractor to "deep clean" the restroom at the Station, cashiers still had to check the restrooms between visits to do light cleaning and maintenance. *Id.* Harden assigned the task of checking on the restrooms to the cashiers on duty in the north and south booths. Harden Dep., A307. While cleaning the restroom, a cashier could close and block the door to keep customers out. *Id.*; Kiliddjian Dep., A391; Mocsary Decl., A429. There is no evidence that it would be against the Muslim faith to clean a restroom under such conditions. Nevertheless, and contrary to the implications of the Complaint, Zeller was not made to clean the men's restroom. As she admits in her deposition, at

most Harden asked her to clean the restroom 5-6 times, and when she requested an accommodation, it was granted. Zeller Dep., A214.

Thus, neither Maloney nor Zeller suffered the usual indicators of discrimination. They were not demoted, given reduced pay, transferred to a less advantageous job, subjected to overly discriminatory comments by a supervisor, physically threatened or humiliated, or given negative evaluations.[17]   Maloney and Zeller's alleged harassment was neither pervasive nor severe, and summary judgment has been routinely granted in cases alleging far worse incidents of harassment.   Moreover, Maloney cannot demonstrate that she, much less a reasonable person, was compelled to quit because of workplace conditions.   The Complaint only alleges one incident in the two months before she resigned — that she was allegedly accused of the theft of cigarettes.   A reasonable person would not resign because of a single incident.   Moreover, Maloney was not accused of stealing cigarettes, but of failing to perform a cigarette count on her shift — a charge she has not denied. *Infra* at 36-37. Of course, Maloney fails to mention in the Complaint the real reason why she quit — she was under investigation by ExxonMobil for filing a fake work-site injury claim. *Supra* at 14.

## C.   THERE IS NO EVIDENCE THAT THE BUSINESS REASONS PROFFERED FOR EXXONMOBIL'S ACTIONS WERE PRETEXTUAL.

Plaintiffs cannot meet their heavy burden of demonstrating that the legitimate, business reasons proffered by ExxonMobil for its conduct are so "weak, incoherent, implausible or inconsistent [] that they lack credibility." *Mowafy*, 620 F. Supp. 2d 612. Plaintiffs have the burden of demonstrating discriminatory intent, either through disparate treatment or direct discriminatory conduct. *See Burdine*, 450 U.S. at 258-59 ("*McDonnell Douglas* teaches that it is

---

[17] Although they received written and verbal warnings for being late to work, they do not claim that they came to work on time, and the Station's time records confirm they were frequently tardy.

the plaintiff's task to demonstrate that similarly situated employees were not treated equally").

However, for virtually every step of their interactions with Plaintiffs, Arnold and Harden

followed established, neutral ExxonMobil policies and guidelines for operating one of

ExxonMobil's stations. Plaintiffs were not treated differently than similarly situated employees.

Additionally, Plaintiffs do not allege that their supervisors used racial or religious slurs.

During the year and a half that Arnold supervised Romdhani, Romdhani can only allege that

Arnold asked him what kind of country Tunisia was and seemed surprised when Romdhani said

it was a Muslim country. Compl., A24. The statement does not convey animosity. Even

assuming Arnold "seemed surprised" to learn it was a Muslim country, Arnold said or did

nothing to indicate he viewed Muslims, or the country, negatively.[18]

Likewise, assuming that the comments that Maloney and Zeller attributed to Arnold and

Harden were made — and the evidence suggests they were not[19] — the comments have a neutral

interpretation and do not demonstrate pretext. Plaintiffs assert that Arnold asked about Maloney

and Zeller's conversion, including "did Sofiene recruit you," why they "switched up" religions,

---

[18] Of course, Arnold was not surprised to learn it was a Muslim country, since he had been giving Romdhani Fridays off to attend Muslim prayers for three months before the conversation took place. Arnold Dep., A328.

