IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SOFIENE ROMDHANI, MICHELLE :
MALONEY, and BOBBI JOE ZELLER, :
                                 :
        Plaintiffs,              :
                                 :
    v.                           :      Civil Action No. 07-715-JJF
                                 :
EXXON MOBIL CORPORATION,         :
                                 :
        Defendant.               :

---

Debra S. Katz, Esquire; Avi Kumin, Esquire and Nicole J. Williams, Esquire of KATZ, MARSHALL & BANKS, LLP, Washington, D.C.
Barbara H. Stratton, Esquire of KNEPPER & STRATTON, Wilmington, Delaware.

Attorneys for Plaintiff.

Joe Robert Caldwell, Jr., Esquire; Benjamin Kringer, Esquire and Heather M. Souder, Esquire of BAKER BOTTS LLP, Washington, D.C.
Kathleen Furey McDonough, Esquire and Sarah E. DiLuzio, Esquire of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.

Attorneys for Defendant.

---

## MEMORANDUM OPINION

February 23, 2011
Wilmington, Delaware



**Stark, District Judge:**

Pending before the Court is a Motion For Summary Judgment (D.I. 80) filed by

Defendant, Exxon Mobil Corporation ("ExxonMobil"). For the reasons discussed, the Motion

will be denied except to the extent it relates to Plaintiff Romdhani's claim that he was denied a

salary increase as a result of unlawful discrimination.

## BACKGROUND

### I.    Procedural Background

Plaintiffs, Sofiene Romdhani, Michelle Maloney, and Bobbi Joe Zeller (collectively,

"Plaintiffs"), filed this employment discrimination action against ExxonMobil, alleging claims

pursuant to 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et*

*seq.*; and 19 Del. C. § 710, *et seq.*  Specifically, Plaintiffs allege unlawful discrimination based

on race, religion, and national origin, as well as retaliation, harassment based on a hostile work

environment, and failure to accommodate religious requests. (D.I. 1)  Prior to initiating this

action, Plaintiffs filed claims of discrimination with the Delaware Department of Labor. (D.I. 96

at A008-A0031)  The DDOL issued Plaintiffs' Right To Sue Letters (D.I. 92 at B229) and,

therefore, Plaintiffs have appropriately exhausted their administrative remedies.

Since the filing of the initial Complaint, Plaintiffs have amended their Complaint twice.

All claims brought under Delaware state law (Counts VII, VIII and IX) have been voluntarily

dismissed. (D.I. 21, 23)  The parties completed discovery and ExxonMobil filed the instant

Motion For Summary Judgment. (D.I. 80)  In their Opposition Brief to ExxonMobil's Motion,

Plaintiffs also agreed to relinquish their claim that ExxonMobil refused to accommodate their

religious beliefs, as alleged in Count V of the Second Amended Complaint. (D.I. 90 at 40 n.17)

Accordingly, the Court will consider ExxonMobil's Motion as it pertains to the remaining counts of the Second Amended Complaint.[1]

## II.   Factual Background

### A.   Sofiene Romdhani

Plaintiff Sofiene Romdhani is a native of Tunisia and a Muslim. (D.I. 23 at ¶¶ 6, 10) Plaintiff Romdhani was initially employed with ExxonMobil as the Assistant Manager of the ExxonMobil Service Station #25726, located along the Delaware Turnpike (the "Station"). (D.I. 82, Kiliddjian Decl. at A1-A2) The Station was considered among the largest and most complex in the relevant region based on the volume of customers, the number of employees, the size of the location, and sales volume. (D.I. 82, Kiliddjian Decl. at A388; Arnold Dep. at A321) In February 2005, Plaintiff Romdhani was promoted to Station Manager. (D.I. 82, Kiliddjian Decl. at A2; D.I. 91, Romdhani Decl. at B1-2) During the relevant time period, his immediate supervisor was Territory Manager, Richard Arnold, an African American male who is not Muslim. (D.I. 82, Arnold Dep. at A313)

In 2005, Plaintiff Romdhani was evaluated three times, twice by Steve Oshetsky, a Field Operations Analyst for ExxonMobil, and once by Mr. Arnold. Plaintiff Romdhani's initial performance evaluation, approximately one month after assuming the Station Manager position,

---

[1]Although Plaintiffs have dismissed their accommodation claim, Plaintiffs state that "under the totality of the circumstances test, however, a reasonable jury could still find [ExxonMobil's] hostile response to Plaintiffs' religious practices and requests to be relevant to Plaintiffs' claim of religious harassment." (D.I. 90 at 40 n. 17) ExxonMobil does not dispute the relevance of these allegations to the surviving counts of the Second Amended Complaint. Therefore, the Court will consider the allegations concerning ExxonMobil's responses to accommodation requests in the context of the totality of the circumstances giving rise to Plaintiffs' remaining claims.

2

was "unsatisfactory," with a score of 59 points out of a possible 100 points.[2] (D.I. 82 at A60-A62) Among other things, Plaintiff Romdhani was not properly keeping records, auditing cash, or performing inventory and invoicing counts for commodities such as lottery tickets and cigarettes. In his second evaluation by Mr. Oshetsky in July 2005, Plaintiff Romdhani achieved a satisfactory ranking with a score of 70, an improvement although still a score below the average performance rating for Station Managers generally. (D.I. 82 at A63-A65) Among other things, Plaintiff Romdhani was still not completing the required paperwork or performing the required audits. In December 2005, Mr. Arnold completed a third evaluation of Plaintiff Romdhani, in which Plaintiff Romdhani achieved a satisfactory rating with a score of 71. (D.I. 82 at A66) Although Plaintiff Romdhani had made some improvements, Mr. Arnold noted that he was still not completing required paperwork, including time sheets, and still not counting cigarettes, lottery tickets, and safe contents.

Based on his 2005 performance, Plaintiff Romdhani was ranked 13%, among the bottom 20% of ExxonMobil Station Managers, according to ranking procedures used by ExxonMobil Territory Managers. (D.I. 82, Malave Decl., at A68-70) Due to a nationwide change in ExxonMobil policy, the bottom 20% of Station Managers was ineligible for a raise. Prior to this change, only the bottom 10% of Station Managers was ineligible for a raise. (D.I. 82, Bryant Decl. at A74)

In 2006, Plaintiff Romdhani was evaluated twice, once by Mr. Oshetsky and once by Mr.