[19] Arnold and Harden specifically deny making the majority of the comments. Arnold Dep., A359-360; Harden Dep., A304. Plaintiffs' own witnesses state that they never heard Arnold or Harden make any derogatory statements towards or about Muslims or Arabs. Rash Dep., A164-165, A175; Griscom Dep., A150-151 . Even assuming that other, non-supervisory employees at the Station made inappropriate comments, those statements were not made in front of Harden and Arnold. Rash Dep., A169-170. The one time a comment allegedly made by a cashier was brought to Arnold's attention (the graffiti at the station), Arnold had the matter investigated by HR and resolved. *Supra* at 27-28. Moreover, it is simply incredible that Arnold would insult the Muslim faith. Musharraf, a Muslim Station Manager supervised by Arnold, testified that Arnold always showed him respect, always accommodated his religious requests, and never had anything remotely derogatory to say about Muslims. Musharraf Dep., A86-87, A89-90. When asked if he could imagine Arnold saying the things described in the Complaint, he testified that he could not. *Id.* at A91. Not only did he treat his Muslim coworkers with respect, but in his private life, *Arnold chose a Muslim to be the godfather of his child.* Yousaf Decl., A420-421; Uzdil Decl., 418-419.

why they "jumped the fence" and why they began wearing the Hijab. Compl., A35, A43. However, these questions are not objectively negative. Assuming *arguendo* that they occurred, the statements at most are evidence of curiosity regarding the decision to convert. There is no expression of disapproval. Questions of curiosity, with no specific slur or religious epithets, do not support a finding of pretext. *Mowafy*, 620 F. Supp. 2d at 614. Plaintiffs further assert that Arnold also referred to "Sofiene's kind" and "Sofiene's team," and even stated that he was going to "clean house of the people of Sofiene's kind." Compl., A36. Assuming *arguendo* that the statements were made, they are not objectively discriminatory. The language used is not actually derogatory towards Muslims, and doesn't even objectively refer to Muslims. The only witness who thought he heard Harden make a similar comment assumed Harden was talking about all of Romdhani's hires, including non-Muslims. Rash Dep., A170-172. Finally, Plaintiffs assert that Arnold and Harden said to Maloney that prayer services "are not a legit reason" to have off and "I am not here to accommodate your religious beliefs." Compl., A37-38. However, since these statements were purportedly made in conjunction with a denial of time off for Maloney to attend religious services on Friday, and since the time records conclusively establish that Maloney was not required to work a single Friday while Harden was SM, the alleged statements are hardly credible. *Infra* at 38.

Ultimately, taken in the light most favorable to Plaintiffs, the alleged statements of Arnold and Harden are subject to a religiously neutral interpretation and are not so outrageous that they can demonstrate that the legitimate, business reasons given for ExxonMobil's conduct are purely pretextual. *Salkovitz v. Pioneer Electronics (USA), Inc.*, 188 F.App'x 90, 94 (3d Cir. 2006) (occasional, questionable comments constitute insufficient evidence of pretext to create question for jury). While the alleged comments *might* be considered rude or harsh by some, they

33

are not slurs and they do not indicate that Arnold and Harden acted discriminatorily by merely enforcing ExxonMobil's guidelines.

## II.   PLAINTIFFS WERE NOT SUBJECTED TO RETALIATION (COUNTS II AND VI).

To demonstrate retaliation, an employee must prove that "(1) she engaged in a protected employment activity, (2) her employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a 'causal link' exists between the adverse action and the protected activity." *Andreoli v. Gates*, 482 F.3d 641, 649 (3d Cir. 2007). As with harassment and discrimination cases, the plaintiff must first establish a *prima facie* case of retaliation, but the employer can shift the burden back to the plaintiff by articulating a legitimate business reason for its actions. *Griffiths v. Cigna Corp.*, 988 F.2d 457, 468 (3d Cir. 1993), *overruled on other grounds by Miller v. Cigna Corp.*, 47 F.3d 586 (3d Cir. 1995) (en banc). Title VII only protects a plaintiff from an adverse employment action that is materially adverse; it "does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted). An employment action is materially adverse where "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68(internal quotations omitted).

Plaintiffs cannot establish that they suffered an adverse employment action. As discussed above, neither the terms of Plaintiffs' employment, nor the overall conditions of their employment, changed as a result of discrimination. Moreover, there were legitimate, business reasons for ExxonMobil's actions. Accordingly, there can be no claim for retaliation.