_____

[2]Exxon utilizes a four category rating system with the following designations: (1) good (above 84 points); (2) satisfactory (60-84 points); (3) unsatisfactory (40-59 points); and (4) unacceptable (below 40 points). The average score of a Station Manger ranges between 75 and 83 points. (D.I. 82, Oshetsky Decl. at A432)

Arnold. In his February 2006 assessment by Mr. Oshetsky, Plaintiff Romdhani received a satisfactory ranking with a score of 77 points. (D.I. 82 at A76-A77) Mr. Oshetsky again noted, however, that Plaintiff Romdhani was not following all of ExxonMobil's procedures, particularly with respect to completing required paperwork and reconciling cash cards. In March 2006, Mr. Arnold also gave Plaintiff Romdhani a satisfactory evaluation, this time with a score of 65 points. In this evaluation, Mr. Arnold noted numerous deficiencies regarding such tasks as completion of required paperwork and cigarette counting. (D.I. 82 at A78)

During his tenure as Station Manager, Plaintiff Romdhani worked part-time in other positions at Genesco (Johnston & Murphy), a shoe retail store; BCI International, a fur coat retail store; and Dominos Pizza. (D.I. 82, Romdhani Dep. at A10-14) Pursuant to ExxonMobil policy, as set forth in a training slide show, a part-time job is considered a conflict of interest, so employees are instructed to notify their Territory Managers of part-time employment. (D.I.82 at A108) It is not disputed that Plaintiff Romdhani failed to inform Mr. Arnold or any other ExxonMobil supervisor about his part-time employment. However, Plaintiff Romdhani contends that ExxonMobil never informed him of a policy prohibiting part-time work in his free time or required him to follow any particular procedures before doing so – and his testimony in this regard is corroborated by another Station Manager in his region. (D.I. 91, Musharraf Dep. at B155-157; Romdhani Decl. at B18-19) Mr. Romdhani maintains that his only understanding of ExxonMobil policy was that "employees were free to take outside jobs as long as the jobs posed no conflict of interest such as working at a competing gas station." (D.I. 91, Romdhani Decl. at B18-19) With this understanding, Plaintiff Romdhani did not believe his part-time employment posed a conflict with his job as Station Manager. (D.I. 91, Romdhani Decl. at B19)

4

With respect to a Station Manager's hours on the job, ExxonMobil's corporate representative explained that Station Managers are expected to work 80 hours within a two-week period. There is no set policy as to how the 80 hours are achieved, meaning, for example, that a person could work 35 hours one week and 45 hours the next week, so long as a total of 80 hours is reached in two weeks. (D.I. 91, Kiliddjian Dep. at B162-164) As Mr. Kiliddjian explained on behalf of ExxonMobil, "We do not have a set hour for starting or a set hour for finishing the day, but it's somewhat expected that [a store manager] would be there during core business hours." (D.I. 91, Kiliddjian Dep. at B162-164) He went on to confirm, however, that there is no policy requiring a store manager to work until 3 or 4 or 5 o'clock in the evening. (D.I. 91, Kiliddjian Dep. at B164) Plaintiff Romdhani maintains that his part-time jobs did not preclude him from putting in the required 80 hours of work. (D.I. 91, Romdhani Decl. at B19) Logs from at least one of Plaintiff Romdhani's part-time employers show that he worked at the part-time job during what ExxonMobil contends would be considered "core" hours, meaning prior to 5:00 pm on weekdays. (D.I. 82 at A122-125)

Plaintiff Romdhani maintains that throughout his employment, and despite receiving satisfactory ratings from Mr. Arnold, he was discriminated against by Mr. Arnold based upon Plaintiff Romdhani's religion and national origin. As a Territory Manager, Mr. Arnold was not present at the Station on a daily basis, and in the three months prior to the time Romdhani quit, Mr. Arnold was only present at the Station six times. (D.I. 82, Mileage Records at A237-239) Nevertheless, Plaintiff Romdhani maintains that Mr. Arnold engaged in the following acts of discrimination and/or harassment:

- Mr. Arnold lied to investigators during an investigation into missing cigarette inventory, to shift the blame to Plaintiff Romdhani, who was on vacation at the time, and away from Corey Harden, who was supervising the Station in Plaintiff Romdhani's absence. (D.I. 91, Romdhani Decl. at B6-7; D.I. 92, Correspondence Regarding Security Cameras and Requests for Service, 2005 at B191-208)

- Mr. Arnold pressured an employee, Theresa Pierce, to implicate Plaintiff Romdhani in an illegal cigarette swap with another store, again while Plaintiff Romdhani was away on vacation. Plaintiff Romdhani reported Mr. Arnold's actions to Mr. Kiliddjian, but ExxonMobil failed to report or investigate the matter. (D.I. 91, Pierce Decl. at 74-75; Romdhani Dep. at B88-89)

- Mr. Arnold humiliated Plaintiff Romdhani in front of Station Managers by criticizing his performance and making him look unprepared by showing up unannounced. (D.I. 91, Romdhani Decl. at B10-11; Griscom Dep. at B138; Maloney Decl. at B30)

- Mr. Arnold refused to back up Plaintiff Romdhani in the decision to terminate Charisma Muwwakkil, which undermined Plaintiff Romdhani's ability to manage his employees. In contrast, Mr. Arnold supported non-Arab managers on employee management issues. (D.I. 91, Romdhani Decl. at B13-14, 16, 19; Griscom Dep. at B139-140; Pierce Decl. at B73-74; Maloney Decl. at B28-32; Zeller Decl. at B50-51; B57-59; Rash Dep. at B127)

- Mr. Arnold pressured Ms. Muwwakkil to report Plaintiff Romdhani to ExxonMobil's Human Resources Department for discrimination against Ms. Muwwakkil, who is African-American. (D.I. 91, Romdhani Decl. at B14; D.I. 92, Employee Declarations Supporting Romdhani's DDOL Complaint at B217-218)

- Mr. Arnold demanded that Plaintiff Romdhani work seven days per week without requiring that of non-Muslim managers. (D.I. 91, Romdhani Dep. at B90-91; Romdhani Decl. at B14-16; Musharraf Dep. at B158-159; Maloney Decl. at B24)

- Mr. Arnold failed to take action concerning reports of anti-Muslim and anti-Arab harassment by other subordinate employees. (D.I. 91, Romdhani Decl. at B17; Maloney Decl. at B29)