### A.   ROMDHANI DID NOT SUFFER AN ADVERSE EMPLOYMENT ACTION BECAUSE OF ALLEGED RETALIATION.

Romdhani claims that, because he allegedly reported discrimination to John Kiliddjian, ExxonMobil retaliated against him in the following ways: (i) Arnold attempted to make him look

bad to management, (ii) Arnold undermined his authority, and (iii) Arnold condoned anti-Arab comments in the workplace. However, as addressed above, the alleged incidents do not constitute an adverse employment action. *Supra* at 23-27.

Moreover, Romdhani did not engage in a protected activity because he never complained to ExxonMobil of discrimination or harassment based on religion, race or national origin. The Complaint does not allege that Romdhani ever made a discrimination or harassment complaint to HR, and Kiliddjian specifically testified that Romdhani did not complain to him of discrimination or harassment. While Romdhani did occasionally complain to Kiliddjian about Arnold, it was always about work-related decisions made by Arnold, not about discrimination. Kiliddjian Decl., A6; Kiliddjian Dep. at A400. In fact, even in a letter Romdhani drafted to ExxonMobil HR, but never mailed, Romdhani does not claim discrimination or harassment based on religion, race, or national origin. A200-201. While the letter calls the environment "hostile" and he wishes it was "a little better," it does not claim that anything occurred because he was Muslim or even mention that Romdhani is Muslim. Instead, the letter provides the same laundry list of perceived slights as the Complaint, without identifying discrimination as the cause. *Id.* Hence, his present claim of discrimination, harassment and retaliation appears to have been manufactured *after* his departure from ExxonMobil. To constitute a protected activity, a complaint must specifically identify the "protected characteristic" and state that the "protected characteristic was the basis for the adverse employment action." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006).

### B.   NEITHER MALONEY NOR ZELLER SUFFERED AN ADVERSE EMPLOYMENT ACTION BECAUSE OF ALLEGED RETALIATION.

Maloney and Zeller allege that they were retaliated against because they complained about discrimination to HR and the Delaware Department of Labor ("DDOL"). However, they

did not complain of discrimination to HR.  In their call to HR in October, 2006, Maloney and

Zeller only requested an accommodation relating the leaving their shirttails untucked.  A216

(ExxonMobil's HR database record reflects only that Plaintiffs complained only about tucking in

their shirttails).  Moreover, Courtneye Sprague, the HR representative who took the call, recalls

that they discussed an accommodation regarding shirttails only.  Sprague Dep., A137-139.

Zeller and Maloney allege that they drafted a letter complaining of discrimination and sent it to

HR in late 2006.  Whether Zeller and Maloney sent such a letter to HR in 2006 is irrelevant since

HR never received it.[20]  Arnold and Harden could not have retaliated against Maloney and Zeller

for complaining to HR since Arnold, Harden and HR were not aware of the complaint.[21]

Moreover, the incidents of which Plaintiffs complain do not support a claim of

retaliation.  While Maloney alleges that Harden accused her of stealing cigarettes, she was not

punished or prosecuted for stealing cigarettes.  To the contrary, Harden merely told her that,

under ExxonMobil policy, she was responsible for cigarettes that were discovered missing after

her shift, either because they were stolen on her watch or because she failed to perform an

---

[20] Plaintiffs have no evidence that the letter was sent in 2006.  HR has no record of receipt of the letter until the day Maloney resigned, when she "re-sent" the letter, in August, 2007.  Moreover, the copy of the letter "re-sent" in 2007 is inconsistent with the letter purportedly sent in 2006. The copy produced by Plaintiffs is dated October 25, 2006, was signed by Zeller and Maloney on October 25, and was witnessed by Bakhorrou Hsi on October 26.  A217-222.  However, the copy of the letter given to ExxonMobil in August 2007, while also dated October 25, 2006, does not have a dated signature page, was not witnessed by Bakhorrou Hsi and includes a new paragraph from November 2007.  A205-210.