- Mr. Arnold maintained an openly hostile attitude towards Plaintiff Romdhani, including mocking his Arab accent on at least one occasion. (D.I. 91, Romdhani Decl. at B17-20; Maloney Decl. at B30; Zeller Decl. at B54; Griscom Dep. at B143; Rash Dep. at B114-116, 128; Pierce Decl. at B72-73, B75; D.I. 92, Employee Declarations Supporting Romdhani's DDOL Complaint at B212-B228)

On August 4, 2006, Plaintiff Romdhani was offered a position by The Pepsi Bottling Group ("Pepsi") at a salary more than $10,000 higher than his base salary (before bonuses) at ExxonMobil. (D.I. 82, Letter from Matt Bates to Sofiene Romdhani at A126; Kiliddjian Decl. at A7) Plaintiff Romdhani initially accepted this offer on August 7, 2006, without informing ExxonMobil; subsequently, he sought permission to work both jobs. (D.I. 82, Acknowledgment of Terms of Employment at A127) ExxonMobil denied Plaintiff Romdhani's request. On September 21, 2006, Plaintiff Romdhani negotiated his start date with Pepsi and quit his job at ExxonMobil without notice. (D.I. 82, Casto Dep. at A129-130) Plaintiff Romdhani maintains that on that day he again had difficulties with Ms. Muwwakkil, and that Mr. Arnold refused to discipline her and mocked Plaintiff Romdhani's Arab accent when Plaintiff Romdhani threatened to complain to the DDOL about Mr. Arnold's alleged discrimination. (D.I. 91, Romdhani Decl. at B19-21) According to Plaintiff Romdhani, he felt compelled to quit his job on September 21 because his working conditions had become intolerable. (D.I. 91, Romdhani Decl. at B20) However, it is also undisputed that, as of the same date, Pepsi knew Plaintiff Romdhani would be starting on October 10 and that Plaintiff's paperwork and background tests had been completed. (D.I. 82 Castro Dep. at A129-130)

## B.    Michelle Maloney

Plaintiff Michelle Maloney is a Caucasian woman who was hired as a cashier by Station

Operators in March 2005. (D.I. 91, Maloney Decl. at B23) A year after her employment began, Plaintiff Maloney converted to Islam. At this time, Plaintiff Maloney began to wear the traditional Muslim headscarf known as the hijab. (D.I. 91, Maloney Decl. at B26) Plaintiff Maloney contends that Mr. Arnold had always maintained a friendly attitude toward her but that, when she converted to Islam, his attitude changed. (D.I. 91, Maloney Decl. at B26-27; Zeller Decl. at B52-53) According to Plaintiff Maloney, Mr. Arnold became openly hostile towards her. In addition, Plaintiff Maloney contends that she was harassed by Plaintiff Romdhani's replacement, Corey Harden.

In particular, Plaintiff Maloney maintains that she endured the following harassment:

- Mr. Arnold frequently interrogated her in a mocking tone of voice as to why she "switched up" religions and "jumped the fence" from Christianity to Islam. (D.I. 91, Maloney Decl. at B27; Zeller Decl. at B52-53; Hsi Decl. at B78)

- Mr. Arnold and others at Exxon refused to investigate anti-Muslim graffiti and comments made by other employees at the Station. (D.I. 91, Maloney Decl. at B29; D.I. 92, Complaint by Nine Muslim/Arab Employees Regarding Religious and Racial Harassment at B211)

- Mr. Harden refused to prevent or stop subordinate employees' daily use of racial epithets when referencing Muslims, such as "Ali Baba," "towelheads," and "ragheads." These remarks were made by Mr. Coleman and Mr. Treece, two assistant Managers at the Station. (D.I. 91, Rash Dep. at B117-121; Maloney Decl. at B37)

- Mr. Arnold made threatening remarks to her that demonstrated discriminatory animus towards her faith. According to Plaintiff Maloney, Mr. Arnold stated that "[a]t the end, it'll be just me and Corey [Harden] standing." He further told Plaintiff Maloney: "Ninety percent of the station is of Sofiene's kind and you've jumped to Sofiene's team." He suggested that he would "clean house of the people of Sofiene's kind" and vowed to "get each and every one of you out of here." Plaintiff Maloney maintains that at

8

least some of these comments were made in the context of discussing accommodations to her religion or complaints concerning harassment, and, therefore, Plaintiff Maloney understood these comments to be directed at her Muslim faith and indicative of Arnold's desire to terminate the employment of all Muslims. (D.I. 91, Maloney Decl. at B31-35; Maloney Dep. at B95-97; Hsi Decl. at B80)

- Mr. Harden instructed her, without instructing non-Muslims, to "clean the toilets" and "scrub the walls" in the men's bathroom, but then would mockingly withdraw the request saying, "That's right, you can't do that, you're Muslim." Mr. Harden made these comments to Plaintiff Maloney, despite the fact that ExxonMobil engaged a third-party vendor to perform these tasks. (D.I. 91, Maloney Decl. at B36; Kiliddjian Dep. at B165-167)

- Mr. Harden refused to allow her to work the day after she left work after vomiting. (D.I. 91, Maloney Decl. at B31-33)

- Mr. Arnold and Mr. Harden retaliated against her for speaking to DDOL investigators about Romdhani's complaint, including by confronting her in her tiny booth causing her to feel frightened and physically threatened. (D.I. 91, Maloney Decl. at B39-42)

- Mr. Harden refused to fill out benefits paperwork for her and refused to submit workers-compensation paperwork for an injury she suffered on the job. (D.I. 91, Maloney Decl. at B43, 46; Hsi Decl. at B80-81; B237; Griscom Dep. at B149-150)

- Mr. Harden falsely accused her of stealing cigarettes. (D.I. 91, Maloney Decl. at B44-46)

Plaintiff Maloney found the aforementioned conduct to be offensive, humiliating, and embarrassing. Because she felt that her work conditions had become intolerable, Plaintiff Maloney quit her job on August 4, 2007, without having found another one. (D.I. 91, Maloney Decl. at B45-46; Zeller Decl. at B69; Hsi Decl. at B80)

It is undisputed that Plaintiff Maloney frequently violated ExxonMobil policy[3] by reporting to work late. In the period from mid-October 2006 through May 30, 2007, Plaintiff Maloney was late 66 times, including 19 times by 15 minutes or more. (D.I. 82, Keelty Decl. at A438) However, Plaintiff Maloney was never suspended or terminated by ExxonMobil for her tardiness.