[21] There was no retaliation because Maloney and Zeller spoke to the DDOL either.  Maloney and Zeller allege they spoke to the DDOL in the Spring of 2007 — after they were allegedly denied sick leave.  And, while Zeller and Maloney allege they were threatened for speaking with the DDOL, Zeller only alleges that Arnold said "you are making it harder on yourself," while Maloney only vaguely alleges that Harden was "harsh" and "criticized" her.  Compl., A39-40, A46.  While there is no evidence that either incident actually occurred, even taken as true they are not severe enough to constitute retaliation.  See Burlington N., 548 U.S. at 68 ("petty slights, minor annoyances, and simple lack of good manners" would not deter an employee from filing an EEOC claim); Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 619 (8th Cir. 2007).

adequate cigarette count when she went on duty. Harden Dep., A305-306. Harden was merely doing his job in instructing Maloney to do a proper cigarette count when going on duty. Additionally, it has been conclusively established that Zeller was properly terminated in accordance with ExxonMobil's progressive discipline policy. *Supra* at 21. She certainly was not terminated for speaking to the DDOL. The DDOL interviewed many Muslim employees at the Station, including Maloney, but only Zeller was terminated.

## III.   PLAINTIFFS' REQUESTS FOR RELIGIOUS ACCOMMODATION WERE GRANTED (COUNTS V).

To establish a *prima facie* case of religious accommodation under Title VII a plaintiff must show that: "(1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement." *Shelton*, 223 F.3d 220, 224 (3d Cir. 2000). If the employee establishes a *prima facie* case, the burden shifts to the employer to show that it made good faith efforts to accommodate, i.e., offered a reasonable accommodation, or that the requested accommodation would result in an undue hardship. *See United States v. Board of Educ.*, 911 F.2d 882, 886-87 (3d Cir. 1990) (no Title VII violation; allowing Muslim teacher to wear religious garb while teaching, thereby violating state criminal statute, would impose undue hardship on school district); *Getz v. Pennsylvania*, 802 F.2d 72, 73 (3d Cir. 1986) (no Title VII violation; employee failed to establish *prima facie* case where Commonwealth allowed her to take religious holidays with pay, but did not allow her to work overtime to earn extra vacation time).

Plaintiffs claim that they informed their employer of the following conflicts: (i) Romdhani requested time off for prayers on Friday, (ii) Maloney requested time off for prayers on Friday, (iii) Maloney and Zeller asked to leave their shirttails untucked, (iv) Zeller asked not

37

to have to clean the men's restroom, and (v) Zeller requested time off to attend to Ramadan. However, an accommodation for the first four listed requests was actually granted. And, although Zeller alleges her request for time off on Ramadan was not granted, she acknowledges in the Complaint that she accepted an alternative accommodation that was offered.

*First*, Romdhani's request for time off on Fridays was granted. Arnold had two Muslim Station Managers in his territory, Romdhani and Atif Musharraf, who requested time off on Fridays to attend prayer. Arnold Dep., A319. It was Arnold's position that their request was granted so long as they scheduled an assistant SM to be on duty.[22] *Id.* In fact, Arnold not only permitted Musharraf time off on Fridays when he was a SM, but also actively worked to ensure that Musharraf would have time off when he was going through SM training. Musharraf Dep., A86, A89. There is no evidence that Romdhani was prevented from attending prayers.

*Second*, the Complaint alleges that in "late 2006" Harden told Maloney she had to work Fridays and would not even give her two hours off to attend Muslim prayer. Compl., A37. The evidence clearly demonstrates that the allegation is a fabrication. According to Maloney's time sheets, she never once worked a Friday from the day Harden arrived as SM until the day she quit. Keelty Decl., A439.

*Third*, ExxonMobil policy for employee uniforms requires its employee tuck their shirttails in, apparently a requirement that Romdhani did not enforce. A223-230. Harden, as the SM who replaced Romdhani, properly tried to enforce the guideline. Zeller complained about being forced to tuck in her shirttail. When asked what part of the Muslim religion prevented a

---

[22] To ensure that his SM's had time to attend religious services on Fridays, Arnold would not, as a general rule, even visit a store on a Friday. *Id.* at 201. During the nine months between January 2006 and when Romdhani left in September 2006, Arnold visited the Station on a Friday only twice. 2006 Mileage Record, A231-239. Moreover, the site visit report for the first visit specifically notes Romdhani was allowed to leave the Station for prayer. A195-197.