## C.     Bobbi Joe Zeller

Plaintiff Bobbi Joe Zeller is a Caucasian woman who was also hired as a cashier by Station Operators in March 2005. Plaintiff Zeller also converted to Islam in early 2006, and began to wear the hijab. (D.I. 91, Zeller Decl. at B49) According to Plaintiff Zeller, she suffered harassment from both Mr. Arnold and Mr. Harden, the Station Manager who replaced Plaintiff Romdhani. Plaintiff Zeller repeats many of the allegations made by Plaintiff Maloney, and also adds the following additional incidents of alleged harassment:

- The first time Mr. Arnold saw her wearing the hijab, he mockingly stated, "I see that we have more of Sofiene's kind in here!" (D.I. 91, Zeller Decl. at B52)

- Mr. Harden switched her work schedule so that she was required to work on Fridays, such that she could not attend prayer services, despite her request for Fridays off for this purpose. (D.I. 91, Zeller Decl. at B54-55)

- Mr. Harden refused to correct an error in her paycheck, and when Plaintiff Zeller reported this to Mr. Arnold he stated, "I don't care how many complaints you make to the Labor Board, Human

---

[3]ExxonMobil maintained a Progressive Discipline Policy. With respect to lateness and absenteeism, the policy requires (1) a verbal warning for the first offense of being late fifteen minutes or more; (2) written warning for the second offense; (3) suspension for the third offense; and (4) termination for the fourth offense. A no call/no show is subject to immediate suspension for the first offense and termination for a second. (D.I. 82, ExxonMobil HR Discipline Guidelines at A132; Sprague Decl. at A424-425)

Resources, Equal Opportunity Board or anywhere else, [Harden] is not going anywhere, I will bet my job on it. The only people going anywhere are the people of Sofiene's kind." He further added, "Get used to it, your old boss is gone and definitely not coming back, and Sofiene's kind of people will be gone soon as well." Plaintiff Zeller understood Arnold's comments to be referencing Muslims and Arabs. (D.I. 91, Zeller Decl. at 58-59)

• Plaintiff Zeller became ill at work, and Mr. Harden denied her permission to leave, even though he knew she was seriously ill. Mr. Harden finally relented, but because of the delay, Plaintiff Zeller needed to be rushed to the hospital, where she was diagnosed with severe dehydration. (D.I. 91, Zeller Decl. at B59-60)

• After Plaintiff Zeller's report of discrimination to the DDOL, Mr. Arnold and Mr. Harden became more hostile to Plaintiff Zeller, cornering her in her cashier booth in an intimidating manner and threatening her with remarks to the effect that she was only going to make it harder for herself with her complaints. (D.I. 91, Zeller Decl. at B63-65; Zeller Dep. at B106)

• Mr. Harden assigned her unnecessary tasks and required her to redo them multiple times. (D.I. 91, Zeller Decl. at B64)

• Plaintiff Zeller observed managers, including Mr. Harden, viewing pornographic materials with nude pictures. She complained to both Mr. Harden and her Assistant Manager, Mr. Griscom, who laughed at her and ignored her complaints. (D.I. 91, Zeller Decl. at B66-68; Zeller Dep. at B100-103, 107-108, 110; Griscom Dep. at B144-148; Rash Dep. at B134-135; Zeroulale Decl. at B86)

It is also undisputed that Plaintiff Zeller was suspended for three days on January 30, 2007, because she failed a tobacco sting.[4] (D.I. 82, Discipline Reports at A143-144) Following her suspension, Zeller had three "no call/no shows." It appears, however, that Zeller was given a

---

[4]Under ExxonMobil's progressive discipline policy, an employee who fails an alcohol or tobacco sting (failure to check ID during the sale of regulated products to an ExxonMobil agent) is subject to suspension for the first offense and termination for the second.

written warning only for the last of these three, which occurred on April 9. (D.I. 82, Work Schedule at A430; Discipline Reports at A142; Keelty Decl. at 438-439) The written warning was signed by Mr. Treece, who is alleged to have frequently referred to Muslim employees using the anti-Muslim ethnic slurs "towelheads," "ragheads," and "Ali Baba." (D.I. 91, Rash Dep. at B117-119; Maloney Decl. at B37)

Like Plaintiff Maloney, it is also undisputed that Plaintiff Zeller was frequently late for work. From mid-October 2006 through May 30, 2007, Plaintiff Zeller reported to work late 55 times, 11 of which involved being late more than fifteen minutes. (D.I. 82, Keelty Decl. at A438) After her suspension, Plaintiff Zeller was late 20 times, and two of the 20 incidents involved lateness by more than 15 minutes. Despite this frequent pattern of tardiness, Plaintiff Zeller was not terminated until May 21, 2007. On that day, Plaintiff Zeller was more than fifteen minutes late for work. Also on that same day, Plaintiff Zeller observed pornography in the workplace, and she and her fiancé, Mr. Boukra, complained to Mr. Harden about the pornography. (D.I. 91, Zeller Decl. at B67-68; Zeller Dep. at B102-103; B108-109) According to Plaintiff Zeller, it was only a few minutes after she and her fiancé complained that Mr. Harden instructed Plaintiff Zeller to report to him before she left for the day. When she did so, Mr. Harden told Plaintiff Zeller that she was terminated, effective immediately, for "[her] behavior and [her] tardiness." (D.I. 91, Zeller Decl. at B102-103, 107-108)

ExxonMobil does not dispute that no employee at the Station had ever been fired for tardiness over the previous five years. (D.I. 91, Sprague Dep. at B174; ExxonMobil Suspension Records at the Station at B238-239) However, it is also undisputed that no other employee at the Station had been previously suspended in the same manner as Plaintiff Zeller.

12

## LEGAL STANDARDS

### I.    Summary Judgment

A grant of summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U .S. 574, 586 n.10 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e) (emphasis in original)). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Service,* 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50

(internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## II.    Framework for Evaluating Discrimination Claims

Consistent with the standard of review under Fed. R. Civ. P. 56, the Court's role in evaluating a motion for summary judgment in a discrimination case is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987). Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, prohibits an employer from discriminating against any individual on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(l). A plaintiff may prove discrimination under Title VII in two ways: (1) by direct evidence as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-46 (1989), or (2) by indirect evidence through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The standards are the same for claims brought under Section 1981. *See Rosario v. Ken-Crest Services*, 189 Fed. Appx. 79, 82 (3d Cir. 2006).