shirttail from being tucked-in, Maloney provided material indicating that her religion required her not to wear clothing that would reveal her figure. Compl., A44-45. Because it was unclear whether tucking in a shirttail constituted revealing her figure, Harden sought clarification from HR. Harden Dep., A272. Maloney and Zeller also separately contacted HR and requested accommodation regarding their shirttails. Sprague Dep., A136. HR checked with the legal department and, although it was not clear whether ExxonMobil's shirttail policy was truly in conflict with the Muslim faith, HR instructed Harden to allow Zeller and Maloney to leave their shirttails untucked in an abundance of caution. *Id.* at A137. Both Maloney and Zeller concede that they were permitted to keep their shirttails untucked after they requested the accommodation. Maloney Dep., A441; Zeller Dep., A213.

*Fourth*, Zeller also acknowledges that her request to be relieved from cleaning the men's bathroom was accommodated. Harden asked her to clean the bathroom 5-6 times as part of her duty as a cashier, but she was never forced to clean the restroom once she requested the accommodation. *Supra* at 30-31.

*Fifth*, Zeller alleges that *one time* her request for time off on a Friday to attend prayers was denied. Compl., A47. However, she acknowledges that she was still allowed to attend prayers, but she was forced to take unpaid leave for the entire day. Assuming *arguendo* that her claim is true, the Complaint acknowledges that she was offered a reasonable accommodation by Harden. The Supreme Court has made clear that a reasonable accommodation does *not* have to rise to the level of the "most beneficial accommodation," nor does it have to be the accommodation preferred by the employee. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68-69 (1986). "Nor does Title VII require employers to accommodate an employee's religious practices in a way that spares the employee any cost whatsoever." *Pinsker v. Joint Dist. No. 29J*

*of Adams & Arapahoe Counties*, 735 F.2d 388, 390-91 (10th Cir. 1984) (citing *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145-46 (5th Cir. 1982)).  It is a reasonable accommodation to require that employees "occasional[ly] take unpaid leave" in fulfilling their religious practices.  *Pinsker*, at 390-91 (noting that requiring a teacher to take unpaid leave was a reasonable accommodation since "neither [his] job nor his observation of religious holidays" was jeopardized).  Unpaid leave is a reasonable accommodation because it resolves the conflict by allowing the person to follow their religion while giving up only compensation for a day that they did not actually work.  *Ansonia*, 479 U.S. at 70 (1986) (noting that unpaid leave is only unreasonable when paid leave is provided for every purpose except religious ones).  Zeller was allowed to take unpaid leave and was not disciplined for missing work to attend prayers.  Her religion was accommodated.

## CONCLUSION

For the reasons set forth in this Memorandum of Law in support of Defendant's Motion for Summary Judgment, ExxonMobil respectfully requests that summary judgment be granted with respect to all claims.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joe Robert Caldwell, Jr.
Benjamin Kringer
Heather M. Souder
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 639-7700

By  */s/ Sarah E. DiLuzio*
    Kathleen Furey McDonough (#2395)
    Sarah E. DiLuzio (#4085)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    (302) 984-6000

Dated:  December 15, 2009
933022

*Attorneys for Defendant*
*Exxon Mobil Corporation*

40

## CERTIFICATE OF SERVICE

I hereby certify this 15th day of December, 2009 that the foregoing **Defendant Exxon Mobil Corporation's Brief In Support Of Its Motion For Summary Judgment, Appendix In Support, and Proposed Order** were electronically filed with U.S. District Court District of Delaware via CM/ECF which will send notification of such filing that the documents are available for viewing and downloading via CM/ECF to the following counsel of record:

Barbara H. Stratton, Esquire
Knepper & Stratton
1228 North King Street
Wilmington, Delaware  19801
bhs@knepperstrattonlaw.us

Debra S. Katz, Esquire
Avi Kumin, Esquire
Katz, Marshall, & Banks LLP
1789 Connecticut Ave., N.W., Sixth Floor
Washington, DC 20009
katz@kmblegal.com
kumin@kmblegal.com

*Sarah E. DiLuzio*
Kathleen Furey McDonough (#2395)
Sarah E. DiLuzio ( #4085)
Potter Anderson & Corroon, LLP
Hercules Plaza, Sixth Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000