Direct evidence of discrimination is evidence which, if believed, would prove the existence of the fact in issue without any inference or presumption. *See Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994). Direct evidence may also be described as overt or explicit evidence which directly reflects a discriminatory bias. *See Armbruster v. Unisys Corp.*, 32 F.3d 768, 778

14

(3d Cir. 1994) *abrogated on other grounds by Showalter v. University of Pittsburgh Medical Ctr.*, 190 F.3d 231 (3d Cir. 1999). Stated another way, direct evidence of discrimination is evidence that demonstrates that "decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 248 (3d Cir. 2002). Courts have made clear that only the most blatant remarks, whose intent could be nothing other than to discriminate, are considered sufficient to constitute direct evidence of discrimination. *See Taylor v. Procter & Gamble Dover Wipes*, 184 F. Supp. 2d 402, 413 (D. Del. 2002). If a plaintiff puts forth direct evidence of discrimination, the causation burden shifts to the defendant to prove that it would have taken the same employment action even if it had not considered an impermissible factor. *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 338-39 (3d Cir. 2002).

With respect to indirect evidence under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination by showing that: (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the circumstances of the adverse employment action give rise to an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected class is treated differently. *See* 411 U.S. at 802; *see also Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant, who must "articulate some legitimate, nondiscriminatory reason" for its treatment of the plaintiff. *McDonnell Douglas*, 411 U.S. at 802; *see also Fuentes*, 32 F.3d at 763. If the defendant produces a sufficient reason for its actions, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer's rationale is pretextual. *See McDonnell Douglas*, 411 U.S. at 804; *see also*

*Fuentes*, 32 F.3d at 763.

It bears emphasis that "throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes*, 32 F.3d at 763. Therefore, once the defendant has articulated a nondiscriminatory reason for its actions, the plaintiff must point to some evidence, direct or circumstantial, that the defendant's proffered reasons are merely a pretext for discrimination. *See id.* at 763-64. That is, the plaintiff must point to some evidence from which the "factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). Thus, to make a sufficient showing of pretext, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reason that "a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765 (internal quotation marks and citations omitted).

## DISCUSSION

### I.    Hostile Work Environment and Constructive Discharge

A prima facie case of discrimination based on a hostile work environment requires a plaintiff to demonstrate that (1) he or she suffered intentional discrimination on the basis of membership in a protected group;[5] (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally

---

[5]Courts have also permitted discrimination claims to be based upon a "close relationship" with a person who is a member of a protected class. *Swick v. United Parcel Service*, 2005 WL 1793723, *6 (D.N.J. Jul. 26, 2005); *see also Stezzi v. Aramark Sports*, 2009 WL 2356866, at *4 (E.D. Pa. July 30, 2009) (collecting cases).

affect a reasonable person of the same race, gender, religion, or national origin in the same position; and (5) the existence of respondeat superior liability. *See Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006). In analyzing a hostile work environment claim, the Court must consider "the totality of the circumstances." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990). Such circumstances include the "frequency of the allegedly discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance." *Shramban v. Aetna*, 2004 WL 4184841, at *23 (3d Cir. 2004) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). In evaluating these circumstances, the plaintiff must prove that he or she was subjected to conduct that was so objectively offensive as to "alter the conditions of her employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Casual, isolated, or sporadic comments or incidents are insufficient to demonstrate a hostile work environment. *See Andrews*, 895 F.2d at 1482; *Brooks v. CBS Radio*, 2008 WL 5262988 (3d Cir. Aug. 14, 2008) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."). Rather, the plaintiff must show that he or she was subjected to continuous and repeated acts of harassment. *See Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir. 1990); *Harris v. SmithKline Beecham*, 27 F. Supp. 2d 569, 578 (E.D. Pa. 1998).

In the case of constructive discharge based upon a hostile work environment, the plaintiff is required to present more than a prima facie case of hostile environment. Rather, he or she must present evidence from which the finder of fact can conclude that the "working conditions were so

intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 131 (2004). "'Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233 n.7 (3d Cir. 2006) (quoting *Suders*, 542 U.S. at 141). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Id.*

Applying these principles to the circumstances presented in this case, the Court concludes that Plaintiffs have offered sufficient evidence of a hostile work environment so as to withstand summary judgment, notwithstanding the competing evidence presented by ExxonMobil. The Court further concludes, with respect to Plaintiffs Maloney and Romdhani, that sufficient evidence has been offered demonstrating that the work environment at the Station was so intolerable that a reasonable person would have felt compelled to resign, as required to maintain a claim for constructive discharge.

### A. Plaintiffs Maloney and Zeller

Plaintiffs Maloney and Zeller are members of a protected class by virtue of their adherence to the Muslim faith and their association with Arab and Muslim employees. *See, e.g., Pourkay v. City of Philadelphia*, 2009 WL 1795814, at *8 (E.D. Pa. 2009); *Swick*, 2005 WL 1793723, at *6.[6] Plaintiffs Maloney and Zeller have offered evidence demonstrating that they suffered severe, regular, and pervasive intentional discrimination based upon their conversion to Islam and that such discrimination detrimentally affected them, and would likewise have so affected reasonable

---

[6]This is not disputed by ExxonMobile. (D.I. 81 at 18)

persons of the same faith.

Among other things, Plaintiffs Maloney and Zeller have put forth evidence demonstrating that they were subjected to repeated threats of termination and retaliation from their supervisors, Mr. Arnold and Mr. Harden, based upon their Muslim faith and their affiliation with Plaintiff Romdhani and other Muslims. For example, Plaintiffs Maloney and Zeller maintain in their affidavits and depositions that Mr. Arnold told them that the "people of Sofiene's kind" would be "gone soon," and that he and Mr. Harden were going to "clean house of the people of Sofiene's kind." (D.I. 91 (Zeller Decl.) at B58-59) Plaintiffs Maloney and Zeller understood these comments, in light of their context, to refer to their own potential termination due to their Muslim faith – and that understanding, in the circumstances here, was not unreasonable. *See generally Aman*, 85 F.3d 1074, 1082-1084 (holding that use of "code words" like "all of you" in statement by supervisor that "we're going to have to come up there and get rid of all of you" can violate Title VII when used in context and tone that carries discriminatory motivations and implications). Plaintiffs Maloney and Zeller also maintain that Mr. Harden repeatedly instructed them, and not other non-Muslim employees, to "clean the toilets" and "scrub the walls," thereafter withdrawing these instructions in a mocking tone by saying, "Oh, that's right, you can't do that, you're Muslim." (D.I. 91 (Zeller Decl.) at B56; (Zeller Dep.) at B111-112; (Maloney Decl.) at B36) In addition, Plaintiffs Maloney and Zeller maintain that Assistant Managers at the Station, who had supervisory authority over them, on a daily basis used derogatory anti-Muslim and anti-Arab comments such as "Ali Baba," "towelheads," and "ragheads" to refer to Muslims. (D.I. 91 (Rash Dep.) at B117-121; (Maloney Decl.) at B37)

Although the identified managers and assistant managers deny the comments attributed to

19

them by Plaintiffs Maloney and Zeller, the Court concludes that the record is sufficient to withstand summary judgment. As set forth in the Court's recitation of the factual background of this case, Plaintiffs Maloney and Zeller have portrayed an environment at the Station that was rampant with anti-Muslim and anti-Arab sentiment that extended beyond occasional and inactionable workplace banter. The evidence adduced by Plaintiffs Maloney and Zeller includes not just subtle "code words" but also explicitly derogatory and discriminatory comments by supervisory employees, as well as overt actions taken against them by supervisors, which arguably demonstrate discriminatory motivations and intentions. Plaintiffs Maloney and Zeller have further adduced evidence demonstrating that the discriminatory sentiment at the Station permeated upper levels of management, and that Plaintiffs Maloney and Zeller, as well as other workers, lodged complaints with their supervisors and with ExxonMobil's Human Resources Department, but that inadequate action was taken to respond to their concerns.

ExxonMobil denies the facts alleged by Plaintiffs Maloney and Zeller, including allegations that ExxonMobil ignored complaints from employees about a discriminatory work environment. However, the Court may not make credibility determinations on a motion for summary judgment. In the Court's view, the evidence offered by Plaintiffs and the discrepancies raised in response to it by ExxonMobil are significant enough to require resolution by the jury. In particular, the Court concludes that genuine issues of material fact exist concerning whether the discriminatory comments and actions were made or taken; whether these comments and actions were directed at Plaintiffs because of their religious beliefs; and, if the comments were made and the actions were taken, whether they were brought to the attention of appropriate personnel at ExxonMobil.

At the hearing, ExxonMobil maintained that remarks regarding "Sofiene's kind" could not automatically be assumed to be references to Muslims and should be construed by the Court as referring to the people Sofiene hired, i.e. his "team" of employees. (Tr. 11/22/2010 at 57-58) However, the Court cannot as a matter of law conclude that ExxonMobil's interpretation of these comments is the correct interpretation, particularly given the context of the anti-Muslim behavior and climate at the Station, as presented by Plaintiffs and their witnesses in their affidavits. Similarly, the Court cannot make any conclusions as a matter of law regarding the allegedly mocking tone of other hostile comments directed at Plaintiffs.

Further, the Court concludes that if the facts alleged by Plaintiffs Maloney and Zeller are borne out at trial, a sufficient basis exists to impose respondeat superior liability on ExxonMobil. Plaintiffs Maloney and Zeller have offered evidence that ExxonMobil knew or should have known about the harassment at the Station, but failed to take prompt remedial action. *See Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) (recognizing that employer may be liable for negligently failing to take remedial action if employer knew or should have known about harassment). Accordingly, the Court will deny ExxonMobil's Motion For Summary Judgment as it pertains to the hostile work environment claims asserted by Plaintiffs Maloney and Zeller and the constructive discharge claim asserted by Plaintiff Maloney.

## B. Plaintiff Romdhani

Although the factual allegations differ slightly in the case of Plaintiff Romdhani, the Court likewise concludes that there is sufficient evidence in the record to demonstrate that Plaintiff Romdhani was subjected to a hostile work environment. As a Muslim and a native of Tunisia, Plaintiff Romdhani is also a member of a protected class. *See, e.g., Pourkay*, 2009 WL 1795814,

at *8.  Against the backdrop of an openly anti-Muslim and anti-Arab environment, as alleged by

Plaintiffs Maloney and Zeller and discussed above, Plaintiff Romdhani maintains that his

supervisor, Mr. Arnold, repeatedly undermined his managerial authority and set him up for false

complaints, investigations, and placement on a Performance Plan.  Based on the affidavit of

Plaintiff Romdhani, as well as the affidavits of Plaintiff Maloney, Plaintiff Zeller, and other

employees at the Station, the Court concludes that Plaintiff Romdhani has adduced sufficient

evidence to substantiate his allegations, for purposes of withstanding summary judgment, that he

was subjected to a hostile work environment and that the environment was sufficiently

overbearing so as to compel a reasonable person to resign.

### C.    Summary

In sum, the Court concludes that Plaintiffs have presented sufficient evidence to withstand

summary judgment of a work environment at the Station that was openly hostile to Muslims and

Arabs.  Genuine issues of material fact emerge from the record, concerning the credibility of key

witnesses, the pervasiveness and severity of the alleged hostility, and whether the evidence, if

accepted as true by a jury, could so detrimentally affect a reasonable person as to compel a

reasonable person to resign.  Accordingly, the Court will deny ExxonMobil's Motion as it pertains

to the claims of hostile work environment asserted by Plaintiffs Romdhani, Maloney, and Zeller,

and the related claims of constructive discharge asserted by Plaintiffs Romdhani and Maloney.

## II.    Plaintiffs' Claims Of Discrimination Based On Race, Religion, And National Origin

Generally, to establish a prima facie case of race, national origin, or religious

discrimination under Title VII, a plaintiff must demonstrate that: (1) he/she is a member of a

protected class or bears a close relationship with a member of a protected class; (2) he/she is

qualified for the former position; (3) he/she suffered an adverse employment action despite being

qualified; and (4) the action occurred under circumstances giving rise to an inference of unlawful

discrimination, such as when non-members of the protected class are treated more favorably than

the plaintiff. However, the Third Circuit has "repeatedly emphasized that the requirements of the

prima facie case are flexible" and must be tailored to fit the specific context in which it is to be

applied. *See Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797-98 (3d Cir. 2003) (per

curiam); *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 357 (3d Cir. 1999). Whether a

plaintiff has met his or her burden of establishing a prima facie case of discrimination is a

question of law to be determined by the Court in light of the facts and circumstances of each case.

The burden of establishing a prima facie case "is not intended to be onerous." *Sempier v. Johnson*

*& Higgins*, 45 F.3d 724, 728 (3d Cir.1995).

Applying these legal principles to the facts and circumstances of this case, the Court

concludes that Plaintiffs have established a prima facie case of racial discrimination. Plaintiffs are

members of a protected class and/or associate with members of a protected class. Plaintiffs

suffered adverse employment actions in the form of actual discharge in the case of Plaintiff Zeller

and constructive discharge in the case of Plaintiffs Maloney and Romdhani. *See Embrico v. U.S.*

*Steel Corp.*, 245 Fed. Appx. 184, 187 (3d Cir. 2007) (recognizing that cognizable claim of

constructive discharge can constitute adverse employment action); *Duffy v. Paper Magic Group,*

*Inc.*, 265 F.3d 163, 167 (3d Cir. 2001) (same). Plaintiffs have further advanced evidence that

these employment decisions were made under circumstances giving rise to an inference of

unlawful discrimination, including the evidence discussed above demonstrating an openly hostile

work environment against Arab and Muslim employees, intentional discrimination on the part of

23

employees in a supervisory position – including Mr. Arnold, Mr. Harden, and numerous assistant managers – and the uneven application of the Progressive Discipline Policy maintained by ExxonMobil.

Exxon Mobil contends that Plaintiff Romdhani cannot satisfy the qualified prong of the prima facie case as it pertains to his claim that he was denied a raise based on discriminatory reasons, because his performance evaluations ranked him in the bottom 20% of managers, who by company policy were not entitled to a raise. Similarly, ExxonMobil contends that Plaintiff Zeller was not qualified for her position because she was properly terminated.[7] In the Court's view, ExxonMobil's arguments are more appropriately directed to the issue of whether legitimate business reasons existed for its employment decisions, than to whether the Plaintiffs were qualified in the first instance for their positions. Accordingly, the Court concludes that Plaintiffs have established a prima facie case of intentional and unlawful discrimination.

Having established a prima facie case of discrimination, the burden of production shifts to ExxonMobil to demonstrate that it had a legitimate nondiscriminatory reason for the adverse employment actions taken against Plaintiffs. Once a legitimate nondiscriminatory reason is articulated, the burden shifts back to Plaintiffs to demonstrate by a preponderance of the evidence that the proffered reasons are a pretext for discrimination.

With respect to Plaintiff Maloney, the Court cannot discern, from either ExxonMobil's brief or its argument before the Court, any legitimate nondiscriminatory reason for ExxonMobil's actions. With respect to Plaintiff Romdhani, ExxonMobil maintains that it was justified in

---

[7]The Court notes that ExxonMobil does not otherwise challenge the qualifications of Plaintiff Romdhani to hold the position of Station Manager, or of Plaintiffs Zeller and Maloney to hold the position of cashier.

denying Plaintiff Romdhani a raise.[8]  With respect to Plaintiff Zeller, ExxonMobil contends that it

had grounds to terminate her employment because she had a tobacco sting violation followed by

several instances of lateness.

With respect to Plaintiff Romdhani, the Court concludes that Plaintiff Romdhani cannot

establish that ExxonMobil's decision vis-a-vis his raise was a pretext for discrimination.

Although Plaintiff Romdhani received several satisfactory evaluations, the scores of those

evaluations placed him in the lower 20% of employees who, by company policy, were not entitled

to a raise.  Plaintiff Romdhani suggests discrimination in his ranking process, but the record is

devoid of any evidence that discriminatory intent permeated the ranking procedures used by

ExxonMobil.  It is true, as ExxonMobil concedes, that the first step in the ranking process is

performed by the Territory Manager, in this case, Mr. Arnold.  Mr. Arnold gave Mr. Romdhani

one of his lowest rankings (D.I. 91 (Arnold Dep. at B180, B179)), and Mr. Arnold is alleged to

have engaged in various acts of discrimination against Plaintiff Romdhani.  Although Romdhani

alleges discrimination by Mr. Arnold, there is no evidence that Mr. Arnold was solely or even

largely responsible for the denial of Plaintiff Romdhani's pay raise.  In addition, while Plaintiff

Romdhani maintains that Mr. Arnold treated him unfairly, he does not take issue with the

satisfactory evaluation scores he received on his evaluations, nor does he dispute the areas in

which he was faulted that lowered his overall satisfactory score.  Accordingly, the Court will grant

summary judgment in favor of ExxonMobil on Plaintiff Romdhani's claim that he was denied a

---

[8]To the extent ExxonMobil offers legitimate non-discriminatory reasons for other adverse employment actions taken against Mr. Romdhani, such as his placement on a Performance Action Plan, the Court concludes that genuine issues of material fact exist which could affect whether a reasonable jury believes ExxonMobil's proffered reasons.

pay raise as a result of unlawful discrimination.

As for Plaintiff Zeller, the Court concludes that Plaintiff Zeller has offered evidence demonstrating that ExxonMobil's asserted reason for firing her is a pretext for intentional discrimination. Plaintiff Zeller was purportedly terminated under the Progressive Discipline policy because she was late to work. However, Plaintiff Zeller had been late to work 54 times before, but on none of these occasions had she been disciplined. Moreover, ExxonMobil concedes that over the five years preceding Plaintiff Zeller's termination, no other employee at the Station had been terminated for lateness. In seeking to distinguish other Station employees, ExxonMobil points out that no other employee at the Station was suspended for a tobacco sting like Plaintiff Zeller; however, Plaintiff Zeller had been late to work by fifteen minutes or more three times after her tobacco sting suspension, yet she was not terminated.[9] Accordingly, at this juncture, the Court concludes that Plaintiff Zeller has presented sufficient evidence to establish that ExxonMobil's proffered justification for her termination was a pretext for discrimination.

In sum, the Court concludes that Plaintiffs have proffered sufficient evidence demonstrating the elements of a prima facie case of intentional discrimination based on race, religion, and national origin, and that genuine issues of material fact permeate Plaintiffs' claims, including the question of whether ExxonMobil's asserted business reason, in the case of Plaintiff Zeller's termination, should be disbelieved and considered a pretext for unlawful discrimination.

---

[9]There is a suggestion in the record that Ms. Muwwakkil had also been suspended and failed to report to work timely, yet she was not even disciplined for her infractions. ExxonMobil contends that Ms. Muwwakkil is not a valid comparator because her suspension was not official in that it lacked a suspension code; however, the absence of the suspension code has been offered by Plaintiff Romdhani as evidence of Mr. Arnold's alleged discriminatory attempts to undermine his managerial authority.

The only claim that the Court concludes cannot be maintained at this juncture is Plaintiff

Romdhani's claim that he was denied a pay raise as a result of intentional discrimination.

Accordingly, the Court will grant summary judgment in favor of ExxonMobil on Plaintiff

Romdhani's claim that he was denied a pay raise due to unlawful discrimination and deny the

Motion in all other respects.

## III.    Retaliation

A prima facie case of retaliation requires a plaintiff to proffer evidence demonstrating that

(1) he or she engaged in conduct protected by Title VII; (2) the employer took an adverse action

against him or her; and (3) there was a causal connection between the employee's participation in

the protected activity and the adverse employment action. *See Moore v. City of Philadelphia*, 461

F.3d 331, 340-41 (3d Cir.2006). To be actionable, the employment action taken against the

plaintiff must be "materially adverse," meaning the action "well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Burlington N. and*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations and quotation marks

omitted). A retaliation claim is controlled by the three-step burden shifting *McDonnell Douglas*

analysis, as outlined above. *See Moore*, 461 F.3d at 342. Thus, once the plaintiff presents a prima

facie case of retaliation, the burden of production shifts to the employer to demonstrate a

legitimate business reason for the actions taken. The plaintiff must then demonstrate that the

proffered reasons are a pretext for discrimination by showing "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for

its action that a reasonable factfinder *could* rationally find them unworthy or credence and hence

infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d

at 765.

Applying these legal principles to the facts and circumstances of this case, the Court concludes that Plaintiffs have established a prima facie case of retaliation. It is not disputed that Plaintiffs Maloney and Zeller filed discrimination complaints with the DDOL. Plaintiffs Maloney and Zeller also contend that they complained to ExxonMobil's HR Department about racial and religious discrimination at the Station, and Plaintiff Romdhani maintains that he lodged complaints with Mr. Arnold and ExxonMobil's HR department about anti-Muslim graffiti at the Station. In the case of Plaintiff Zeller, she also maintains that she complained to Mr. Harden, the Station Manager, and Mr. Griscom and Mr. Treece, both Assistant Managers, about a sexually hostile work environment, including the viewing of pornography by employees at the Station. ExxonMobil questions the veracity of these allegations. Both ExxonMobil's HR Department and Mr. Arnold deny receiving at least some of the complaints identified by Plaintiffs, and ExxonMobil contends that the content of the magazines observed by Plaintiff Zeller was not pornographic. In the Court's view, these denials give rise to material questions of fact inappropriate for resolution on summary judgment.

Following their complaints, Plaintiffs maintain that they were treated differently by Mr. Arnold and/or Mr. Harden, and that these differences in treatment rose to the level of constituting significant and material adverse employment actions. Specifically, Plaintiffs Maloney and Zeller maintain that Mr. Arnold and Mr. Harden both became more hostile towards them, and cornered them in their booths on an almost daily basis in order to intimidate and harass them. (D.I. 91 (Maloney Decl.) at B40; (Zeller Decl.) at B63-64) Plaintiff Maloney also maintains that Mr. Harden threatened to terminate her employment, repeatedly telling her "I'm gonna nail you one

28

way or another," and refused to process her workers' compensation claim. (D.I. 91 (Maloney Decl.) at B40) Plaintiff Maloney maintains that this type of severe and pervasive discriminatory hostility led to her constructive discharge. Similarly, Plaintiff Romdhani alleges an escalating campaign of antagonism from Mr. Arnold, including the continued undermining of his managerial authority, which ultimately led to his constructive discharge. Plaintiff Zeller maintains that Mr. Arnold threatened unspecified employment action against her and told her that her complaints would only make it harder for her in the workplace. (D.I. 91 (Zeller Decl.) at B63-65; (Zeller Dep.) at B106) In addition, Plaintiff Zeller maintains that she was terminated from her employment within hours of reporting complaints of sexual harassment to her supervisors. (D.I. 91 (Zeller Decl.) at B64) If Plaintiffs' testimony and evidence on these issues is believed by a jury, the actions allegedly taken by ExxonMobil can constitute materially adverse employment actions. *See, e.g., Burlington Northern*, 5548 U.S. at 73; *see also Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (recognizing "failure to process [plaintiff's] insurance forms" can be adverse employment action); *see also Angeloni v. Dociese of Scranton*, 135 Fed. Appx. 510, 513 (3d Cir. 2005) (holding that constructive discharge is "functional equivalent" of actual termination). To the extent ExxonMobil challenges Plaintiffs' testimony and evidence, these denials raise genuine issues of material fact that are inappropriate for summary resolution.

In addition, Plaintiffs have all advanced evidence that these adverse employment actions were taken in temporal proximity to their protected activity. Evidence that intervening harassment and antagonistic behavior followed protected activity could lead a reasonable jury to find a causal link between Plaintiffs' protected activity and the adverse employment actions taken by ExxonMobile. *See Bates v. Board of Educ. of Capital Sch. Dist.*, 2000 WL 376405, *4 (D.

29

Del. Mar. 31, 2000); *see also Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-921 (3d Cir. 1997); *Aman*, 85 F.3d at 1086. To the extent ExxonMobil identifies a legitimate business reason for its actions against Plaintiff Zeller, the Court concludes that, given the timing of Plaintiff Zeller's complaints and her termination, sufficient evidence exists (as discussed in the context of her discrimination claim) which, if true, could lead a reasonable jury to conclude that the proffered business reasons are nothing more than a pretext for discrimination. *See Kellerman v. UPMC St. Margaret*, 317 Fed. App'x 290, 292-293 (3d Cir. 2009) (reversing grant of summary judgment in favor of employer at pretext prong and holding that "[i]t is not for a court to decide the significance, if any, of the timing of [plaintiff's] termination").

Accordingly, the Court concludes that Plaintiffs have advanced sufficient evidence of retaliation to withstand summary judgment and genuine issues of material fact permeate Plaintiffs' evidence. Therefore, the Court will deny Plaintiffs' Motion For Summary Judgment as it pertains to Plaintiffs' retaliation claims.

## CONCLUSION

For the reasons discussed, the Court will grant ExxonMobil's Motion For Summary Judgment on Plaintiff Romdhani's claim that he was denied a salary increase as a result of unlawful discrimination and deny the Motion in all other respects. An appropriate Order will be entered.

30